UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────X

KELLY MACNEAL,                          :

                         Plaintiff,     :

                                        :

            -against-                   :

                                        :        COMPLAINT

THE STATE OF NEW YORK, THE              :
CITY OF NEW YORK, THE NEW YORK STATE    :
DIVISION OF HUMAN RIGHTS, THE NEW YORK  :
CITY POLICE DEPARTMENT, THE NEW YORK    :
CITY FIRE DEPARTMENT EMS, CHELSEA JOHN, :
GINA MARTINEZ,  ELENA PERLONGO, JOHN    :
HERRION, CANDACE TYNDALL, LT. CORDE,    :
P.O. CASTRO, P.O. ORELLANA,             :
P.O. QUINTUNA-GUAMAN,  JOHN DOE EMT 1   :
AND JOHN DOE EMT 2.                     :

                         Defendant(s), :
─────────────────────────────────────X

Plantiff, Kelly MacNeal, complaining of the Defendant(s), The State of New York and The City Of New

York and those agents and officers, named here in, employed by and/or acting in an official capacity for

The State of New York and The City of New York, alleges as follows:

**PRELIMINARY STATEMENT**

1.  Plaintiff, Kelly MacNeal, brings this action *pro se.*

2.  Plaintiff brings this complaint with notice to the court that it is related to active case 23-CV-
    05890, by way of the common Defendant, the City of New York, and the fact that their more
    recent actions have duplicated, and added to, the original offenses claimed in the earlier
    complaint.  The two cases also share background facts, and it would appear the new Defendant,
    the State of New York, has duplicated the offenses of the City of New York, perhaps with
    intentionality for the sake of continuity or solidarity, regardless of how misguided.

3.  Plaintiff brings this action against The State of New York for its municipal liability in (i) The New
    York State Division of Human Rights ("DHR"), (ii) Chelsea John, in her official capacity as
    Director, DHR Housing Investigation Unit,  (iii) Elena Perlongo, in her official capacity as DHR
    Human Rights Specialist II, Housing Investigation Unit, (iv) Gina Martinez, in her official capacity

as DHR Deputy Commissioner, (v) Candace Tyndall in her official capacity as DHR Program Aide and (vi) John Herrion, in his official capacity as DHR Director of Disability Rights

4. Plaintiff also brings this action against The City of New York for its municipal liability in (i) The New York Police Department ("NYPD"), (ii) Lt. Corde in his capacity as an NYPD officer, (iii) P.O. Castro in his capacity of a NYPD officer, (iv) P.O. Orellana in his capacity of a NYPD officer, (v) P.O. Quintuna-Guaman in his capacity of a NYPD officer, (vi) The New York City Fire Department Bureau of Emergency Medical Services, (vii) John Doe EMT 1 in his capacity of an FDNY emergency medical technician, (viii) John Doe EMT 2 in his capacity of an FDNY emergency medical technician.

5. Plaintiff brings this action to remedy Defendants' unlawful conspiracy to deny Plaintiff her rights afforded by the Americans with Disabilities Act (ADA) and the Fair Housing Act (FHA). Defendants, as state actors, misrepresented the scope of the law and Plaintiff's rights, under color of law. Their failure to properly enforce the laws ultimately, denied Plaintiff equal protection under the law.

6. Failure to offer lawful protections caused the disabled Plaintiff to endure extreme physical pain for more than a year, by way of chronic, unbearable migraines, caused as the direct result of housing conditions from which Plaintiff sought protection and the impact of those conditions on Plaintiff's disability (namely a traumatic brain injury).

7. The severe migraines have become a daily, life altering and agonizingly debilitating situation, for which Plaintiff seeks both future rectification and past compensation.

8. Plaintiff, contends that there exists a discriminatory bias at DHR which prioritizes cases that are based on race, gender, sexual orientation and other "Diversity, Equity and Inclusion" discrimination issues to the detriment of those who are disabled… constituting a net result equivalent to discrimination against those with disabilities… and discrimination against those who are not in a minority race or sexual orientation group.

9. DHR showed a depraved indifference to Plaintiff's suffering and stated, in plain language, that

they did not care that Plaintiff was in physical pain or that she was disabled. They claimed that these circumstances would not influence whether her case would be given any priority or be expedited in any manner to alleviate her physical distress. It even appeared that Plaintiff's case was de-prioritized, as it took 3 months longer to conclude (395 days) than DHR's stated goal to resolve all cases within 300 days. Plaintiff maintains that the delays were motivated by unlawful discrimination.

10. DHR's depraved indifference to Plaintiff's physical suffering and their disinterest in her case, was evident through the entire process, up to and including DHR's final determination dismissing Plaintiff's complaint. From the beginning, DHR's contempt was evident when they "sat" on Plaintiff's complaint for more than a month, despite it having been handed off to them by the U.S. Department of Housing and Urban Development (HUD) with instructions to act within 30 days. DHR further "sat" on Plaintiff's landlord's response for three months, before contacting Plaintiff for a rebuttal. And after the rebuttal was submitted, DHR "sat" on the case for another six months before issuing a sloppy, legally flawed and nonsensical dismissal.

11. The slanted content, glaring omissions, and flawed legal position of DHR's dismissal so closely mirror the prior wrongful dismissal handed down by the New York City Commission on Human Rights (CCHR), that it appears DHR was blindly reinforcing the opinion of their reciprocal agency. Unfortunately, CCHR made it clear that their treatment of Plaintiff was rooted in racial discrimination, which led to the prior related suit being filed in this court.

12. CLNY Chapter 18 Article 15 Section 295 defines the general duties of DHR. Part 13 states, "To promote the creation of human rights agencies by counties, cities, villages…" and part 16 states, "To have concurrent jurisdiction with the New York City Commission on Human Rights over the administration and enforcement …" DHR's relationship to CCHR must surely make them aware of CCHR's activities and knowledgable of the anti-Caucasian pedagogy being promoted at CCHR. Therefore, DHR's alliance with CCHR in their deprivation of Plaintiff's rights to equal protection under ADA and FHA law, make DHR's motives equally as questionable as CCHR, even if not so

overtly and clumsily exposed.

13. Plaintiff brings this action to remedy DHR acting in a retaliatory manner toward the Plaintiff when she complained of delays. Such retaliation included falsely reporting Plaintiff to "authorities" as being suicidal and initiating an unlawful Police action.

14. Plaintiff brings this action to remedy DHR personnel causing, through false and misleading statements, the violation of Plaintiff's rights of due process with 1) unlawful detention and unlawful imprisonment, 2) unlawful entry into Plaintiff's home, in her absence, without a warrant, and 3)unlawful search of private property and papers.

15. Plaintiff brings this action to remedy NYPD's pattern of behavior in using the power of their office to harass and intimidate Plaintiff on numerous occasions, over a period of years. Such behavior has been done, under color of law, in furtherance of aiding and abetting Plaintiff's landlord in their attempts at intimidating and harassing Plaintiff.

16. This action is brought, with regard to Defendants New York City, NYPD and NYFD EMS, for their actions on May 2, 2023 and May3, 2023 when they, without sufficient cause, unlawfully removed Plaintiff from her residence, falsely detained and imprisoned her and violated Plaintiff's rights of due process.

17. This action is also brought, with regard to Defendants New York City, NYPD and NYFD EMS for exhibiting a pattern of behavior, where by, on more than one occasion, they have, without sufficient cause, unlawfully removed Plaintiff from her residence, falsely detained and imprisoned her and violated Plaintiff's rights of due process.

18. This action is brought to remedy NYPD's unlawful entry into Plaintiff's apartment in her absence and the unlawful search of her private papers and property without a warrant on May 2, 2023.

19. Plaintiff seek punitive and compensatory damages for physical and emotional pain and suffering sustained and endured due to Defendants' failure to enforce ADA and FHA laws and for Defendants conspiring to deny Plaintiff equal protection under the law.

20. Plaintiff seek punitive and compensatory damages for egregious violations of Plaintiff's civil and

disability right and the violation of her rights of due process.

21. Plaintiff further seeks punitive and compensatory damages for extreme emotional distress, causing terror and lasting emotional and psychological harm.

22.  Plaintiff further seeks punitive and compensatory damages for public embarrassment and damage to reputation.

## **PARTIES**

23. Plaintiff, Kelly MacNeal, resides at 507 W 28th Street,  in the state of NewYork, in the country of New York and is a citizen of the United States.

24. Plaintiff is a Caucasian female and has been classified as physically disabled by the Social Security Administration since April 2015.

25. Defendant is the City of New York, a municipal entity.

26. Defendant is the State of New York a municipal entity.

27. Defendant The New York Division of Human Rights ('DHR") is a legal entity and a subdivision of the State of New York.

28. Defendants Chelsea John, Elena Perlongo, Gina Martinez, Candace Tyndall and John Herrion are employees of DHR.

29. Defendants the New York Police Department and the New York City Fire Department Bureau of Emergency Medical Services are divisions of the City Of New York.

30. Defendants Lt. Corde, P.O. Castro. P.O. Orellana , P.O. Quintuna-Guaman , John Doe EMT 1 and John Doe EMT 2 are employees of the City of New York

## **JURISDICTION AND VENUE**

31.  Jurisdiction is proper in federal court under federal question jurisdiction

32.  Venue is proper in the Southern District of New York because the events leading to this

action took place in SDNY jurisdiction.

33.  This court has jurisdiction under the state law claims under supplemental jurisdiction.


## STATEMENT OF FACTS

### *Background leading to Plaintiff's interactions with Defendant DHR*

34.  Plaintiff resides in an "affordable unit" in a building subsidized by the New York State 421–

a tax abatement program, which promotes mixed income occupancy (apportioned 80%

market rate/20% affordable).

35.  Plaintiff's lease began on September 25, 2017.

36.  Plaintiff's apartment is overseen by Housing Preservation and Development (HPD) and is

designated as, not only an "affordable unit", but also specifically a "disability unit"; and, was

awarded to Plaintiff in a public lottery on the basis of her disability.

37. Plaintiff's landlord is fully aware of Plaintiff's disability status and the

"disability" status of the Plaintiff's specific apartment unit within the building.  The Plaintiff's

apartment unit includes wheelchair accessible appliances and shelving as well as additional

safety features include grab–bars in the bathroom for mobility assistance and flashing lights

on the fire

alarm for hearing-impaired persons.

38. Plaintiff's lease, and all leases in the building, contain a "no smoking" clause that classifies

the entire building, including the interior of individual units, as "smoke-free."

39. Plaintiff suffered a traumatic brain injury, which is part of her disability.  This brain injury

has made Plaintiff highly susceptible to migraines and vertigo triggered by exposure to

chemical irritants including cigarette smoke and vape fumes.  This makes the "no-smoking"

clause of Plaintiff's lease a necessity and not simply a preference.

40. Protection, for chemically sensitive disabled persons, from second-hand smoke and

chemical fumes is covered under the Fair Housing Act.

41. Plaintiff's apartment conditions and her relationship with her landlord were an exercise in patience and tolerance (see Further Background below) from day one.

42. But things became truly unacceptable when Plaintiff's realized her chronic migraine's from her traumatic brain injury had become so intractable, since moving into the building, because of powerful formaldehyde fumes that were saturating her apartment every night as she slept.

43. The downstairs neighbor was heating a floor cleaner called Fabuloso and using it to cover the smell of lease-violating cigarette smoke.

44. Plaintiff's pleas to management for relief were scoffed at.

45.  Plaintiff was getting sicker and sicker each day.

46. On April 7, 2018, after a week of violently throwing up from the powerful fumes entering her apartment and being too dizzy to stand up, Plaintiff had to call an ambulance to take her to the hospital.   And while the hospital noted her dizziness, it needs to be acknowledged that Plaintiff's condition immediately began to improve upon removal from her apartment's toxic environment.

47. After the hospital visit, Plaintiff  tried again to reminded her landlord of the parameters of her disability, including her head injury, and her need of special accommodations to protect her from migraine triggering chemical fumes... including smoking and vaping... and the incredibly toxic and dangerous "off-label" use of a floor cleaner her neighbor was using to cover the smell of smoke.

48. . It must also be noted that Plaintiff did, in fact, on numerous occasions smell the actual smoke the neighbor was trying to hide with the Fabuloso.

49. Plaintiff then supplied her landlord with the above referenced hospital records, along with a brain MRI report from March 27, 2018, which noted anomalies consistent with physical evidence of the migraines Plaintiff had been complaining about.

50. After being threatened with legal action, Plaintiff's landlord agreed to a mediation process in late-April 2018.

51. The fumes stopped

52. However, chronic wall damaging water leaks plagued Plaintiff's apartment... 24 leaks in six years... to the date of this action. (see Further Background below) and the relationship between Plaintiff and management continued to deteriorate.

53. Plaintiff was forced to call the Department of Buildings (DOB) when water kept seeping through exterior walls of the building into the interior of Plaintiff's apartment. And on April 27, 2018 the DOB issued the landlord a summons for "failure to maintain building in code compliant manner", resulting in a fine of $250.

54. June 27, 2018 was the latest date by which the landlord was required to give Plaintiff her renewal lease. However, not only was the landlord failing to send the renewal in a timely manner, but after almost a year, had still refused to return the original counter-signed lease.

55. When the lease renewal finally arrived, it included several illegal clauses added to a rider, which would allow the landlord to capriciously retract the affordable rent that had been advertised in the lottery. All the affordable apartments in the building had been reported to the rent stabilization authority as having "preferential rents" while the actual registered "stabilized rent" was claimed to be 50% higher. Plaintiff reported this to Housing Preservation and Development (HPD), the agency responsible for overseeing the lotteries and affordable housing programs. The agency lawyers stepped in and forced Plaintiff's landlord to remove the unlawful clauses.

56. Then the front disability doors began breaking down on a regular basis ... and remaining broken for months at a time. Plaintiff's complaints about the doors were met with ridicule and mockery.

57. After years of escalating confrontations, the treatment of Plaintiff became truly abusive. Management instructed building staff to ignore Plaintiff and any of her complaints. Plaintiff was regularly refused the respect and services afforded other tenants.

58. Building staff were told to not speak to Plaintiff, but to just refer her to the office on Long Island.

At which point, the Long Island management team would refuse to answer the phone or return voicemail or email messages.

59. The obnoxious behavior took a particularly humiliating turn on April 29,2021, with a confrontation between one of the doormen and the Plaintiff. It concerned the broken disability entrance doors. The doorman mocked the Plaintiff's need to use the doors and refused to open them while leaving her standing outside in the rain. When the doors are broken, as they were at that time, the doorman must force them opened with both hands. They are sliding doors without handles for manual use when unaided by the electronic mechanism.

60. Plaintiff's subsequent complaint against the building and the doorman set off what Plaintiff has perceived to be a concerted effort to harass her out of the building.

61. By June 2021 the fumes entering Plaintiff's apartment had returned as a daily, chronic problem and though, all leases in the building contain "no-smoking" riders, management not only refused to assist Plaintiff in stopping the source of the fumes, but ran interference to protect the violator.

62. Management facilitated the lease violating activity by lying on numerous occasions to both the Plaintiff and her upstairs neighbor, who was also suffering ill effects from the fumes.

63. Management completely ignored Plaintiff's disability needs to be protected from exposure to the chemicals entering her apartment. They mocked Plaintiff's tearful pleas and multiple requests for an "accommodation" to simply enforce the existing no-smoking policy of the building. Management and the superintendent (who now carried a personal vendetta against Plaintiff for her complaints against him) would lie to Plaintiff about making efforts to investigate and continually claim that Plaintiff was experiencing something they could not detect.

64. This continued even after Plaintiff purchase an air quality monitor to prove toxic fumes were entering her apartment … and at what times of day. The monitor confirmed the daily late-night activity Plaintiff had been reporting. And Plaintiff supplied the data to management. Still, Management refused to investigate during the times the fumes were at their worst

(from 12 a.m. to 4 a.m.). And even though the superintendent lived in the building, he refused to cooperate at that hour. He refused to allow any staff to disturb him after 5 p.m. unless there was a building emergency. The superintendent's lack of motivation was compounded by his hatred of Plaintiff and the fact that he was himself a smoker and so resented the no-smoking policy in the building.

65. Management showed a depraved indifference to Plaintiff and her disability needs when they refused to simply enforce their own "no-smoking" policy, despite being made aware of Plaintiff's level of pain from migraines triggered by the fumes.

66. Plaintiff's landlord then refused to participate in a second mediation request and refused to engage in good faith in any further meaningful negotiations directly with Plaintiff.

67. The level of distress the fumes caused Plaintiff, because of her disability, increasingly appeared to be a convenient source of harassment the landlord had stumbled upon and they were using it to force Plaintiff out of the building.

68. In April 2022, Plaintiff's upstairs neighbor, moved to another apartment in the building to escape the fumes. Her problem, ironically, got worse. In April 2023, to protect her children's health, she moved her family out of the building altogether.

69. On March 22, 2022, as the conditions in Plaintiff's apartment caused her health to continue to deteriorating and her physical pain and emotional distress became so unbearable as to be effecting her ability to live in peace and function in life, Plaintiff approached The New York City Commission on Human Rights (CCHR), seeking protection and assistance with filing Americans with Disabilities Act (ADA) and Fair Housing Act (FHA) claims against her landlord.

70. The core of Plaintiff's request for protection centered on:

    a. the toxic fumes entering her apartment   and     triggering

    migraines

    b. chronically broken disability entrance

    c. discrimination and abuse by management based on Plaintiff's affordable tenant

status

    d.  retaliation due to outside complaints filed with the Department of Buildings and HPD

       and internal complaints filed against the superintendent and certain staff members.

71. Unfortunately, CCHR refused to take Plaintiff's claims seriously and refused substantial help or

any legal representation because Plaintiff was not a racial minority.   That racial discrimination in

now the subject of a lawsuit actively filed in this court (23-CV-05890).

72. After Plaintiff made it clear that she intended on taking action against CCHR for racial

discrimination, she sent them a sarcastic, angry email inquiring whether they simply expected

Plaintiff to continue living in agonizing pain.  Plaintiff then made a black humored joke suggesting

that, if she was smarter, she should just kill herself …  a simple, straight forward solution to end

the pain.  This was a sarcasm intended to inspire a reassessment of their callous disinterest in

another person's suffering.  It was also meant as a scathing shot at what has become a horrifying

new "service" offered by the Canadian "health care" system… which is now pushing euthanasia

on a shockingly large swath of their disabled population.  Plaintiff is not now, nor has ever been,

suicidal.  Plaintiff has desperately been seeking help to improve her quality of life… not end it.

73. Despite the clear hyperbole in Plaintiff's email, CCHR, viciously and intentionally took the

message literally as an excuse to call the police and report Plaintiff as a suicide threat.

74. A large NYPD/FDNY EMS S.W.A.T. team appeared at Plaintiffs door and demanded she be taken

for a psychological evaluation.

75. Plaintiff put the lead officer on the phone with the attorney who was handling the lawsuit at the

heart of the accident, which caused Plaintiff's disability.  He explained that Plaintiff was, in fact,

not suicidal.  Plaintiff explained in detail how the "suicide" call was likely generated and that it

was inaccurate and even, perhaps, an intentional act of retaliation.

76. It was clear to any reasonable person that Plaintiff exhibited no signs of being mentally unstable

or a danger to herself or others.

77. When the officers made numerous threats of taking Plaintiff by force, she relented out of fear of

having her current injuries further aggravated.   Plaintiff broke her back in two places, dislocated the nerve in her elbow and suffered a traumatic brain injury among other injuries in a prior slip and fall accident.

78. Once Plaintiff agreed to cooperate she told the officers about her injuries.

79. Regardless of this fact, the officers acted with a vicious depraved indifference to Plaintiff's vulnerability.  As soon as Plaintiff stepped out of the door to her apartment, she was violently grabbed and handcuffed.  Her cane was snatched from her hand and she was shoved into a rickety EMS folding chair and forced to lean her injured back onto her handcuffed wrists.  The handcuffs were also put on sideways with the metal cutting into her wrist bone.  As she shrieked in pain, Plaintiff was mad to look truly insane in front of her neighbors as she was dragged out of the building and placed in an ambulance.

80. By the time Plaintiff arrived at the hospital she was truly distraught… entirely due to the trauma of what the police and EMTs had just done to her.  She was in so much physical pain and so emotionally traumatized that she could not stop sobbing.  And, though the doctors were immediately able to determine that Plaintiff was not suicidal or a threat to herself or others, they still could not release her in her distraught state and held her over night, against her will without admitting her to the hospital.  It was a truly unlawful imprisonment.

81. Plaintiff's other active lawsuit in this court (23-CV-05890) has named the NYPD and NYFD EMS as well as CCHR for their part in the above actions.

82. Plaintiff brings this new complaint to cover a second incident, repeating these egregious actions by NYPD and NYFD EMS, with the implication that this is a pattern of behavior … and that the second act, in particular, was done with intent and knowledge of the wrongfulness of such actions.

83. After Plaintiff's truly horrifying experience with CCHR, she took her issues against her landlord to the U. S. Department of Housing and Urban Development ('HUD") to file a federal complaint and seek federal protection of her ADA and FHA rights.   HUD recognized Plaintiff's claims, but stated

that they first had to give the State Of New York an opportunity to resolve the matter.

### *Facts leading to this action*

### *DHR's stated depraved indifference to Plaintiff's pain and suffering*

84. On April 10, 2023, HUD referred Plaintiff's complaint against her landlord to The New York State Division Of Human Rights with the caveat that the agency must take action within 30 days, or the case could revert back to HUD.

85. When a couple of weeks passed and DHR made no attempt to contact Plaintiff, she phoned the number on the documents HUD had sent her and asked to speak with Chelsea John the DHR Director, Housing Investigation Unit, who was listed as the contact person. Plaintiff spoke to Candace Tyndall, who promised Plaintiff a call back from Ms. John.

86. On May 2, 2023, 22 days into the 30 day time period HUD had designated as a deadline to take action, Plaintiff had still not heard from DHR or received the promised call back from Ms. John. She made a second call to DHR.

87. Plaintiff was told that her pain was not going to have any effect on expediting her case and was "told off" for calling and bothering the staff of DHR.

88. When Plaintiff took offense at the callous, unprofessional and unnecessarily rude attitude of Ms. John and Ms. Tyndall. Ms. John snipped, "If you are not happy you can take you're case to City Commission on Human Rights." Plaintiff then related the backstory of the horrible experience she had just had with the New York City Commission on Human Rights (CCHR), which had led to her lawsuit against that agency.

89. Plaintiff added that CCHR were so unprofessional that, instead of helping her and protecting her disability and civil rights, they violated her civil rights. Plaintiff explained they did that by twisting her pleas for help into something they weren't and calling in a fake suicide alert, causing her to be hauled off for a psychological evaluation.

90. After relating the CCHR experience, Plaintiff, perhaps a bit emotional from having to relive the traumatizing events in her mind, made a last tearful plea imploring DHR to take her suffering

seriously and not dismiss it as imaginary or exaggerated as CCHR did.  But, they remained

unmoved.

91. Plaintiff, ended the conversation stating that she was getting "vibes" from DHR as equally

unhelpful as CCHR, and felt they were like-wise "blowing her off."  Plaintiff said she feared a

repeat of the previous year.

92.  Plaintiff then reminded DHR of the looming 30 day deadline and begged for some action to be

taken to put an end to the pain she was experiencing everyday.

### DHR falsely reports Plaintiff as a suicide threat:
### retaliatory intent to intimidate

93. The "action" DHR took following that second call was, not only unhelpful, but completely

traumatized the Plaintiff and left her emotionally shattered.

94. DHR took Plaintiff's recitation of her horrible experience with CCHR, not as a warning of how not

to handle the case, but as an invitation to copy exactly what CCHR had done … perhaps retaliating

against Plaintiff on their sister agency's behalf… or simply done to intimidate Plaintiff and "put

her in her place" for daring to think she deserved any prioritization.

95. After her nightmare experience with CCHR, Plaintiff was cautious with her words and, at no time

during any phone conversation or other communication with DHR, did Plaintiff ever say, or hint

at, in any way, that she was suicidal or a danger to herself or others.  Still, Chelsea John and

Candace Tyndall called the authorities and made false statements about Plaintiff being suicidal.

96. The action was an intentional false report without legitimate basis.

97. It showed malice and a complete lack of true concern for the Plaintiff's well-being, as it initiated

yet another threatening visitation from authorities … which Plaintiff had just recounted to DHR

as having been a highly traumatizing experience and did nothing to assist Plaintiff in solving the

problems for which she was seeking help.

98. The false reporting indicated that these representatives of DHR, like the CCHR staff before them,

were treating Plaintiff's claims with contempt as imaginary, unimportant or perhaps born of

exaggerated expectations of "white privilege" that needed to be deflated.

99. DHR's bizarrely depraved assessment of Plaintiff's situation seemed to afforded them false

justification to dismiss any urgency, which should have been given Plaintiff's case, considering

the circumstances of her pain and suffering.   But, DHR made it clear they did not care about

Plaintiff's pain and stated that fact in plain language.

100.    DHR made it even clearer how little they cared about Plaintiff's pain when they dragged

their feet and ignored the 30 day deadline imposed by HUD.

101.    Plaintiff waited patiently.  DHR's false call to authorities, and it's ensuing terror (explained

fully below), effectively succeeded in intimidating Plaintiff and demonstrated the dire

consequences of any attempts to put pressure on DHR to act.

**Violation of due process**
***with unlawful imprisonment – FOR A SECOND TIME***
***And warrantless entry and search***

102.     Around 6 p.m. on May 2, 2023, after Plaintiff's earlier call with DHR, she left her apartment

to attend an event with friends.  She turned her cell phone off during the event.

103.    Around 10 p.m., as Plaintiff and her companions were sitting down for dinner in a

restaurant, Plaintiff turned her phone back on and received a strange call from her step-sister

asking if she was alright.  Plaintiff was unsure what prompted the call, as they had not spoken in

quite a while and it was later in the evening than any usual call from her.   Plaintiff, said she was

fine and was sitting down to eat, so would need to call her back later.  The reason for call made

itself know shortly thereafter.

104.    Around midnight, as Plaintiff and her companions were getting in the car to return home,

her phone rang again.  When Plaintiff answered it, a police officer was on the line and, in a very

stern voice, asked her where she was.  Plaintiff was mystified and asked him why he was asking

her such a question.  The police officer related the fact that Plaintiff had been reported as a

suicide threat and they were at her apartment building.  The officer added that they had been

trying to locate Plaintiff for many hours.  Suddenly, the reason for the call from Plaintiff's step-

sister became clear.

105.    Plaintiff told the officer that she was on her way home and would be happy to explain that

the information he received was erroneous.   Plaintiff then held her phone up while the three

companions she was with laughed and told the police that Plaintiff was in no way suicidal.

106.    After dropping off two of the companions, Plaintiff's third companion, Tony, drove her

home, arriving at Plaintiff's apartment building at 12:45 a.m. on May 3, 2023.

107.    Plaintiff, out of an abundance of caution, due to the past experience with the police that led

to the other on-going lawsuit previously filed,  turned on the camera of her cell phone as she

exited the car and recorded the entire encounter.

108.    Plaintiff and her friend Tony entered the lobby of Plaintiff's building and were met by 4

police officers.

109.    Plaintiff, made a concerted effort to unravel the confusion surrounding the source and

motivation for the "suicide" call, which brought the police into the current situation.  But, they

were unyielding in their stance and refused to cooperate with Plaintiff's attempt to clarify the

story.

110.    The police completely and grossly ignored their obligation to properly assess the situation

and honor Plaintiff's rights of due process.

111.    Plaintiff pointed out that this same abuse of her rights on a previous occasion were at the

heart of a lawsuit she was filing and implored the officers not to repeat the offense.

112.    Even though Plaintiff was perfectly lucid and rationally explained the extensive backstory,

which caused the inaccurate and inappropriate "suicide" call, the police proceeded to call the

FDNY EMS and report that Plaintiff had finally arrived home.

113.     When the EMT's arrived, Plaintiff repeated all of the same information she had given to the

officers.

114.    After 20 minutes of Plaintiff trying to reason with both the police and the EMT's, P.O.

Castro, got very aggressive and threaten to handcuff Plaintiff to a stretcher and take her by force.

115.     Plaintiff put all the officers and EMTs on notice that, if they insisted on taking her, she would bring legal action.  They did not care and proceeded with their intimidating threats.

116.     Plaintiff, out of fear of another assault by the officers and further injury to her existing injuries, agreed to walk to the ambulance and cooperate under duress.

117.     However, while Plaintiff did her best to protect herself from further physical trauma, this did nothing to alleviate the absolute terror she felt for being forced to submit herself to a medical system that could, on a whim, forcibly drug or "treat" her while she was deemed to be under their authority.

118.     Taking ones right to self-determination by labeling them mental incompetent, even for an hour, is among the most severe depravations of ones civil rights.  It is absolutely terrifying to be subjected to this and should be exercised with the utmost of caution and only in the most extreme of circumstances.  Nothing was justified in subjecting Plaintiff to such egregious, dehumanizing disregard of her rights.

119.     Plaintiff also pointed out that these kidnappers had a responsibility to safely return her to her home after forcing her to submit to this unnecessary examination.  It was already after 1 a.m. and Plaintiff would end up being released in the middle of the night without a safe passage home.

120.     EMS made false assurances about Plaintiff being supplied transportation home.

121.     Plaintiff was indeed found to be not suicidal, but when ready for release, she became stranded at the hospital when the hospital was unable to book a car service or provide safe transportation until morning.

122.     Plaintiff was kept up all night, unable to sleep in the psych ward of Roosevelt Hospital.   She broke down in tears as morning approached and she realized she was so exhausted she was going to have to give away the matinee ticket to the Broadway show *Kimberly Akimbo,* which she had been given the day before.  After years of poverty, living on Social Security Disability… and the Covid shutdown… Plaintiff had not seen a Broadway show in a decade.  And now she was going to miss this opportunity over such a senseless and lawless deprivation of her freedom.

123.    The sadness of missing out on the show and the disorienting terror of being held against

her will, by people with the power to do whatever they please to her, were only compounded

when Plaintiff arrived back home.  Plaintiff was overwhelmed with a crushing sense of being

violated when she realized her apartment had been entered in her absence.

124.    However, Plaintiff's apartment wasn't only entered to see if Plaintiff was there… as in a

"wellness check.'  It was obvious that her personal things had been illegally searched.  There

were items on the floor, boxes overturned and even some banners, from a peace really Plaintiff

had attended, partially unrolled.

125.    This was not a "wellness check."  It was an illegal search of Plaintiff's apartment without a

warrant.

126.    What made the entry even more intentionally unlawful, was the fact that, while trying to

convince Plaintiff that whoever made the call to the suicide hotline was credible, one of the

officers swore that they were given a full description of Plaintiff including what she was wearing.

The only person who could have given the police that information was the Plaintiff's doorman.

He would have seen Plaintiff leaving the building.  Therefore, the police had no reason to believe

Plaintiff was in her apartment and no probable cause to enter when no one answered a knock or

bell.

127.    Plaintiff spent days sobbing and trying to overcome her sense of complete violation.

128.    The fact that all these violations were committed by government bodies against Plaintiff,

BECAUSE she had desperately been expressing her need for help from the government to enforce

the law and protect her disability right, has been too much to bear emotionally.   Plaintiff is now

deeply emotionally scarred, lacking faith in the judiciousness of all government agencies and has

become a much harder, sadder and more cynical person.

***DHR drags feet, ignores HUD deadline and
continues to ignore Plaintiff's suffering***

129.    On, May 3, 2023, Plaintiff called DHR for an explanation of the police action they instigated.

Ms. John again, had the nerve to tell Plaintiff that she couldn't keep "calling everyday." This was only Plaintiff's third phone call to DHR and spanned a period of nearly a month since the case was sent over from HUD.

130.     May 10, 2023, the 30 day deadline by which HUD had given DHR to take action, came and went without DHR meeting their responsibility.

131.     On May 17, 2023, DHR finally mailed out a complaint for Plaintiff to sign.

132.     On May 18, 2023, Plaintiff had a second of two mysterious, seizure-like reactions she has had, triggered by the vape fumes entering her apartment.

133.     Plaintiff reported this to her landlord but, as usual, they mocked Plaintiff and showed no interest or concern about the situation.

134.     On May 19, 2023, when DHR refused to answer the phone, Plaintiff left a message on their voicemail about the very scary seizure-like reaction and made another plea for more constructive or expedited help to end the conditions that were so adversely affecting Plaintiff's health and perhaps even endangering her life.

135.     Plaintiff also emailed DHR copies of her medical reports with blood tests showing anomalies that her doctor could not explain, but which were signals for developing cancer or an autoimmune disease. Plaintiff's doctor sent her to have an MRI of her adrenal glands and a sonogram of her Thyroid. Still no answers were found. However, Plaintiff, can pinpoint the general downturn in her health, and the now intractable nature of her, previously sporadic, migraines, to the date she moved into her current apartment and began being bombarded each and every night with toxic fumes from the apartment below her.

136.     DHR maintained their depraved indifference to Plaintiff's situation and, like Plaintiff's landlord, did nothing to intervene and protect Plaintiff ... or even expedite her case.

137.     It was not until Sept 14, 2023 that Plaintiff was finally contacted for an interview by the investigator assigned to her case, Ms. Perlongo.

138.     Plaintiff gave her account of things during the interview and supplied the names of other

tenants who were witnesses ... including the upstairs neighbor who was ultimately
constructively evicted by the intolerable smoke and vape fumes penetration into BOTH of her
apartments.  Plaintiff asked Ms. Perlongo if she should email the various pieces of evidence
spoken of in the interview and the contact information for the witnesses.  Ms. Perlongo told
Plaintiff not to send anything yet ... she would make up a list of what she needed and send it to
Plaintiff.

139.    The list never arrived.

140.    It was not until Oct. 10, 2023, that Plaintiff was contacted for a rebuttal to her landlord's
response.  Plaintiff found out that the response had been returned on July 19, 2023, almost three
months earlier.  And now Plaintiff was given 13 days, until Oct. 23, 2023 to write an extensive
rebuttal.

### *DHR refuses Plaintiff a disability accommodation and fails to properly investigate her case*

141.    Plaintiff was struggling with her daily migraines and other associated problems with her
head injury, including double vision and vertigo ...  and she desperately needed to find legal
assistance ... so she timely asked for an extension on Oct. 11, 2023.  At that time, Plaintiff also
made inquiries about her witnesses and why none of them had been contacted.

142.    No one from DHR would respond to Plaintiff's emailed application for an extension or
respond to phone calls placed to follow up.  Day after day passed and, as the deadline loomed,
Plaintiff was put into a state of panic,

143.    Finally, on Oct. 18, 2023, Chelsea John contacted Plaintiff and, though she had previously
said she would give Plaintiff's landlord (and their lawyers) an automatic 30 day extension to
respond, she begrudgingly only offered a two week extension to the pro se disabled Plaintiff.

144.    In response to Plaintiff asking about her witnesses not being contacted, Ms. John could
barely contain the contempt in her voice when she snipped,  "Ms. Perlongo is not your personal
investigator."  Ms. John made it more than clear in her attitude that DHR, however erroneously,

deemed Plaintiff's claims some sort of nuisance not worthy of their time.

145.    When Ms. John absolutely refused to give Plaintiff the same 30 extension automatically

afforded Plaintiff's landlord, Plaintiff was forced to evoke a disability accommodation request.

This was an earnest request, as producing these legal documents while fighting through

migraines is no small feat and requires much stopping and starting… sometimes Plaintiff is

completely incapacitated for days on end.  Plaintiff was also trying to find assistance.

146.    Ms. John again showed her absolute contempt for Plaintiff when she denied the

accommodation request and forced Plaintiff to appeal that decision to the agencies Disability

department.

147.    Mr. Herrion, the DHR Director of Disability Rights, stepped in and the extension was finally

granted.

### *DHR refuses to acknowledge Plaintiff's disability rights and conspires to denying Plaintiff those rights*

148.    Plaintiff asked that her entire case be transferred to the Disability Department, as that was

a more appropriate department to understand the nature of her case.  That request was denied.

149.    Ms. John's Housing Investigation Unit treated Plaintiff like an ordinary tenant with a smoke

complaint and showed no comprehension of the specific protections covered by the intersection

of ADA and FHA law.  This was evident even after Plaintiff sent DHR documents outlining the

very specific issue of how FHA law addresses the subject of second-hand smoke in relation to

persons with disabilities that are sensitized to it and adversely impacted by it.  These documents

and other legal references were also attached as exhibits with Plaintiff's rebuttal.

150.    One of the above referenced documents was produced by the non-profit The Center for

Social Gerontology, in Ann Arbor, Michigan, but addresses and outlines the legal arguments

concerning Federal law.    It states:

"It is clear that, if secondhand smoke infiltration or seepage substantially            impairs
a disabled person in their housing, the FHA requires the                        owner/landlord to protect the
individual's health by making reasonable                    accommodations in the housing. If an
owner/landlord fails to do so, s/he                    may be found liable under the FHA for having

discriminated against the                    disabled person."

And

"Such accommodations might include, among others, the following: enforcement of existing smoke-free or no smoking policies of the housing management;…"

And

"If a person is disabled and this condition is caused or exacerbated by secondhand smoke, the owner/landlord, as stated by HUD, may not:
        * Refuse to make reasonable accommodations in rules, policies, practices or services if necessary for the disabled person to use the housing.
        Refusal to make such reasonable accommodations is discrimination                    under the FHA. And, as noted above, simply making a number of                    attempts to accommodate the disabled person is not necessarily                    sufficient. Whether the accommodations made are sufficient will be                    determined on a case-by-case basis.'

151.    **Enforcement** (emphasis added) of **existing (**emphasis added) no-smoking policies is all Plaintiff has asked for.

152.    Instead, she has been left to languish in misery with chronic debilitating migraine headaches, nausea, mysterious seizure-like reactions, anomalous blood work and, due to the delay in obtaining any help, all aspects of Plaintiff's health have continued to deteriorate … both mentally and physically.

153.    The only responses Plaintiff has received after asking for help have been: being brutalized by police, humiliated in front of friends and neighbors, locked up in psych wards, emotionally and psychologically abused by management and staff in her own home and been forced to spend every ounce, of what little energy she has, fighting this battle in an effort to make this daily torture end… she is no closer to achieving that goal today than she was at the start… years ago.

154.    Plaintiff's daily physical misery has caused her to gain 50 lbs. since moving into her current apartment, six years ago, and becoming bedridden most days by migraine pain or exhaustion due to lack of sleep during the night.

155.    Plaintiff's simple request to enforce the no-smoking policy in her building is not only reasonable, but constitutes the very slightest of accommodations.

156.     Unfortunately, DHR and all their employees name in this suit, colluded to convince Plaintiff

that, despite all evidence supplied and all legal arguments presented, her rights did not exist.

157.     DHR collectively issued a determination dismissing Plaintiff's complaint and effectively

denying her equal protection under the laws, which are meant to protect her in her vulnerable

disabled state.

### DHR dismisses case and mirrors CCHR's legally flawed decision
### defending lawless landlord and abusive neighbor

158.     DHR accepted Plaintiff's landlord's ridiculous argument that the double-speak in the no-

smoking lease rider, which states that just because the building is smoke-free they were not

required to ensure the building was smoke-free, superseded Plaintiff's disability rights.  The

flaws in this are absurd.

159.     DHR's final determination went on to repeat the same flawed list of "acceptable

accommodations" proposed by CCHR and even repeated the exact same misrepresentations of

Plaintiff's response to those suggestions... namely accusing Plaintiff of being "uncooperative"...

which was untrue.   Plaintiff simply said 1) she already owned a Dyson air purifier and 2) she

would let management change her HVAC and washer filters (but knew that was not the source of

the fumes).  However, the most offensive suggestion was, indeed, flatly declined by Plaintiff

because it was absurdly unfair.  CCHR and DHR both endorsed the concept that Plaintiff should

have to move out of her apartment while the lease violating downstairs neighbor be left in peace.

This was nonsensical and showed an embarrassing lack of legal prowess.  DHR was actually

endorsing Plaintiff's "constructive eviction" ... which is a violation of both state and federal

housing laws.

### DHR's determination completely ignores numerous claims
### which were included in Plaintiff's complaint

160.     However, DHR's refusal to properly defend Plaintiff on the smoking issue was not the limit

of their obvious contempt for Plaintiff and refusal to offer her equal protection under the law.

161.     Plaintiff's rebuttal included videos and audio evidence of the abuse and retaliation she

suffer at the hands of her building's management and staff.  One video even showed a staff member physically assaulting the Plaintiff when he became enraged over the Plaintiff filming him refusing her service.  DHR did not even address the matter in their dismissal.

162.    Photographic evidence of 23 leaks and the rotting water damaged walls, Plaintiff has dealt with for 6 years, were supplied in her rebuttal.  As well as, documents from a Department of Buildings inspection of Plaintiff's unit, which led to the imposing of a $250 fine for failure to maintain the building in a code compliant manner.  Yet, DHR fail to even mention this aspect of Plaintiff's claim in their determination.

163.    This very month, on July 2, 2024, after DHR ignored Plaintiff's claims, Plaintiff called the DOB inspector back to her apartment.  This time the inspector imposed a $625 fine for continued failure to maintain the building in a code compliant manner.

164.    Plaintiff's landlord has also been under a Section 8 sanction since March 1, 2024 for the same failures for which the DOB issued their citation.

165.    And to show DHR just how unlawful and abusive Plaintiff's landlord is, she forwarded DHR an email from the landlord which contained a blatantly illegal threat to sue Plaintiff for the unpaid portions of rent withheld by HPD during the period of sanction.

166.    DHR mockingly replied by simply stating that if Plaintiff felt she had another claim, she was free to start a new case or hire her own lawyer.

167.    Plaintiff's rebuttal also included evidence of a scheme, by her landlord, to inject illegal language into lease renewals, designed to undermine tenants with affordable rents.  Plaintiff also included in her rebuttal, evidence of HPD stepping in on Plaintiff's behalf and forcing Plaintiff's landlord to remove the offending clauses from the lease renewals.  The excised clauses were giving the landlord capricious "loophole" excuses to repeal the affordable rents and replace them with amounts that were 50% higher.

168.    The plethora of evidence, Plaintiff supplied to DHR, was intended to speak to the motive behind the landlord's retaliation against the Plaintiff.  However, it was completely ignored by

DHR, as their final determination did not even mention Plaintiff's claims of retaliation.

169.    DHR also completely ignored Plaintiff's complaints about chronically broken disability

doors at the front entrance of her building.

170.    DHR intentionally avoided addressing the fact that the core of Plaintiff's claims was the fact

that her landlord was using her disability as a weapon.  The landlord was tired of having his

unlawful behavior called out by the Plaintiff, and so, encourage the lease violating behavior of

Plaintiff's downstairs neighbor.  The issue with the fumes entering Plaintiff's apartment became a

known factor the first year after Plaintiff moved in (2017-2018).   The chronic-ness of the

problem did stop and start more than once… when building management was still occasionally

responding to Plaintiff's complaints.   But, as Plaintiff's relationship with the management of the

building deteriorated, the chronic fume problem returned in earnest. Management have since

taken up lying and played games while refusing to end the neighbor's lease violating behavior.  It

has become clear, as Plaintiff claimed in her complaints filed with CCHR, HUD and DHR, that

management want to force Plaintiff to give up and just move out… and they have no qualms

about using Plaintiff's disability vulnerabilities, to smoke and chemical fumes, to achieve their

goal.

### *What was the motive behind DHR's mishandling of case?*

171.    Is it a coincidence that the very same issues ignored by DHR were also ignored by the

overtly racist CCHR?

172.    As a matter of fact, DHR's flawed determination was so similar to CCHR's clumsy, slanted

dismissal, that one could have been "lifted" from the other.

173.    And while, DHR employees were subtle enough not to make the same blatant, blundering

racist statements made by CCHR, their determination spent an inordinate amount of time

actually attacking the Plaintiff and insinuating that Plaintiff was guilty of harassing the "elderly"

Hispanic woman living in the apartment beneath her and claiming that Plaintiff was some how

capriciously trying to get her neighbor evicted.

174.    Both, CCHR and DHR, intentionally misconstrue Plaintiff's statements about demanding the neighbor be held accountable for violating the building no-smoking policy and even go out of their way to sympathetically label the neighbor "elderly" though she is only 14 years older than Plaintiff. And both agencies conveniently leave out any mention of the neighbor's daughter who is much younger than Plaintiff and not disabled or impaired in any way.

175.    Certain circumstances would suggest it is the daughter doing a majority of the vaping, as she has been found occupying the apartment in her mothers absence during periods when the vaping replaced the smoking. Unfortunately, the vape chemicals impact Plaintiff even more adversely than the smoke.

176.    Regardless of all the information supplied to DHR, they completely ignored all of it. Instead, DHR's dismissal stresses (gratuitously mentioning it twice) that Plaintiff called her downstairs neighbor, a "nuisance neighbor," as if to imply impropriety on the part of Plaintiff. Are the attorneys at DHR so unfamiliar with that term, which is commonly used to describe a tenant who refuses to abide house policies to the detriment of the other tenants?

177.    And, though BOTH (mother and daughter) lawless, lease-violating neighbors below Plaintiff, are viciously and knowing abusing their disabled neighbor, both CCHR and DHR inexplicably and irrationally show more concern for them than they do for the Plaintiff.

178.    The only explanation that seems obvious, and fits into these agencies stated DEI goals, is the fact that the neighbors are Hispanic minorities. This unlawful racial bias is depriving the Plaintiff equal protection under the law and violating her disability rights.

179.    It is more than clear in the final determination that DHR was more concerned about Plaintiff's neighbors than they were with Plaintiff's disability rights. DHR's dismissal ultimately endorsed the idea that these neighbors should be allowed to break the lease policies and violated Plaintiff's rights, presumably because their minority status outweighs Plaintiff's disability needs. This was not stated as blatantly as CCHR had stated it, but the end result was the same.

180.    DHR's final determination ignored ALL of Plaintiff's disability rights, all her evidence of

retaliation and all other rights to tenant harassment protection.   DHR's determination has effectively endorsed all of Plaintiff's landlord's abuses and the knowing abuse from Plaintiff's neighbors... and completely and totally denied Plaintiff equal protection under the law.

181.    Such an irrational, broad and complete denial of protection for a disabled Plaintiff must be motivated by something.  Plaintiff contends that the most likely reason is born from the stated anti-Caucasian racist priorities espoused by both CCHR and DHR... hence racial discrimination.

182.    DHR appears to be espousing the same anti-Caucasian pedagogy being promoted on the website of CCHR.

183.    DHR is guilty of depraved indifference to a disabled person in pain and anti-Caucasian discriminatory practices.

184.    The complete failure of DHR to enforce the laws which were designed to protect people with disabilities has left Plaintiff still in agonizing daily pain.  Merriam-Webster defines the verb form of the word  "torture" to mean:

> 1. to cause intense suffering; to torment,
> 2. to punish or coerce by inflicting excruciating pain.

By this definition, Plaintiff continued being tortured every day and every night in her own home.

185.     Plaintiff is still bearing the psychological trauma of being physically assaulted and then falsely imprisoned as a direct result of asking for help to stop the daily abuse she was enduring in her apartment.

186.     The injustice and irony are beyond painful.


### Further Background of Fair Housing Complaint for which Plaintiff Requested Assistance from CCHR, HUD and DHR

(These issues are only background, to establish validity of
case brought to DHR and are NOT the primary causes of action in this case)

187.     On October 2, 2017, five days after Plaintiff's picked up the keys for her new apartment, located at 507 W 28th Street, NY. NY, a massive upstairs flood caused substantial damage to Plaintiff's apartment unit.  It was the first of three separate water damage incidents to occur in

the first two weeks of her tenancy and the first of 24 such incidents to occur in six years leading

up to the date of this complaint.  The building is only six years old.

188.     The Superintendent refused to clean up the construction dust that covered the entire

apartment after the repairs were done.  This was despite knowing that the Plaintiff was

disabled by a broken back and had not even fully moved into the apartment yet.

189.     Plaintiff was coming out of the shelter system and awaiting Human Resources

Administration to arrange movers to bring her belongings from storage.  When Plaintiff asked

the Superintendent if she could at least borrow his building vacuum, and perhaps a mop.  He

rudely told her "no." He added, "You already have the keys. You are responsible for cleaning

your own apartment."   Plaintiff, was forced to purchase a broom, mop, bucket and all manner

of cleaning supplies to make the apartment suitable for her to even partially move in while

waiting for delivery of her belongings.

190.     The clean up caused Plaintiff extreme pain from having to exert her

injured back.

191.     Dealing with the ultra-fine dust blanketing the apartment from sanding large swaths of

drywall putty, caused Plaintiff to get a cyst in her right eye; which remained until 2023 when her

Ophthalmologist had to surgically remove it.  Plaintiff, is legally blind in her left eye and so this

jeopardized the one good eye she has.

192.     Work areas covered is such silt-like drywall compound dust usually require workers to

wear N-95 respirator masks and eye protection.  It was unlawful for the Plaintiff's landlord to

leave Plaintiff's apartment in this hazardous condition.

193.     When the chronic leaking, caused by the Superintendent's unskilled plumbing and the

owner's poor building construction, was reported, by the Plaintiff, to the Department Of Buildings

(DOB) on April 27, 2018, the owner was served an A8 OATH Violation – "failure to maintain the

building in code compliant manner, …" and fined $250.

194.     Instead of apologizing for what Plaintiff had been contending with, the

management/owner's entrenched themselves into an unacceptably acrimonious and

adversarial relationship with the Plaintiff.

195.    This escalated into a non-stop string of harassments, which interfered with Plaintiff's life,

health and peace of mind.  It included:

    a.   Refusing to return the original signed leased for almost a year, until

        their refusal was reported to HPD.

    b.   Mailing the renewal late, without a postmark and backdating the cover letter to

        make it look like it was mailed timely.  This was presumably to make Plaintiff miss

        her lease renewal return date.

    c.   Inserting language in the first renewal lease, which would allow the Landlord to

        illegally and capriciously retract the affordable rent.  Plaintiff reported this to HPD and

        they stepped in and forced the Landlord to be removed the unlawful clauses.

    d.   As Plaintiff made these reports of owner's violations to

        appropriate authorities, she began being inundated by toxic fumes from the tenant in the

        apartment beneath her.   The fumes were a mix of smoke, vape and toxic cleaning fluids

        (inappropriately aerosolized by heating to cover the sent of the smoke.*)  The daily fumes

        were so toxic Plaintiff became too dizzy to stand and on two occasions felt the need to go

        to the emergency room.

    e.   After Plaintiff called for mediation services through 3-1-1 and a session        was held

  between Plaintiff and her landlord, the fumes stopped.

    f.   But the leaks in Plaintiff's apartment continued.

    g.   The disability doors at the front entrance of the building began breaking down on a

        regular basis and remaining unrepaired for months at a time.

    h.   Plaintiff's complaints were met with ridicule and retaliatory     abusive denials

  of service and hostile treatment from staff     and management.

i.   As things escalated in acrimony the fumes entering      Plaintiff's apartment

returned in earnest.

j.   A concerted campaign of harassment against the Plaintiff ramped up, and the

circumstances concerning the fumes appeared to present itself as a very convenient

source of abuse designed to force Plaintiff out of the building.

k.  Plaintiff's failure to find legal protections elsewhere, led to her  approaching CCHR and then

HUD… who handed the case off to DHR.


*heating such cleaning liquids as floor cleaner and fabric softener on the stove or in a
vaporizer is a dangerous trend shared on social media and demonstrated  on video sharing
platforms.  It release substantial and toxic levels dangerous chemicals into the air.

## CAUSES OF ACTION

196.     Plaintiff, brings this action against the State of New York for its municipal liability in

DHR and it's named employees under 42 U.S.C. § 1981, 1983 for discrimination on the basis of

race, in violation of the Fourteenth Amendment of the U. S. Constitution.

197.     Plaintiff, brings this action against the State of New York for its municipal liability in

DHR and it's  named employees under 42 U.S.C. § 1985(3), for multiple agents misrepresenting

the law, in concert, and by which mode, did conspire to deny, and did deny, Plaintiff equal

protection under the New York City Admin Code Title 8 Civil Rights et seq. and New York

Consolidated Laws. Civil Rights Law – CVR § 1 et seq , based on her race in violation of the

Fourteenth Amendment of the U. S. Constitution.

198.     Plaintiff, brings this action against the State of New York for its municipal liability in DHR

and it's named employees, under 42 U.S.C. § 1981,1983, 1985(3), 1986 for multiple agents

misrepresenting the law, in concert, and by which mode, did conspire to deny, and did deny,

Plaintiff equal protection under the law with regard to her rights under the Americans with

Disabilities Act (ADA) and the Fair Housing Act (FHA) and did show negligence to prevent her

abuse and harm due to such lack of protection by these laws and  42 U.S.C. Chapter126. This is

particularly egregious as, protecting citizen's civil rights, is the stated purpose of the existence of DHR.

199.     Plaintiff, brings this action against the State of New York for its municipal liability in DHR and their named employees, under 42 U.S.C. § 1983, 1988 and/or New York common law for intentional and negligent infliction of emotional distress.

200.     Plaintiff, brings this action against the State of New York for its municipal liability in DHR and their named employees, under 42 U.S.C. § 1983, 1988 and/or New York common law for retaliation, carried out with malice, for the intended purpose of intimidating Plaintiff and damaging her credibility with regard to her claims.

201.     Plaintiff, brings this action against the State of New York for its municipal liability under 42 U.S.C. § 1983, 1988 and/or New York common law for negligent supervision and lack of appropriate training of DHR named employees.

202.     Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and the named employees of these agencies, under 42 U.S.C. § 1983, 1988 and New York common law for unlawful imprisonment in violation of the Fourteenth Amendment of the U. S. Constitution and New York common law.

203.     Plaintiff, brings this action against the City of New York for its municipal liability in the NYPD and NYFD EMS and the named employees of these agencies, under 42 U.S.C. § 1983 and 42 U.S.C. Chapter126 for violating her rights under the Americans with Disabilities Act (ADA). For failure to properly assess Plaintiff, and take due care, before forcibly taking her from her home and violating her due process in violation of the Fourteenth Amendment of the U. S. Constitution.

204.     Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and the named employees of these agencies, under 42 U.S.C. § 1983, 1988 and/or New York common law for intentional and negligent infliction of emotional distress.

205.     Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and the named employees of these agencies, under 42 U.S.C. § 1983, 1988 and/or

New York common law for defamation, with damage to reputation and causing extreme embarrassment.

206.    Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and the named employees, under 42 U.S.C. § 1983, 1988 and/or New York common law for retaliation, carried out with malice, for the intended purpose of intimidating Plaintiff.

207.    Plaintiff, brings this action against the City of New York for its municipal liability under 42 U.S.C. § 1983, 1988 and/or New York common law for negligent supervision and lack of appropriate training of: a)Police officers and b)EMS responders.

## JURY DEMAND

208.    Plaintiff demand a trial by jury on all questions of fact raised by this complaint.

## RELIEF

209.    Plaintiff seeks compensatory and punitive damages for the physical pain and suffering she has endured for the past year and a half.  The debilitating, life destroying, migraines that have stolen all peace and happiness from Plaintiff, have been unnecessarily triggered and/or intensified by circumstances that should have been brought to an end, had the State Of New York and DHR taken care to uphold their responsibilities in implementing and enforcing ADA and FHA laws.

210.    Plaintiff seeks punitive and compensatory damages for the infliction of extreme emotional distress associated with 1) the disregard of her disabilities  and 2) callous racism suffered at the hands of DHR.

211.    Plaintiff seeks punitive and compensatory damages for the infliction of fear and terror when she was forcible taken from her and held against her will for an unnecessary psychological evaluation.

212.    Plaintiff seeks punitive and compensatory damages for the act of retaliation that

prompted the suicide call to the police by DHR.  It was vindictive and in no reasonable way could be construed as an attempt to offer any kind of aid or assistance that the Plaintiff was in dire need of.  As a matter of fact it only amounted to further abuse of Plaintiff, which has left her with deep emotional scars.

213.    Plaintiff seeks punitive and compensatory damages for the fact that both the anti-Caucasian bias and the disregard for Plaintiff's disability needs have been a pattern of behavior displayed, not only within DHR, but was also such an insurmountable problem with their local off-shoot CCHR in New York City.   It is a cultural problem and clearly due to systemic negligent supervision from the top of this municipality through all of it's agencies.

214.    Plaintiff seek any other relief that this Court deems just and proper.


        Dated: New York, New York
               August 1, 2024

                                        Respectfully Submitted,

                                        Kelly MacNeal
                                        Plaintiff
                                        507 W 28th St
                                        New York, NY 10001