UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X
KELLY MACNEAL,                        :
                        Plaintiff,    :
                                      :
          -against-                   :          AMENDED COMPLAINT
                                      :
THE STATE OF NEW YORK, THE            :          No. 24-CV-06017-LGS
CITY OF NEW YORK,  CHELSEA JOHN,      :
GINA MARTINEZ,  ELENA PERLONGO,       :
JOHN HERRION, CANDACE TYNDALL,        :
ELIZABETH ORTIZ,                      :
JOHN CORDE, GREY CASTRO, CHRISTIAN    :
ORELLANA, JOSE QUINTUNA-GUAMAN,       :
FRANK TARSILLO AND RYAN STACK         :
                        Defendant(s), :
————————————————————————X

Pro se Plantiff, Kelly MacNeal, complains of the Defendant(s), The State of New York ("State"), The City Of New York ("City") and their employees, named here in acting under color of law in individual and official capacities for the State and City.

Plaintiff apologized to the court for the length of this complaint but, it encompasses a decade of sequential events, which demonstrate a pattern of behavior on the part of both the City and the State. This pattern of behavior demonstrates a cultural and policy bases contempt for the rights of the disabled within agencies of these municipalities.  It also demonstrates a contempt for basic civil rights guaranteed under The Constitution of the United States.  These are not petty grievances.  As a whole, they have had devastating and lasting impact on the life and well being of the Plaintiff.

Both this complaint and its related case 23-cv-05890-LGS are complicated by the fact that they arise from a third complaint.  That original complaint necessitated assistance from either the city or the state to help Plaintiff enforce her disability and fair housing rights. Unfortunately reciting the facts of that original case are required here in order to understand the basis of Plaintiff's claims against both the city and the state.  For it is the very legitimacy of her initial complaint, and her legal right to protection, and the city and state's refusal to offer such protection under the law which now creates the torts of

deprivation and outrageous response for which the plaintiff seeks recompense and rectification.

For which, Plaintiff now complains and alleges as follows:

## **TABLE OF CONTENTS**

JURISDICTION AND VENUE.............................................................................3

PARTIES.............................................................................................................3

PRELIMINARY STATEMENT..........................................................................4
      *Defendant City of New York and Related Case..........................................4*
      *Defendant The State of New York and Related case..................................7*

BACKGROUND
      *Plaintiff's interactions with CCHR leading up to.....................................14*
      *interactions with Defendant DHR*

STATEMENT OF FACTS
      *Plaintiff's initial contact with NEW YORK STATE DIVISION ON HUMAN RIGHTS....23*
      *and DHR's stated indifference to Plaintiff's pain and suffering*

      *DHR falsely reports Plaintiff as a suicide threat:..................................25*
      *retaliation and intent to intimidate*

      *Violation of due process with unlawful imprisonment – AGAIN................26*
      *And warrantless entry and search*

      *DHR drags feet, ignores HUD deadline and continues to ignore.................31*
      *Plaintiff's suffering*

      *DHR refuses Plaintiff a disability accommodation and fails to properly....................33*
      *Investigate her case*

      *DHR refuses to acknowledge Plaintiff's disability rights and........................................34*
      *conspires to denying Plaintiff those rights*

      *DHR dismisses case and mirrors CCHR's legally flawed decision..................................36*
      *defending lawless landlord and abusive neighbor*

      *DHR's determination completely ignores numerous claims in Plaintiff's complaint...37*

      *What was the motive behind DHR's mishandling of Plaintiff's case?.................39*

      *Further Background of Fair Housing Complaint for which Plaintiff Requested...........42*
      *Assistance from CCHR, HUD and DHR*

      *Prior Police Violations Which Establish a Pattern of Behavior..........................44*

CAUSES OF ACTION.......................................................................................49

JURY DEMAND................................................................................................53

RELIEF..............................................................................................................54

**JURISDICTION AND VENUE**

1. Jurisdiction is proper in federal court under federal question jurisdiction:

      a. violation of disability rights under ADA, FHA and RA
      b. violation of constitutional civil rights:
            i) false imprisonment
            ii) due process
            iii) equal protection
            iv) conspiracy to deny access to, and protection of, the law
            v) discrimination based on race and disability

2. Venue is proper in the Southern District of New York because the events leading to this action took place in SDNY jurisdiction and Plaintiff is a United States citizen residing in the State of New York.

3. This court has jurisdiction under the state law claims under supplemental jurisdiction.

**PARTIES**

4. Plaintiff, Kelly MacNeal, resides at 507 W 28th Street,  in the state of NewYork, in the country of New York and is a citizen of the United States.

5. Defendant is the City of New York, a municipal entity with a service address at 100 Church Street, New York, New York 10007.

6. Defendant is the State of New York a municipal entity with a service address at 28 Liberty Street, New York, New York 10005.

7. Defendants Chelsea John, Elena Perlongo, Gina Martinez, Candace Tyndall and John Herrion are employees of The New York Division of Human Rights ('DHR"), which is a legal entity and a subdivision of the State of New York.  These individuals shall each be served at  New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, NY 10458.

8. Defendants Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363) and Police Officer Jose Quintuna-Guaman (Shield No. 7157) are employed by the New York City Police Department ("NYPD") with a service address at New York City Police Department, 10th Precinct, 230 W 20th St, New York, NY 10011.

9.  Defendant EMT Frank Tarsillo is an employee of the Fire Department of the City of New York ("FDNY") Emergency Medical Service ("EMS") with a service address of Fire Department of the City of New York, 9 Metro Tech Center, Brooklyn, NY 11201.

10. Defendant EMT Ryan Stack has resigned from the FDNY EMS and designated the New York City Law Department as his agent to accept service on his behalf in this matter.  His service address is Ryan Stack, New York City Law Department, 100 Church Street, New York, NY 10007.

## PRELIMINARY STATEMENT

11. Plaintiff, Kelly MacNeal, brings this action *pro se.*

12. Plaintiff is a Caucasian female and has been classified as physically disabled by the Social Security Administration since April 2015.

### Defendant City of New York and Related Case

13. Plaintiff brings this complaint with notice to the court that it is related to active case 23-CV-05890-LGS, by way of a common Defendant, the City of New York ("City"), and the fact that the more recent actions by the New York Police Department ('NYPD") and Emergency Medical Service of the New York Fire Department ("FDNY-EMS") have repeated, and added to, the original offenses claimed in the earlier complaint.

14. Plaintiff asserts that Defendant, the City of New York and it's employees ("City"), have exhibited a pattern of behavior establishing official policies, customs and practices related to acts of unlawful and unconstitutional false imprisonment, deprivation of due process, denial of rights of persons with disabilities and unlawfully forcing unnecessary psychological evaluations on subjects without cause.

15. The City has shown a pattern of willfully and wantonly employing tactics of intimidation and excessive force or threats of force and physical harm to achieve compliance with unnecessary psychological examinations.

16. The City has shown a willful, wonton negligence as well as deliberate and depraved indifference

to the rights and safety of the disabled Plaintiff and her preexisting injuries.

17. The most recent abduction and transport to a hospital constituted the sixth time the City has violated the Plaintiff thusly with varied excuses of justification; yet, all lacked any truly legitimate cause and were conducted with blatant, outrageous and clear violations of Plaintiff's rights.

18. On more than one of these occasions, Plaintiff was thusly abused for merely standing up for her disability or other rights.

19. On three of these occasions Plaintiff was brutalized by police officers with full knowledge and forewarning of her injuries and disabilities.

20. And on one occasion, when Plaintiff's only resistance was sitting in a chair and refusing to have her disability rights violated, she was so badly beaten, that instead of taking her for the threatened psychological evaluation, she was dumped off at the regular (not psych) Emergency Room.

21. In the other five, of the six referenced instances, the Plaintiff has been falsely imprisoned, had her property seized and been subjected to humiliating and invasive interrogations by psychiatric doctors before being released because there was no legitimate cause to hold Plaintiff against her will in the first place.

22. Each of the six incidents mentions was initiated during the act of, or immediately following, Plaintiff making complaints against a City or State agency, or their employees or subcontractors, for violating or denying her rights.

23. The majority of these actions were taken against Plaintiff while she was fighting to defend or get help with defending her Federal and State protected disability rights.

24. In each case the Plaintiff's ability to exercise her rights was interfered with.

25. In each instance Plaintiff was made to feel intimidated.

26. In several instances Plaintiff suffered physical harm.

27. In all instances Plaintiff suffered exponentially increasing psychological trauma and lasting

emotional distress.

28.  Instead of assistance with her disability rights, in each instance, Plaintiff was instead violated even further, in both her disability rights and her civil right.

29. In this most recent incident, Plaintiff was exceedingly compliant and made a long and concerted effort to correct and explain the facts behind erroneous information the police had been given by the Codefendant employees of The New York State Division of Human Rights ("DHR"), claiming Plaintiff was suicidal.  Plaintiff had made no such threats or alluded to any such thing.   But, no amount of reasoning would dissuade the police from a blind and irrational intent to take the Plaintiff regardless of all evidence contradicting the third-party hearsay on which they based their probable cause.

30. This failure to properly assess the situation on site makes the City as liable of violating the Plaintiff's rights as the State employees who filed the false report.

31. Because three of the prior incidents were handled with such violence, as mentioned above, and were carried out with such a senseless and unnecessary level of brutality and with such deliberate and depraved indifference to Plaintiff's preexisting injuries, this most recent incident was only assented to by the Plaintiff under duress and out of pure fear and terror based on the prior experiences.

32. However, the lack of physical abuse on this last occasion made it no less terrifying and emotionally traumatizing than the other occasions.

33. There exists a unique danger in being falsely imprisoned in a psychiatric ward, even temporarily, as opposed to a jail cell.  A psychiatric patient loose every aspect of their autonomy.  They are not even allowed a phone call for legal representation.  They can be drugged or "treated" by a doctor, who may or may not fully understand the circumstances of a situation.  And one wrong diagnosis can lead to an innocent person being held indefinitely without ever committing a crime.

34. And the most recent incident was even more emotionally traumatizing, because it included

unlawful entry and warrantless search of Plaintiff's apartment in her absence. Leaving her to feel that much more violated without cause.

35. Wherefore, Plaintiff brings this action against The City of New York for its municipal liability in the following employees of the New York Police Department and against each individual acting under color of law (i) Lieutenant John Corde in his individual and official capacities, (ii) Police officer Grey Castro in his individual and official capacities, (iii) Police officer Christian Orellana in his individual and official capacities, (iv) Police officer Jose Quintuna-Guaman in his individual and official capacities.

36. Plaintiff also brings this action against The City of New York for its municipal liability in the following employees of the New York City Fire Department Bureau of Emergency Medical Services (FDNY-EMS) and each individual emergency medical technicians ("EMT") acting under color of law (v) EMT Frank Tarsillo in his individual and official capacities and (vi) EMT Ryan Stack in his individual and official capacities.

37. From the City Defendants, Plaintiff seeks both compensatory and punitive damages for physical and emotional pain and suffering and violations of her civil and disability rights and any other remedy the court sees fit.

*Defendant The State of New York and related case*

38. Plaintiff also brings this action against The State of New York ("State") for its municipal liability in employees of the New York State Division of Human Rights ("DHR") and each individual employee acting under color of law: (i) Chelsea John, in her official and individual capacities as Director, DHR Housing Investigation Unit, (ii) Elena Perlongo, in her official and individual capacities as DHR Human Rights Specialist II, Housing Investigation Unit, (iii) Gina Martinez, in her official and individual capacities as DHR Deputy Commissioner (for Housing and Urban Development ("HUD") referrals), (iv) Candace Tyndall in her official and individual capacities as DHR Program Aide, (v) John Herrion, in his official and individual capacities as DHR Director of

Disability Rights and (vi) Elizabeth Ortiz in her official and individual capacities as DHR Acting

Director of Housing Investigations.

39. Plaintiff brings this case as related to active case 23-CV-05890-LGS, in that Defendant, State

employee, Chelsea John, previously worked for The New York City Commission On Human Rights

("CCHR"), a Defendant in the other Complaint.

40. Defendant Chelsea John failed to disclose her relationship to CCHR after Plaintiff informed her of

Plaintiff's active lawsuit against CCHR.

41. Defendant Chelsea John's offensive behavior in this case mirrored, as if to endorse, legitimize or

sympathize with, her prior employer and "sister agency" CCHR.

42. Plaintiff brings this action against DHR employees Chelsea John and Candace Tyndall for

willfully, and with malice, initiating the most recent of the police actions, referred to above, by

making knowingly false statements about the Plaintiff being "suicidal."

43. DHR's unjustified action showed intent to harm and intimidate Plaintiff after she made

complaints about DHR and informed them of her action against CCHR.

44. DHR's action, and its timing, also suggests retaliation on behalf of both DHR and CCHR.

45. Plaintiff also brings this action for compensatory, punitive and injunctive relief for deprivation of

her equal protection under the laws of the United States and the State of New York as they relate

to her disability and housing.

46. Plaintiff asserts that DHR engaged in conspiratorial attempts to mislead Plaintiff about:

    *a.* The scope of the law

    b.  DHR's role in enforcement

    c.  Plaintiff's rights to evoke protection.

47. The New York State Division of Human rights receives federal funding from HUD, which makes

them subject to the Rehabilitation Act of 1973 and its amendments (RA).

48. DHR's contemptuous attitude and intentionally slanted determination of "no probable cause" to

dismiss Plaintiff's case, while ignoring all evidence to the contrary, and their refusal to enforce the laws enacted to protect Plaintiff, was tantamount to a denial of services; as it was a denial to bring a proper and legitimate suit against Plaintiff's landlord to enforce her disability rights.

49. Plaintiff was literally told to hire her own lawyer and bring a private civil case. However, since Plaintiff lives on only SSD income, she has been unable to afford to do so. Hence, DHR's denial has left Plaintiff to continue suffering in constant pain and completely unprotected by the laws that were enacted to help her.

50. Like CCHR before them, DHR employees Chelsea John and Candace Tyndall showed a deliberate and depraved indifference to Plaintiff's suffering and pleas for urgency in her case from the start. They stated, in plain language, that they did not care that Plaintiff was disabled and in unnecessarily excessive physical pain due to her landlord's refusing a proper disability accommodation; they insisted that Plaintiff's pain was not cause for DHR, themselves, to offer any accommodation of prioritization nor would her case be expedited in any manner to alleviate her physical distress.

51. Then, seemingly out of spite, DHR even failed to meet the 30 day deadline to take action; imposed by HUD, from whom the case was referred.

52. As the 30 day deadline approached, Plaintiff complained to Chelsea John and Candace Tyndall about their refusing to take proper action on her complaint. Ms. John told Plaintiff if she wasn't happy she could get her own lawyer and file her own case or go to CCHR.

53. At that point, Plaintiff informed Ms. John and Ms. Tyndall of her lawsuit against CCHR and, in so doing, related the details of their bias treatment and stated that the only "action" CCHR took was to **falsely** report Plaintiff, to authorities, as being "suicidal." Plaintiff made it very clear how ridiculous, inappropriate, unhelpful and traumatizing CCHR'S actions were.

54. Yet, in a truly malicious response to Plaintiff's complaints, Chelsea John and her program aide, Candace Tyndall, proceeded to make a similar "suicide" report to authorities without any cause

or basis on which to make such a claim.

55. Chelsea John and Candace Tyndall's call to authorities was a completely manufactured and false report of Plaintiff being suicidal and led to the police and EMS action that followed.

56. Plaintiff filed a timely claim against the City for the NYPD/FDNY-EMS action described above. But, she held off on filing further legal action, as naming Chelsea John and Candace Tyndall as codefendants in a lawsuit against the City, as has now been done, would have interfered with the claim Plaintiff needed DHR to file on her behalf against her landlord. Any settlement with DHR in this case could have jeopardized a DHR decision in Plaintiff's favor against her landlord if that decision was seen as biased or coerced by this suit.

57. After the spiteful police action, it appeared that Plaintiff's case at DHR was even more de-prioritized by Ms. John and the assigned investigator Elena Perlongo, as it took 395 days to conclude, as opposed to DHR's stated goal to resolve all cases within 100 days.

58. Plaintiff maintains that the delays appeared motivated by animus and unlawful discrimination.

59. DHR's deliberate and depraved indifference to Plaintiff's physical suffering and their disinterest in her case, was evident throughout the entire process, up to and including DHR's final determination dismissing Plaintiff's complaint.

60. DHR's contempt was not only evident when they "sat" on Plaintiff's initial complaint for more than a month, despite HUD's 30 deadline; but, then DHR further "sat" on Plaintiff's landlord's response for three months, before contacting Plaintiff for a rebuttal.

61. After the rebuttal was submitted, DHR "sat" on the case for another six months before issuing their sloppy, legally flawed and nonsensical dismissal.

62. Chelsea John, not only failed to disclose, or recuse herself due to, past employment with CCHR after finding out about Plaintiff lawsuit against them but, she also refused to recuse herself, even after numerous requests from Plaintiff to reassign her case to the Disability department instead of Ms. John's Housing Investigation department.

63. These requests were made by Plaintiff when Ms. John showed little understanding of disability law and even ignored documents Plaintiff offered with guidance from HUD on how her particular circumstances were legally addressed by the intersection of FHA and Americans with Disabilities Act ("ADA").

64. Ultimately, Defendants Chelsea John and Elena Perlongo handed down a bias and nonsensical determination of "no probable cause," denying Plaintiff equal protection of what should have been her clear disability rights under the Fair Housing Act ("FHA").

65. A first determination DHR produced had to be recalled due to its sloppy and erroneous statement of facts and Plaintiff's complaint of its failure to address a single shred of her evidence.

66. Plaintiff is under the impression that it was John Herrion who helped facilitate that reassessment.

67. Mr. Herrion also assisted in overriding Ms. John's denial of Plaintiff's request for a disability accommodation extending her time to rebut.

68. Plaintiff has only included Mr. Herrion's name as a defendant due to his lack of response after the revised determination was issued, which did nothing but correct DHR's erroneous recitation of facts and, add a single paragraph referencing Plaintiff's mountain of evidence before dismissing all of it in its entirety without explanation.

69. It is Plaintiff's understanding and belief that Mr. Herrion has left his position at DHR. If he assures Plaintiff that he continued to make good faith efforts to assist her, but was overridden by Chelsea John, Gina Martinez or some other superior, Plaintiff is happy to drop any claim against him.

70. Plaintiff brings this action to remedy Defendants' unlawful conspiracy to deny Plaintiff her disability rights afforded by FHA, ADA, RA and local and state laws of New York.

71. DHR is tasked with both investigating and enforcing the laws.

72. In both the determination handed down and by spoken word these employees of DHR unlawfully

endeavored to collectively convince Plaintiff that her disability rights did not exist and the laws did not protect her.

73. Defendants, as state actors, misrepresented the scope of the law and Plaintiff's rights, under color of law. Their failure to properly enforce the laws ultimately, denied Plaintiff equal protection under the law in violation of the Fourteenth Amendment.

74. Failure to offer lawful protections caused the disabled Plaintiff to endure continued extreme physical pain, by way of chronic, unbearable migraines; caused as the direct result of housing conditions, from which Plaintiff sought protection and the impact of those conditions on Plaintiff's disability (namely a traumatic brain injury).

75. The severe migraines have become a daily, life altering and agonizingly debilitating situation, for which Plaintiff seeks both future rectification and past compensation.

76. To this end, Plaintiff seeks both compensatory and punitive damages for physical and emotional pain and suffering and violations of her civil and disability rights.

77. Plaintiff also seeks an annulment of the Determination handed down by Chelsea John, without which HUD refuses to countermand DHR's decision.

78. Plaintiff also contends that there exists a discriminatory bias at DHR which prioritizes cases that are based on race, gender, sexual orientation and other "Diversity, Equity and Inclusion" discrimination issues to the detriment of those who are disabled… constituting a net result equivalent to discrimination against those with disabilities… and discrimination against those who are not in a minority race or sexual orientation group.

79. And, while Ms. John was wise enough not to overtly make openly racist statements to Plaintiff, as her colleagues at CCHR had, her clear mirroring of their decision including its bizarre sympathies with Plaintiff's abusive neighbor… who happens to be Hispanic…. were otherwise inexplicable.

80. Plaintiff will demand, in discovery, demographic and subject matter data on cases DHR deemed to have "probable cause" and which were worthy of them filing suit on behalf of the

complainants.

81. The slanted content, glaring omissions, and flawed legal position of DHR's dismissal so closely mirror the prior wrongful dismissal handed down by CCHR, that it appears DHR was blindly reinforcing the opinion of their reciprocal agency. Unfortunately, CCHR made it overtly clear that their treatment of Plaintiff was rooted in racial discrimination, which led to the prior related lawsuit (23-CV-05890-LGS) being filed in this court. The similarities in the decisions, therefore, insinuate similar motives in arriving at such flawed conclusions.

82. CLNY Chapter 18 Article 15 Section 295 defines the general duties of DHR. Part 13 states, "To promote the creation of human rights agencies by counties, cities, villages…" and Part 16 states, "To have concurrent jurisdiction with the New York City Commission on Human Rights over the administration and enforcement …" Therefore, DHR's relationship to CCHR must surely make them aware of CCHR's activities and knowledgeable of the anti-Caucasian pedagogy being promoted at CCHR. Therefore, DHR's alliance with CCHR in their deprivation of Plaintiff's rights to equal protection under FHA law, make DHR's motives equally as questionable as CCHR, even if not so overtly and clumsily exposed.

83. Plaintiff brings this action to remedy DHR acting in a retaliatory manner toward the Plaintiff when she complained of delays or the seriousness with which they addressed her case.

84. Plaintiff brings this action to remedy DHR personnel causing, through false and misleading statements, the violation of Plaintiff's rights of due process with 1) unlawful detention and unlawful imprisonment, 2) unlawful entry into Plaintiff's home, in her absence, without a warrant, and 3)unlawful search of private property and papers.

85. Plaintiff also brings this action to remedy NYPD's pattern of behavior in using the power of their office to harass and intimidate Plaintiff on numerous occasions, over a period of years. Such behavior has been done, under color of law, in furtherance of aiding and abetting acts of retaliation and intimidation on behalf of various city and state actors, as well as Plaintiff's

landlord.

86. This action is brought against Defendants New York City, et al, for their actions on May 2, 2023 and May3, 2023 when they, without sufficient cause, unlawfully removed Plaintiff from her residence, falsely detained and imprisoned her and violated Plaintiff's rights of due process.

87. This action is also brought against New York City, et al, for exhibiting a pattern of behavior, where by, on more than one occasion, they have, without sufficient cause, unlawfully moved Plaintiff, falsely detained and imprisoned her and violated Plaintiff's rights of due process.

88. This action is brought to remedy NYPD's unlawful entry into Plaintiff's apartment in her absence and the unlawful search of her private papers and property without a warrant on May 2, 2023.

89. Plaintiff seek punitive and compensatory damages for physical and emotional pain and suffering sustained and endured due to Defendants' failure to enforce ADA and FHA laws and for Defendants conspiring to deny Plaintiff equal protection under the law.

90. Plaintiff seek punitive and compensatory damages for egregious violations of Plaintiff's civil and disability right and the violation of her rights of due process.

91. Plaintiff further seeks punitive and compensatory damages for extreme emotional distress, causing terror and lasting emotional and psychological harm.

92.  Plaintiff further seeks punitive and compensatory damages for public embarrassment and damage to reputation.

**BACKGROUND**

***Plaintiff's interactions with CCHR leading up to interactions with Defendant DHR***

93.  Plaintiff resides in an "affordable unit" in a building subsidized by the New York State 421–a tax abatement program, which promotes mixed income occupancy (apportioned 80% market rate/20% affordable).

94. According to HUD: "The ADA applies to housing that is funded by a state or local government, and might also apply to some parts of other private housing, such as a rental

office that is open to the public."

95.  Plaintiff's lease began on September 25, 2017.

96.  Plaintiff's apartment is overseen by Housing Preservation and Development (HPD) and is
    designated as, not only an "affordable unit", but also specifically a "disability unit"; and, was
    awarded to Plaintiff in a public lottery on the basis of her disability.

97. Plaintiff's landlord is fully aware of Plaintiff's disability status and the
    "disability" status of the Plaintiff's specific apartment unit within the building.  The Plaintiff's
    apartment unit includes wheelchair accessible appliances and shelving as well as additional
    safety features include grab-bars in the bathroom for mobility assistance and flashing lights
    on the fire alarm for hearing-impaired persons.

98. Plaintiff's lease, and all leases in the building, contain a "no smoking" clause that classifies
    the entire building, including the interior of individual units, as "smoke-free."

99. Plaintiff suffered a traumatic brain injury, which is part of her disability.

100.    This brain injury has made Plaintiff highly susceptible to migraines and vertigo
    triggered by exposure to chemical irritants including cigarette smoke and vape fumes.
    Desiccating and dehydrating chemical such as formaldehyde, found in smoke and vape
    fumes have a particularly adverse effect on the level of pain Plaintiff experiences due to
    atrophy (shrinkage) of her brain.  This effect is similar to pain experienced by a healthy
    person with a "hangover" due to dehydration after imbibing large quantities of alcohol.
    Only, Plaintiff's pain in much worse and has become a daily torment due to the lease
    violating behavior of her smoking/vaping downstairs neighbor and the infiltration of fumes
    into Plaintiff's apartment.

101.    Plaintiff's disability makes the "no-smoking" clause of her lease a necessity and not
    simply a preference.

102.    Protection, for chemically sensitive disabled persons, from second-hand smoke and

chemical fumes is covered under the Fair Housing Act as it intersects with the ADA.

103.    Demanding strict enforcement of a preexisting No-Smoking policy is considered a

reasonable accommodation for a disabled person with such sensitives under the FHA.

104.    Plaintiff's apartment conditions and her relationship with her landlord have been an

exercise in patience and tolerance (see Further Background below) from day one.

105.    However, things became truly intolerable when Plaintiff realized that the migraines from

her traumatic brain injury had become so chronic and intractable, since moving into the

building, because of powerful formaldehyde fumes that were saturating her apartment every

night as she slept.

106.    It took months to figure out what was happening and why Plaintiff kept waking up in so

much pain.  But, the neighbor began engaging in the activities during the day and Plaintiff alos

began having so much trouble sleeping that she was up all night.  At that point it became clear

what was happening.

107.    The downstairs neighbor was heating a floor cleaner called Fabuloso and using it to cover

the smell of her and her daughter's lease-violating cigarette and vape smoke.

108.    Fabuloso is a toxic formaldehyde containing floor cleaner and should never be aerosolized

by heat.

109.    Plaintiff's pleas to management for relief were scoffed at.

110.     Plaintiff was getting sicker and sicker each day.

111.    On April 7, 2018, after a week of violently throwing up from the powerful fumes entering

her apartment and being too dizzy to stand up, Plaintiff had to call an ambulance to take her to

the hospital.   And while the hospital noted her dizziness, it needs to be acknowledged that

Plaintiff's condition immediately began to improve upon removal from her apartment's toxic

environment.

112.    After the hospital visit, Plaintiff  tried again to reminded her landlord of the parameters of

her disability, including her head injury, and her need of special accommodations to protect her from migraine triggering chemical fumes… including smoking and vaping… and the incredibly toxic and dangerous "off-label" use of the floor cleaner her neighbor was using to cover the smell of smoke.

113.    It must also be noted that Plaintiff did, in fact, on numerous occasions smell the actual smoke the neighbor was trying to hide with the Fabuloso.

114.    Plaintiff then supplied her landlord with the above referenced hospital records, along with a brain MRI report from March 27, 2018, which noted anomalies "consistent with" physical "evidence" of the migraines Plaintiff had been complaining about.

115.    After being threatened with legal action, Plaintiff's landlord agreed to a mediation process in late-April 2018.

116.     The fumes stopped

117.    However, chronic wall damaging water leaks plagued Plaintiff's apartment… 24 leaks in six years… to the date of this action. (see Further Background below) and the relationship between Plaintiff and her building management continued to deteriorate.

118.    Plaintiff was forced to call the Department of Buildings (DOB) when water kept seeping through exterior walls of the building into the interior of Plaintiff's apartment. And on April 27, 2018 the DOB issued the landlord a summons for "failure to maintain building in code compliant manner", resulting in a fine of $250.

119.    June 27, 2018 was the latest date by which the landlord was required to give Plaintiff her renewal lease.  However, not only was the landlord failing to send the renewal in a timely manner, but after almost a year, had still refused to return the original counter-signed lease.

120.    When the lease renewal finally arrived, it included several illegal clauses added to a rider, which would allow the landlord to capriciously retract the affordable rent that had been advertised in the lottery.  All the affordable apartments in the building had been reported to the

rent stabilization authority as having "preferential rents" while the actual registered "stabilized rent" was claimed to be 50% higher. Plaintiff reported this to Housing Preservation and Development (HPD), the agency responsible for overseeing the lotteries and affordable housing programs. The agency lawyers stepped in and forced Plaintiff's landlord to remove the unlawful clauses.

121.    Shortly afterward, the front disability doors began breaking down on a regular basis ... and remaining broken for months at a time. Plaintiff's complaints about the doors were met with ridicule and mockery.

122.    After years of escalating confrontations, the treatment of Plaintiff became truly abusive. Management instructed building staff to ignore Plaintiff and any of her complaints. Plaintiff was regularly refused the respect and services afforded other tenants.

123.    Building staff were told not to speak to Plaintiff, but to just refer her to the office on Long Island. At which point, the Long Island management team would refuse to answer the phone or return voicemail or email messages.

124.    The obnoxious behavior took a particularly humiliating turn on April 29, 2021, with a confrontation between one of the doormen and the Plaintiff. It concerned the broken disability entrance doors. The doorman mocked the Plaintiff's need to use the doors and refused to open them while leaving her standing outside in the rain. When the doors are broken, as they were at that time, the doorman must force them opened with both hands. They are sliding doors without handles for manual use by tenants when unaided by the electronic mechanism.

125.    Plaintiff's subsequent complaint against the building and the doorman became a turning point and initiated what Plaintiff has now perceived to be a concerted effort to harass her out of the building.

126.    By June 2021 the fumes entering Plaintiff's apartment had returned as a daily, chronic problem and though, all leases in the building contain "no-smoking" riders, management not only

refused to assist Plaintiff in stopping the source of the fumes, but began running interference to protect the violator; perhaps even encouraging the behavior to harass Plaintiff.

127.    Management facilitated the lease violating activity by lying on numerous occasions to both the Plaintiff and her upstairs neighbor, who was also suffering ill effects from the fumes.

128.    Management completely ignored Plaintiff's disability needs to be protected from exposure to the chemicals entering her apartment and once again mocked Plaintiff's tearful pleas and multiple requests for an "accommodation" to simply enforce the existing no-smoking policy of the building.

129.    Management and the superintendent (who now carried a personal vendetta against Plaintiff for her complaints against him associated with all the water leaks and damage) would lie to Plaintiff about making efforts to investigate the fumes and continually claim that Plaintiff was experiencing something they could not detect.

130.    This continued even after Plaintiff purchase an air quality monitor to prove toxic fumes were entering her apartment … and at what times of day.  The monitor confirmed the daily late-night activity Plaintiff had been reporting.

131.    Plaintiff supplied the data to management.  Still, Management refused to investigate during the times the fumes were at their worst (from 12 a.m. to 4 a.m.).  And even though the superintendent lived in the building, he refused to cooperate at that hour.  He refused to allow any staff to disturb him after 5 p.m. unless there was a building emergency.

132.    The superintendent's lack of motivation was compounded by his hatred of Plaintiff and the fact that he was himself a smoker and so resented the no-smoking policy in the building.

133.    Management showed a depraved indifference to Plaintiff and her disability needs when they refused to simply enforce their own "no-smoking" policy, despite being made aware of Plaintiff's severe level of pain being triggered by the fumes.

134.    Plaintiff's landlord then refused to participate in a second mediation request and

refused to engage in good faith in any further meaningful negotiations directly with Plaintiff.

135.    The level of distress the fumes caused Plaintiff increasingly appeared to be a convenient source of harassment the landlord had stumbled upon and they were using it to constructively evict Plaintiff and force her out of the building.

136.    In April 2022, Plaintiff's upstairs neighbor, moved to another apartment in the building to escape the fumes.  Her problem, ironically, got worse.  In April 2023, to protect her children's health, she moved her family out of the building altogether.

137.    On March 22, 2022, as the conditions in Plaintiff's apartment caused her health to continue deteriorating, and her physical pain and emotional distress became so unbearable it was effecting her ability to live in peace and function in life, Plaintiff approached The New York City Commission on Human Rights (CCHR), seeking protection and assistance with filing Americans with Disabilities Act  (ADA) and Fair Housing Act (FHA) claims against her landlord.

138.    The core of Plaintiff's request for protection centered on:

    a.    the toxic fumes entering her apartment and triggering migraines associated with her disability

    b.    chronically broken disability front entrance doors

    c.    discrimination and abuse by management based on Plaintiff's affordable tenant status

    d.    retaliation due to outside complaints filed with the Department of Buildings and HPD, and internal complaints filed against the superintendent and certain staff members due to countless water leaks and failed building maintenance.

139.    Regardless of massive amounts of documentation including: medical records, air quality monitor readings, video and audio of abuse by building staff (including an assault), texts and testimony of a neighbor, city records from DOB, emails from HPD and mountains of emails between building management and Plaintiff, CCHR refused to take Plaintiff's claims seriously and

dismissed her request to file a formal complaint.

140.    CCHR's conclusions were factually and objectively untrue, and could only be so interpreted

by ignoring the evidence in its entirety.

141.    CCHR's refusal to offer Plaintiff proper legal representation and failure to enforce the Fair

Housing Act or even the State and City laws, which should have protected Plaintiff as an

affordable tenant, were explicitly motivated by the fact that Plaintiff was not a racial minority.

That racial discrimination in now the subject of the related lawsuit actively filed in this court (23-

CV-05890).

142.    After Plaintiff made it clear that she intended on taking action against CCHR for racial

discrimination, she sent them a sarcastic, angry email inquiring whether they simply expected

Plaintiff to continue living in agonizing pain.  Plaintiff then made a black humored joke suggesting

that, if she was smarter, she should just kill herself …  a simple, straight forward solution to end

the pain.  This was a sarcasm intended to inspire a reassessment of their callous disinterest in

another person's suffering.  It was also meant as a scathing black humored shot at what has

become a horrifying new "service" offered by the Canadian "health care" system… which is now

pushing euthanasia on a shockingly large swath of their disabled population.  Plaintiff is not now,

nor has ever been, suicidal.  Plaintiff has desperately been seeking help to improve her quality of

life… not end it.

143.    Despite the clear hyperbole in Plaintiff's email, CCHR, viciously and intentionally took the

message literally as an excuse to call the police and report Plaintiff as a suicide threat.

144.    A large NYPD/FDNY EMS S.W.A.T. team appeared at Plaintiffs door and demanded she be

taken for a psychological evaluation.

145.    Plaintiff put the lead officer on the phone with the attorney who was handling the lawsuit

at the heart of the accident, which caused Plaintiff's disability.  He explained that Plaintiff was, in

fact, not suicidal.  Plaintiff explained in detail how the "suicide" call was likely generated and

asserted that it was inaccurate and even, perhaps, an intentional act of retaliation.

146.    It was clear to any reasonable person that Plaintiff exhibited no signs of being mentally

unstable or a danger to herself or others.

147.    When the officers made numerous threats of taking Plaintiff by force, she relented out of

fear of having her current injuries further aggravated.  Plaintiff broke her back in two places,

dislocated the nerve in her elbow and suffered a traumatic brain injury among other injuries in a

prior slip and fall accident.

148.    Once Plaintiff agreed to cooperate she told the officers about her injuries.

149.    Regardless of this fact, the officers acted with a deliberate, vicious, depraved indifference to

Plaintiff's vulnerability.  As soon as Plaintiff stepped out of the door to her apartment, she was

violently grabbed and handcuffed.  Her cane was snatched from her hand and she was shoved

into a rickety EMS folding chair and forced to lean her injured back onto her handcuffed wrists.

The handcuffs were also put on sideways with the metal cutting into her wrist bone.  As she

shrieked in pain, Plaintiff was mad to look truly insane in front of her neighbors as she was

dragged out of the building and placed in an ambulance.

150.    By the time Plaintiff arrived at the hospital she was truly distraught... entirely due to the

trauma of what the police and EMTs had just done to her.  She was in so much physical pain and

so emotionally traumatized that she could not stop sobbing.  And, though the doctors were

immediately able to determine that Plaintiff was not suicidal or a threat to herself or others, they

still could not release her in her distraught state and held her over night, against her will without

admitting her to the hospital.  It was a truly unlawful imprisonment.

151.    Plaintiff's other active lawsuit in this court (23-CV-05890) has named the City Of New York

for their municipal liability in the NYPD and NYFD EMS, as well as, CCHR and their employees, for

their part in the above actions.

152.    Plaintiff brings this new complaint to cover a another incident, repeating the egregious

actions by NYPD and NYFD EMS, with the implication that this is a pattern of behavior … and that

the most recent act, in particular, was done with intent and knowledge of the wrongfulness of

such actions and fully aware that claims had already been filed against them and put them on

notice of the wrongness of their actions.

153.    After Plaintiff's truly horrifying experience with CCHR, she took her issues against her

landlord to the U. S. Department of Housing and Urban Development ('HUD") to file a federal

complaint and seek federal protection of her ADA and FHA rights.   HUD recognized Plaintiff's

claims, but stated that they first had to give the State Of New York an opportunity to resolve the

matter.

## STATEMENT OF FACTS

### Plaintiff's initial contact with NEW YORK STATE DIVISION ON HUMAN RIGHTS and DHR's stated indifference to Plaintiff's pain and suffering

154.    On April 10, 2023, HUD referred Plaintiff's complaint against her landlord to The New York

State Division Of Human Rights ("DHR") with the caveat that the agency must take action within

30 days, or the case could revert back to HUD.

155.    When a couple of weeks passed and DHR made no attempt to contact Plaintiff, she phoned

the number on the documents HUD had sent her and asked to speak with Chelsea John the DHR

Director, Housing Investigation Unit, who was listed as the contact person.

156.    Plaintiff spoke to DHR Program Aide Candace Tyndall, and tried to explain the pain she was

in and asked if there was any means to address Plaintiff's urgent need for action and

intervention. Ms. Tyndall promised Plaintiff a call back from Ms. John.

157.    On May 2, 2023,  22 days into the 30 day time period HUD had designated as a deadline to

take action, Plaintiff had still not heard from DHR or received the promised call back from Ms.

John.  She made a second call to DHR.

158.    On this day Plaintiff spoke with both Ms. Tyndall and Ms. John, who both showed irritation

at Plaintiff's inquiry.  Plaintiff was then told they would get to her case in the order in which it

was submitted and went on to state in direct and plain language that Plaintiff's pain was not

going to have any effect on expediting her case and there were no disability accommodations

available to prioritize any case based on alleviating a claimant's physical pain.  Plaintiff was then

"told off" for calling and bothering the staff of DHR and asked not to call again.

159.     When Plaintiff took offense at the callous, unprofessional and unnecessarily rude attitude

of Ms. John and Ms. Tyndall.  Ms. John snipped, "If you are not happy you can take you're case to

the City Commission on Human Rights."  Plaintiff then related the backstory of the horrible

experience she had just had with the New York City Commission on Human Rights (CCHR) and

informed Ms. Tyndall and Ms. John about her lawsuit against that agency.

160.     Plaintiff added that CCHR were so unprofessional that, instead of helping her and

protecting her disability and civil rights, they violated her rights.  Plaintiff explained they did that

by twisting her pleas for help into something they weren't and calling in a fake suicide threat;

causing her to be violently  "S.W.A.T.ed"  by the police and hauled off for a psychological

evaluation.

161.     After relating the horrors of her CCHR experience, Plaintiff, perhaps a bit emotional from

having to relive the traumatizing events in her mind, made a last tearful plea imploring DHR to

take her suffering seriously and not dismiss it as imaginary, exaggerated or unimportant as CCHR

did.  But, Ms. Tyndall and Ms. John remained unmoved.

162.     Plaintiff, ended the conversation stating that she was getting "vibes" from DHR as equally

unhelpful as CCHR, and felt they were like-wise "blowing her off."  Plaintiff said she feared a

repeat of the previous year's disregard from CCHR.

163.      Plaintiff then reminded Ms. Tyndall and Ms. John of the looming 30 day deadline and

begged them to at least meet that and take action to put an end to the pain she was experiencing

everyday.

*DHR falsely reports Plaintiff as a suicide threat:*
*retaliation and intent to intimidate*

164.    The only "action" Ms. Tyndall and Ms. John took, immediately following that second call,

was to viciously and intentionally initiate a repeat of, what they knew at that point was, an

extremely traumatizing event for the Plaintiff.  They called authorities and reported another fake

suicide threat against her.

165.    This was done with full knowledge that no such threat was made or alluded to by Plaintiff

in any written, spoken or other communication with them.

166.    After Plaintiff's nightmare experience with CCHR, she was extremely cautious with her

words; and so, took pains to ensue that at no time during any phone conversation or other

communication with DHR, did Plaintiff ever say, joke about, allude to or hint at in any way, that

she was suicidal or a danger to herself or others.  She made it clear she merely wanted help to

address the problem causing her pain.  Still, Chelsea John and Candace Tyndall called the

authorities and made the false statements about Plaintiff being suicidal.

167.    Ms. Tyndall and Ms. John were fully apprised of the devastating effects of such an action

since Plaintiff had just recounted it to them in the details about her experience with CCHR; And,

therefore, had full knowledge of the outcome of such an action and the likelihood of physical and

emotional harm to Plaintiff.

168.    This left Plaintiff dumbfounded and emotionally shattered… particularly, that it was done

with such knowing malice.

169.    Ms. Tyndall and Ms. John took Plaintiff's recitation of her horrible experience with CCHR,

not as a warning of how not to handle the case, but as an invitation to copy exactly what CCHR

had done.

170.    The complete baselessness of the false suicide report opens questions of motive.

171.    Plaintiff, only recently (a year after these events), found out the Chelsea John was

previously employed at CCHR and failed to disclose that fact to Plaintiff at the time Plaintiff

recounted her experiences and informed Ms. John of the legal action she was taking against

CCHR.

172.    Plaintiff wonders whether the suicide report was made to retaliate against Plaintiff on

behalf of Ms. John's prior employer, and sister agency; or, simply done to intimidate Plaintiff and

"put her in her place" for daring to think she deserved any prioritization due to her disability and

pain.

173.    However, regardless of motive, the action was an intentional false report without

legitimate basis.

174.    It showed malice and a complete lack of true "concern for the Plaintiff's well-being", as it

initiated yet another threatening and intimidating visitation from authorities and did nothing to

assist Plaintiff in solving the problems for which she was seeking help.

175.    The false reporting also indicated that these representatives of DHR, like the CCHR staff

before them, were treating Plaintiff's claims with contempt as imaginary, unimportant or

perhaps born of exaggerated expectations of  "white privilege" that needed to be deflated.

176.    DHR made it even clearer how little they cared about Plaintiff's claims of pain when they

proceeded to drag their feet and ignored the 30 day deadline imposed by HUD.

177.    Plaintiff could do nothing but endue her pain and waited patiently.  DHR's false call to

authorities, and it's ensuing terror (explained fully below), effectively succeeded in intimidating

Plaintiff and demonstrated the dire consequences of any attempts to put pressure on DHR to act.

**Violation of due process**
***with unlawful imprisonment – AGAIN***
***And warrantless entry and search***

178.     Around 6 p.m. on May 2, 2023, after Plaintiff's earlier call with DHR, she left her apartment

to attend an event with friends.  She turned her cell phone off during the event.

179.    Around 10 p.m., as Plaintiff and her companions were sitting down for dinner in a

restaurant, Plaintiff turned her phone back on and received a strange call from her step-sister asking if she was alright. Plaintiff was unsure what prompted the call, as they had not spoken in quite a while and it was later in the evening than any usual call from her. Plaintiff, said she was fine and was sitting down to eat, so would need to call her back later. The reason for call made itself know shortly thereafter.

180.     Around midnight, as Plaintiff and her companions were getting in the car to return home, her phone rang again. When Plaintiff answered it, a police officer was on the line and, in a very stern voice, asked Plaintiff where she was. Plaintiff was mystified and asked him why he was asking her such a question. The police officer related the fact that Plaintiff had been reported as a suicide threat and they were at her apartment building. The officer added that they had been trying to locate Plaintiff for many hours. Suddenly, the reason for the call from Plaintiff's step-sister became clear.

181.     It was later revealed that Plaintiff apartment was illegally entered and searched in her absence and then a conspicuous police presence had staked-out the lobby of Plaintiff's building for hours, making it truly embarrassing and humiliating when neighbors later found out it was for her.

182.     Unaware of what had been going on, Plaintiff was completely cooperative and told the officer on the phone that she was on her way home and would be happy to explain that the information they received was erroneous. Plaintiff then held her phone up while the three companions she was with laughed and told the police that Plaintiff was in no way suicidal.

183.     After dropping off two of the companions, Plaintiff's third companion, Tony, drove her home, arriving at Plaintiff's apartment building at 12:45 a.m. on May 3, 2023.

184.     Plaintiff, out of an abundance of caution due to the last experience with the police, which led to the related lawsuit, turned on the camera of her cell phone as she exited the car and recorded the entire encounter.

185.    Plaintiff and her friend Tony entered the lobby of Plaintiff's building and were met by

Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994), Police Officer Christian

Orellana (Shield No. 15363) and Police Officer Jose Quintuna-Guaman (Shield No. 7157).

186.    Plaintiff, made a concerted effort to unravel the misinformation and confusion surrounding

the source and motivation for the "suicide" call, which brought the police into the current

situation.  But, they were unyielding in their stance and refused to cooperate with Plaintiff's

attempt to clarify the story.

187.    The Police even refused to acknowledge the source of the third-party report claiming

Plaintiff was suicidal.  At that point, Plaintiff was unsure whether the intentionally false report

was made by her vindictive landlord, her abusive neighbor or the employees at DHR, with whom

she had spoken earlier in the day.

188.    When Plaintiff pointed out the danger of violating her civil rights by allowing any stranger

or unknown person, with ulterior motives, to file a false report and then refuse her, as the

accused, any right to refute the claim before being wrongfully taken by force, the officers

confirmed that this was their policy and protocol.

189.    The police completely and grossly ignored their obligation to properly assess the situation

on-site and honor Plaintiff's rights of due process.

190.    Plaintiff even gave the police fair warning of her intent to file this lawsuit; and pointed out

that this same abuse of her rights, on a previous occasion, were at the heart of a related lawsuit

she was in the process of filing.  She implored the officers not to repeat the offense.

191.    However, even though Plaintiff was perfectly lucid and rationally explained the extensive

backstory leading up to the inaccurate and inappropriate "suicide" call, and even though she

showed no signs that there was any merit to the report the police received, the officers

proceeded to call the FDNY EMS and report that Plaintiff had finally arrived home.

192.     When the EMT's, Frank Tarsillo and Ryan Stack, arrived, Plaintiff repeated all of the same

information she had given to the officers.

193.    After 20 minutes of Plaintiff trying to reason with both the police and the EMT's, Police

Officer Grey Castro, got very aggressive and threaten to handcuff Plaintiff to a stretcher and take

her by force if she didn't walk herself out of the building and get in the ambulance.

194.    Plaintiff put all the officers and EMTs on notice that, if they insisted on taking her, she

would bring legal action.  They did not care and proceeded with their intimidating threats.

195.    Plaintiff, for no other reason than complete terror and fear of another assault by the

officers and further injury to her existing injuries, agreed to walk to the ambulance and cooperate

under duress.

196.    However, while Plaintiff did her best to protect herself from further physical trauma, this

did nothing to alleviate the additional absolute terror she felt for being forced to submit herself

to a medical system that could, on a whim, forcibly drug or "treat" her while she was deemed to

be under their authority.

197.    Taking ones right to self-determination by labeling them mental incompetent, even for an

hour, is among the most severe depravations of ones civil rights.  It is absolutely terrifying to be

subjected to this and should be exercised with the utmost of caution and only in the most

extreme of circumstances.  Nothing was justified in subjecting Plaintiff to such egregious,

dehumanizing disregard of her rights.

198.    Plaintiff also pointed out that these kidnappers had a responsibility to safely return her to

her home after forcing her to submit to this unnecessary examination.  It was already after 1 a.m.

and Plaintiff would end up being released in the middle of the night without a safe passage home.

199.    The EMT's and Police made false assurances about Plaintiff being supplied transportation

home.

200.    Plaintiff was indeed found to be not suicidal, but when ready for release, she became

stranded at the hospital when the hospital was unable to book a medical car service or provide

safe transportation until morning.

201.    Plaintiff had no money for a taxi and was too frightened to attempt getting home on the Bus

or subway in the wee hours of the morning.

202.    Plaintiff was kept up all night, unable to sleep in the psych ward of Roosevelt Hospital.   She

broke down in tears as morning approached and she realized she was so exhausted she was

going to have to give away the matinee ticket to the Broadway show *Kimberly Akimbo,* which she

had been given the day before.  After years of poverty, living on Social Security Disability... and

the Covid shutdown... Plaintiff had not seen a Broadway show in a decade.  And now she was

going to miss this opportunity over such a senseless and lawless deprivation of her freedom.

203.    The sadness of missing out on the show and the disorienting terror of being held against

her will, by people with the power to do whatever they please to her, were only compounded

when Plaintiff arrived back home.  Plaintiff was overwhelmed with a crushing sense of being

violated when she realized her apartment had been entered in her absence.

204.    However, Plaintiff's apartment wasn't only entered to see if Plaintiff was there... as in a

"wellness check.'  It was obvious that her personal things had been illegally searched.  There

were items on the floor, boxes overturned and even some banners, from a peace really Plaintiff

had attended, partially unrolled ... as if to obtain information about Plaintiff interest and such.

205.    This was not a "wellness check."  It was an illegal search of Plaintiff's apartment without a

warrant.

206.    What made the entry even more intentionally unlawful, was the fact that, while trying to

convince Plaintiff that whoever made the call to the suicide hotline was credible, Officer Orellana

stated that the police were given a full description of Plaintiff including what she was wearing.

The only person who could have given the police that information was the Plaintiff's doorman.

He would have seen Plaintiff leaving the building.  Therefore, the police had no reason to believe

Plaintiff was in her apartment and no probable cause to enter when no one answered a knock or

bell.

207.    Plaintiff spent days sobbing and trying to overcome her sense of complete violation.

208.    The fact that all these violations were committed by government bodies against Plaintiff, BECAUSE she had desperately been expressing her need for help from the government to enforce the law and protect her disability right, has been too much to bear emotionally.   Plaintiff is now deeply emotionally scarred, lacking faith in the judiciousness of all government agencies and has become a much harder, sadder and more cynical person.

### *DHR drags feet, ignores HUD deadline and*
### *continues to ignore Plaintiff's suffering*

209.    On, May 3, 2023, after ascertaining that the call to the suicide hotline did not come from Plaintiff's landlord, Plaintiff called DHR for an explanation of the police action.   Ms. Tyndall and Ms. John confessed that the call was made by them.

210.    Ms. John and Ms. Tyndall showed a remorseless and callous disregard for the trauma they had just subjected the Plaintiff to; and added insult to injury by having the nerve to tell Plaintiff that she couldn't keep "calling everyday."  This was only Plaintiff's third phone call to DHR and spanned a period of nearly a month since the case was sent over from HUD.

211.    May 10, 2023, the 30 day deadline by which HUD had given DHR to take action, came and went without DHR meeting their responsibility.

212.    On May 17, 2023, DHR finally mailed out a complaint for Plaintiff to sign.

213.    On May 18, 2023, Plaintiff had a second of two mysterious, seizure-like reactions triggered by the vape fumes entering her apartment.

214.    Plaintiff reported this to her landlord but, as usual, they mocked Plaintiff and showed no interest or concern about the situation.

215.    On May 19, 2023, when DHR refused to answer the phone, Plaintiff left a message on their voicemail about the very scary seizure-like reaction and made another plea for more constructive or expedited help to end the conditions that were so adversely affecting Plaintiff's health and

perhaps even endangering her life.

216.     Plaintiff also emailed DHR copies of her medical reports with blood tests showing

anomalies that her doctor could not explain, but which were signals for developing cancer or an

autoimmune disease.  Plaintiff's doctor sent her to have an MRI of her adrenal glands and a

sonogram of her Thyroid.  Still no answers were found.  However, Plaintiff, can pinpoint the

general downturn in her health, and the now intractable nature of her, previously sporadic,

migraines, to the date she moved into her current apartment and began being bombarded each

and every night with toxic fumes from the apartment below her.

217.     DHR maintained their depraved indifference to Plaintiff's situation and, like Plaintiff's

landlord, did nothing to intervene and protect Plaintiff … or even expedite her case.

218.     It was not until Sept 14, 2023, almost 4 months later, that Plaintiff was finally contacted for

an interview by the investigator assigned to her case, Ms. Elena Perlongo.

219.     Plaintiff gave her account of things during the interview and supplied the names of other

tenants who were witnesses … including the upstairs neighbor who was ultimately

constructively evicted from the building by intolerable smoke and vape fumes penetration into

two separate apartments she attempted to live in.  She had moved to a second apartment when

the fume became too much in the apartment where she resided directly above the Plaintiff.

220.     Plaintiff asked Ms. Perlongo if she should email the various pieces of evidence spoken of in

the interview and the contact information for the witnesses.  Ms. Perlongo told Plaintiff not to

send anything yet … she would make up a list of what she needed and send it to Plaintiff.

221.     The list never arrived.

222.     It was not until Oct. 10, 2023, that Plaintiff was contacted for a rebuttal to her landlord's

response.  Plaintiff found out that the response had been returned to DHR on July 19, 2023,

almost three months earlier.  And now Plaintiff was given 13 days, until Oct. 23, 2023 to write an

extensive rebuttal.

*DHR refuses Plaintiff a disability accommodation*
*and fails to properly investigate her case*

223.    Plaintiff was struggling with her daily migraines and other associated problems with her

head injury, including double vision and vertigo … and she desperately needed to find legal

assistance … so, on Oct. 11, 2023, she timely asked for an extension of time to rebut.  At that time,

Plaintiff also made inquiries about her witnesses and why none of them had been contacted.

224.    No one from DHR would respond to Plaintiff's emailed application for an extension or

respond to phone calls placed to follow up.  Day after day passed and, as the deadline loomed,

Plaintiff was put into a state of panic,

225.    Finally, on Oct. 18, 2023, Chelsea John contacted Plaintiff and, though she had previously

said she would give Plaintiff's landlord (and their lawyers) an automatic 30 day extension to

respond, she begrudgingly only offered a two week extension to the pro se disabled Plaintiff.

226.    In response to Plaintiff asking about her witnesses not being contacted, Ms. John could

barely contain the contempt in her voice when she snapped,  "Ms. Perlongo is not your personal

investigator."  Ms. John made it more than clear in her attitude that DHR, however erroneously,

deemed Plaintiff's claims some sort of nuisance not worthy of their time.

227.    When Ms. John absolutely refused to give Plaintiff the same 30 extension automatically

afforded Plaintiff's landlord, Plaintiff was forced to evoke a disability accommodation request.

This was an earnest request, as producing these legal documents while fighting through

migraines is no small feat and requires much stopping and starting… sometimes Plaintiff is

completely incapacitated for days on end.  Plaintiff was also trying to find assistance.

228.    Ms. John again showed her absolute contempt for Plaintiff when she denied the

accommodation request and forced Plaintiff to appeal that decision to the agencies Disability

department.

229.    Mr. Herrion, the DHR Director of Disability Rights, stepped in and the extension was finally

granted… but only because of his intervention.  Ms. John's denial stands as an unreasonable

rejection of a disability accommodation.

### *DHR refuses to acknowledge Plaintiff's disability rights and conspires to denying Plaintiff those rights*

230.    When Ms. John showed such a complete lack of understanding of disability rights, Plaintiff asked that her entire case be transferred to the Disability Department, as that was a more appropriate department, considering the nature of Plaintiff's case.

231.    That request was denied by Ms. John.

232.    Ms. John's Housing Investigation Unit proceeded to treat Plaintiff like an ordinary tenant with a smoke complaint, for which there exist inadequate legal protection; and showed no comprehension of the specific protections covered by the intersection of ADA and FHA law which did indeed offer the disabled Plaintiff legal rights and protections.

233.    Ms. John and Ms. Perlongo's disregard of disability law was evident even after Plaintiff sent documents outlining the very specific issue of how FHA law addresses the subject of second-hand smoke in relation to persons with disabilities that are sensitized to it and adversely impacted by it. These documents and other legal references were also attached as exhibits with Plaintiff's rebuttal to her landlord.

234.    One of the above referenced documents was produced by the non-profit The Center for Social Gerontology, in Ann Arbor, Michigan, but addresses and outlines the legal arguments concerning federal law guidance issued by HUD.    Excerpts include:

> "It is clear that, if secondhand smoke infiltration or seepage substantially impairs a disabled person in their housing, the FHA requires the owner/landlord to protect the individual's health by making reasonable accommodations in the housing. If an owner/landlord fails to do so, s/he may be found liable under the FHA for having discriminated against the disabled person."

And

> "Such accommodations might include, among others, the following: enforcement of existing smoke-free or no smoking policies of the housing management;…"

And

> "If a person is disabled and this condition is caused or exacerbated by
> secondhand smoke, the owner/landlord, as stated by HUD, may not:
>    * Refuse to make reasonable accommodations in rules, policies,
>      practices or services if necessary for the disabled person to use the housing.
> Refusal to make such reasonable accommodations is discrimination under the FHA. And, as
> noted above, simply making a number of attempts to accommodate the disabled person is
> not necessarily sufficient. Whether the accommodations made are sufficient will be
> determined on a case-by-case basis.'

235.    **Enforcement** (emphasis added) of **existing (**emphasis added) no-smoking policies is all
Plaintiff has asked for from the beginning.

236.    No City or State agency has stepped up to enforce Plaintiff's federally protected rights.

237.    Both City and State agencies have continually conspired to convince Plaintiff that her rights
as a disabled person do not exist and the laws of the United States and the laws of the State and
City of New York do not offer her any protection.

238.    Instead, she has been left to languish in misery, being tortured by chronic, debilitating
migraine headaches, nausea, mysterious seizure-like reactions, anomalous blood work and, due
to the delay in obtaining any help, all aspects of Plaintiff's health have continued to deteriorate …
both mentally and physically.

239.    The only responses Plaintiff has received after asking for help have been: being brutalized
by police, humiliated in front of friends and neighbors, locked up in psych wards, emotionally and
psychologically abused by management and staff in her own home and been forced to spend
every ounce, of what little energy she has, fighting this battle in an effort to make this daily
torture end… she is no closer to achieving that goal today than she was at the start… years ago.

240.    Plaintiff's daily physical misery has caused her to gain 50 lbs. since moving into her current
apartment, seven years ago, and becoming bedridden most days by migraine pain or exhaustion
due to lack of sleep from the toxic air in her apartment during the night.

241.    Plaintiff's simple request to enforce the no-smoking policy in her building is not only
reasonable, but constitutes the very slightest of accommodations and is one of the prescriptions
specifically named in the FHA and HUD guidance statements.

242.    Unfortunately, DHR and all their employees named in this suit, colluded to convince

Plaintiff that, despite all evidence supplied and all legal arguments presented, her rights did not

exist.

243.    Ms. John and DHR, collectively, issued a determination dismissing Plaintiff's complaint for

"no probable cause" and effectively denied her equal protection under the laws, which were

meant to protect her in her vulnerable disabled state.

244.    The determination itself stands as a declarative statement wrongfully denying Plaintiff

equal access to her disability rights and protections.

245.    And, in this process of denying Plaintiff her pursuit of happiness, the Defendants also, for

an extra kick, denied Plaintiff her liberty; and, as her health deteriorates, may ultimately deprive

Plaintiff her life.  This will not be from her own hand, but due to Plaintiff's deteriorating general

health resulting from the stress of living in constant chronic pain and so physically and mentally

stressed by lack of sleep and being subjected to a toxic environment.

### DHR dismisses case and mirrors CCHR's legally flawed decision
### defending lawless landlord and abusive neighbor

246.    On April 11, 2024, DHR Director of Housing Investigations, Elizabeth Ortiz, handed down a

determination of "no probable cause" for Plaintiff's complaint and dismissed her claims.  That

determination was so sloppy and flawed that it contained numerous errors of fact and failed to

address a single shred of Plaintiff's evidence.

247.    DHR ultimately accepted Plaintiff's landlord's ridiculous argument that the double-speak in

their no-smoking lease rider, which states that just because the building is smoke-free they were

not required to ensure the building was smoke-free, superseded Plaintiff's disability rights.  The

flaws in this argument are beyond absurd.

248.    DHR's final determination went on to repeat the same flawed list of "acceptable

accommodations" proposed by CCHR and even repeated the exact same misrepresentations of

Plaintiff's response to those suggestions... namely accusing Plaintiff of being "uncooperative"... which was untrue.

249.    Plaintiff's responses to her Landlord's and CCHR's suggested accommodations, which DHR mimicked, were simply 1) Plaintiff already owned a Dyson air purifier and 2) she would let management change her HVAC and washer filters (but knew that was not the source of the fumes).

250.    However, the most offensive suggestion, was indeed, flatly declined by Plaintiff.  But, this was not because she was "uncooperative."  It was because it was absurdly unfair... even illegal.  CCHR and DHR both endorsed the concept that Plaintiff should have to move out of her apartment while the lease violating downstairs neighbor be left in peace.

251.     This was nonsensical and showed an embarrassing lack of legal prowess.  DHR was actually endorsing Plaintiff's "constructive eviction" ... which is a violation of both state and federal housing laws.

### DHR's determination completely ignores numerous claims in Plaintiff's complaint

252.    DHR's refusal to properly defend Plaintiff on the smoking issue was not the limit of their obvious contempt for Plaintiff and refusal to offer her equal protection under the law.

253.    Plaintiff's rebuttal included videos and audio evidence of the abuse and retaliation she suffer at the hands of her building's management and staff.  One video even showed a staff member physically assaulting the Plaintiff when he became enraged over the Plaintiff filming him refusing her service.  DHR did not even address the matter in their dismissal.

254.    Photographic evidence of 23 leaks and the rotting water damaged walls, Plaintiff has dealt with for 7 years, were supplied in her rebuttal.  As well as, documents from a Department of Buildings inspection of Plaintiff's unit, which led to the imposing of a $250 fine for failure to maintain the building in a code compliant manner.  Yet, DHR fail to even mention this aspect of Plaintiff's claim in their determination.

255.    On July 2, 2024, after DHR dismissed Plaintiff's claims, Plaintiff called the DOB inspector

back to her apartment.  This time the inspector imposed a $625 fine for continued failure to

maintain the building in a code compliant manner.  DHR completely ignored what the DOB

clearly saw as gross and continued violations inside Plaintiff's apartment.

256.    Plaintiff's landlord had also been under a Section 8 sanction since March 1, 2024 for the

same failures for which the DOB issued their citation.

257.    And to show DHR just how unlawful and abusive Plaintiff's landlord is, she forwarded DHR

an email from the landlord which contained a blatantly illegal threat to sue Plaintiff for the

unpaid portions of rent withheld by HPD during the period of sanction.

258.    DHR mockingly replied by simply stating that if Plaintiff felt she had another claim, she was

free to start a new case or hire her own lawyer.

259.    Plaintiff's rebuttal also included evidence of a scheme, by her landlord, to inject illegal

language into lease renewals, designed to undermine tenants with affordable rents.  Plaintiff also

included in her rebuttal, evidence of HPD stepping in on Plaintiff's behalf and forcing Plaintiff's

landlord to remove the offending clauses from the lease renewals.  The excised clauses were

giving the landlord capricious "loophole" excuses to repeal the affordable rents and replace them

with amounts that were 50% higher.

260.    The plethora of evidence, Plaintiff supplied to DHR, was intended to speak to the motive

behind the landlord's retaliation against the Plaintiff.  However, it was completely ignored by

DHR, as their final determination did not even mention Plaintiff's claims of retaliation.

261.    DHR also completely ignored Plaintiff's complaints about chronically broken disability

doors at the front entrance of her building.

262.    DHR intentionally avoided addressing the fact that the core of Plaintiff's claims was the fact

that her landlord was using her disability as a weapon.  The landlord was tired of having his

unlawful behavior called out by the Plaintiff, and so, encourage the lease violating behavior of

Plaintiff's downstairs neighbor. The issue with the fumes entering Plaintiff's apartment became a known factor the first year after Plaintiff moved in (2017-2018). The chronic-ness of the problem did stop and start more than once… when building management was still occasionally responding to Plaintiff's complaints. But, as Plaintiff's relationship with the management of the building deteriorated, the chronic fume problem returned in earnest. Management have since taken up lying and played games while refusing to end the neighbor's lease violating behavior. It has become clear, as Plaintiff claimed in her complaints filed with CCHR, HUD and DHR, that management want to force Plaintiff to give up and just move out… and they have no qualms about using Plaintiff's disability vulnerabilities, to smoke and chemical fumes, to achieve their goal.

263.    Plaintiff contacted Mr. Herrion in the Disability Department about the disgracefully inadequate determination and enumerated the omissions, inaccuracies and senseless logic.

264.    At that point the determination was recalled.

265.    And then, on May 10, 2024, a full 395 days (one year and one month) after HUD referred the case to DHR, Chelsea John handed down the final determination, which did nothing but, correct DHR's blatantly sloppy errors in reciting facts and add a single paragraph listing Plaintiff's inventory of evidence, before using the following paragraph to dismiss all of it, in its entirety, without discussion or explanation.

### *What was the motive behind DHR's mishandling of Plaintiff's case?*

266.    Is it a coincidence that the very same issues ignored by the overtly racist CCHR were also ignored by DHR?

267.    Did Ms. John prior employment at CCHR and her knowledge of Plaintiff's lawsuit affect her handling of Plaintiff's case.

268.    DHR's flawed determination was so similar to CCHR's clumsy, slanted dismissal, that one could have been "lifted" from the other.

269.    And while, DHR employees were subtle enough not to make the same blatant, blundering racist statements made by CCHR, their determination spent an inordinate amount of time actually attacking the Plaintiff and insinuating that Plaintiff was guilty of harassing the "elderly" Hispanic woman living in the apartment beneath her and claiming that Plaintiff was some how capriciously trying to get her neighbor evicted.

270.    Both, CCHR and DHR, intentionally misconstrue Plaintiff's statements about demanding the neighbor be held accountable for violating the building no-smoking policy and even go out of their way to sympathetically label the neighbor "elderly" though she is only 14 years older than the Plaintiff.  And both agencies conveniently leave out any mention of the neighbor's daughter, who is much younger than the Plaintiff, not disabled or impaired in any way and a main source of the smoking and vaping fumes coming from that apartment.

271.    As a matter of fact, circumstances would suggest it is the daughter doing a majority of the vaping, as she has been found occupying the apartment in her mother's absence during periods when the vaping completely replaced the smoking.  Unfortunately, the vape chemicals impact Plaintiff even more adversely than the smoke.

272.    Regardless of all the information and evidence supplied to DHR, their determination fails to address any of it properly.  Instead, DHR's dismissal stresses (gratuitously mentioning it twice) that Plaintiff called her downstairs neighbor, a "nuisance neighbor," as if to imply impropriety on the part of Plaintiff.   Are the attorneys at DHR so unfamiliar with that term, which is commonly used to describe a tenant who refuses to abide house policies to the detriment of the other tenants?

273.    And, though BOTH (mother and daughter) lawless, lease-violating neighbors below Plaintiff, are viciously and knowing abusing their disabled neighbor, both CCHR and DHR inexplicably and irrationally show more concern for them than they do for the Plaintiff.

274.    The only explanation that seems obvious, and fits into these agencies stated DEI goals, is

the fact that the neighbors are Hispanic minorities.  This unlawful racial bias is depriving the Plaintiff equal protection under the law concerning her disability rights, while at the same time discriminating against Plaintiff based on her Caucasian race.  This is a two fold discrimination claim because one discrimination is leading to the other.

275.    It is more than clear in the final determination that DHR was more concerned about Plaintiff's neighbors than they were with Plaintiff's disability rights.  DHR's dismissal ultimately endorsed the idea that these neighbors should be allowed to break the lease policies and violated Plaintiff's rights, presumably because their minority status outweighs Plaintiff's disability needs.  This was not stated as blatantly as CCHR had stated it, but the end result was the same.

276.    DHR's final determination ignored ALL of Plaintiff's disability rights, all her evidence of retaliation and all other rights to tenant harassment protection.   DHR's determination has effectively endorsed all of Plaintiff's landlord's abuses and the knowing abuse from Plaintiff's neighbors... and completely and totally denied Plaintiff equal protection under the law.

277.    Such an irrational, broad and complete denial of protection for a disabled Plaintiff must be motivated by something.  Plaintiff contends that the most likely reason is born from the stated anti-Caucasian racist priorities espoused by both CCHR and DHR... hence racial discrimination.

278.    DHR appears to be espousing the same anti-Caucasian pedagogy being promoted on the website of CCHR.

279.    DHR is guilty of depraved indifference to a disabled person in pain and anti-Caucasian discriminatory practices.

280.    The complete failure of DHR to enforce the laws, which were designed to protect people with disabilities, has left Plaintiff still in agonizing daily pain.  Merriam–Webster defines the verb form of the word  "torture" to mean:

        1. to cause intense suffering; to torment,
        2. to punish or coerce by inflicting excruciating pain.

By this definition, Plaintiff continued being tortured every day and every night in her own home.

281.      Plaintiff is still bearing the psychological trauma of being physically assaulted and then

falsely imprisoned as a direct result of asking for help to stop the daily abuse she was enduring

in her apartment.

282.      The injustice and irony are beyond painful.

### *Further Background of Fair Housing Complaint for which Plaintiff Requested Assistance from CCHR, HUD and DHR*

(These issues are only background, to establish validity of
case brought to DHR and are NOT the primary causes of action in this case)

283.      On October 2, 2017, five days after Plaintiff's picked up the keys for her new apartment,

located at 507 W 28th Street, NY. NY, a massive upstairs flood caused substantial damage to

Plaintiff's apartment unit.  It was the first of three separate water damage incidents to occur in

the first two weeks of her tenancy and the first of 24 such incidents to occur in seven years

leading up to the date of this complaint.  The building is only six years old.

284.      The Superintendent refused to clean up the construction dust that covered the entire

apartment after the repairs were done.  This was despite knowing that the Plaintiff was

disabled by a broken back and had not even fully moved into the apartment yet.

285.      Plaintiff was coming out of the shelter system and awaiting Human Resources

Administration to arrange movers to bring her belongings from storage.  When Plaintiff asked

the Superintendent if she could at least borrow his building vacuum, and perhaps a mop.  He

rudely told her "no." He added, "You already have the keys. You are responsible for cleaning

your own apartment."   Plaintiff, was forced to purchase a broom, mop, bucket and all manner

of cleaning supplies to make the apartment suitable for her to even partially move in while

waiting for delivery of her belongings.

286.      The clean up caused Plaintiff extreme pain from having to exert her

injured back.

287.    Dealing with the ultra-fine dust blanketing the apartment from sanding large swaths of

drywall putty, caused Plaintiff to get a cyst in her right eye; which remained until 2023 when her

Ophthalmologist had to surgically remove it.  Plaintiff, is legally blind in her left eye and so this

jeopardized the one good eye she has.

288.    Work areas covered is such silt-like drywall compound dust usually require workers to

wear N-95 respirator masks and eye protection.  It was unlawful for the Plaintiff's landlord to

leave Plaintiff's apartment in this hazardous condition.

289.    When the chronic leaking, caused by the Superintendent's unskilled plumbing and the

owner's poor building construction, was reported, by the Plaintiff, to the Department Of Buildings

(DOB) on April 27, 2018, the owner was served an A8 OATH Violation – "failure to maintain the

building in code compliant manner, ..." and fined $250.

290.    Instead of apologizing for what Plaintiff had been contending with, the

management/owner's entrenched themselves into an unacceptably acrimonious and

adversarial relationship with the Plaintiff.

291.    This escalated into a non-stop string of harassments, which interfered with Plaintiff's life,

health and peace of mind.  It included:

   a.  Refusing to return the original signed leased for almost a year, until

       their refusal was reported to HPD.

   b.  Mailing the renewal late, without a postmark and backdating the cover letter to

       make it look like it was mailed timely.  This was presumably to make Plaintiff miss

       her lease renewal return date.

   c.  Inserting language in the first renewal lease, which would allow the Landlord to

       illegally and capriciously retract the affordable rent.  Plaintiff reported this to HPD and

       they stepped in and forced the Landlord to be removed the unlawful clauses.

   d.  As Plaintiff made these reports of owner's violations to

appropriate authorities, she began being inundated by toxic fumes from the tenant in the

apartment beneath her.   The fumes were a mix of smoke, vape and toxic cleaning fluids

(inappropriately aerosolized by heating to cover the sent of the smoke.*)  The daily fumes

were so toxic Plaintiff became too dizzy to stand and on two occasions felt the need to go

to the emergency room.

e.   After Plaintiff called for mediation services through 3-1-1 and a session  was held between

Plaintiff and her landlord, the fumes stopped.

f.   But the leaks in Plaintiff's apartment continued.

g.   The disability doors at the front entrance of the building began breaking down on a

regular basis and remaining unrepaired for months at a time.

h.   Plaintiff's complaints were met with ridicule and retaliatory abusive denials of

service and hostile treatment from staff and management.

i.   As things escalated in acrimony the fumes entering Plaintiff's apartment

returned in earnest.

j.   A concerted campaign of harassment against the Plaintiff ramped up, and the

circumstances concerning the fumes appeared to present itself as a very convenient

source of abuse designed to force Plaintiff out of the building.

k.   Plaintiff's failure to find legal protections elsewhere, led to her  approaching CCHR and then

HUD... who handed the case off to DHR.


*heating such cleaning liquids as floor cleaner and fabric softener on the stove or in a
vaporizer is a dangerous trend shared on social media and demonstrated  on video sharing
platforms.  It release substantial and toxic levels dangerous chemicals into the air.

### *Prior Police Violations Which Establish*
### *a Pattern of Behavior*

292.     The first time NYPD and EMS unlawfully took Plaintiff for an unnecessary psychological

evaluation was on February 7, 2014.   Plaintiff went to the Human Resources Administration

('HRA") with a notice of fair hearing and instructions to obtain her file from HRA if she wished to see the documents on which HRA would rely at the hearing. The workers at HRA refused to produce the file or documents Plaintiff was asking for and kept claiming that they didn't understand the instructions she was given in the notice. The HRA workers began demanding that Plaintiff leave without the documents but she refused.  They then called guards along with someone dressed in an NYPD uniform.  Whether the "police officer" was on duty or moonlighting at HRA as an in- house cop is unknown.  But, either way he was working for the City.  The "officer" grabbed the handle of Plaintiff's tote bag and slung her into a metal fire equipment box in the hallway. It was so forceful it broke the strap on her bag.   She slammed her head into the sharp pointed corner of the firebox.  Plaintiff proceeded to asked the "officer" if he was insane and she called 9-1-1 to report the assault.  When the police arrived the other "officer" disappeared.  The police asked if Plaintiff needed an ambulance?  She wasn't bleeding but, had a scrape and lump on her head; so, Plaintiff said, "Yes, I want to document this."  A "blue wall" began to emerge.  The police huddled with the EMT's before letting them speak to Plaintiff.   The EMT's then approached Plaintiff with particularly hostile stance. When they examined Plaintiff in the ambulance the EMT claimed there were no marks or signs of injury on her head.   She put her finger directly on the lump and scrape and told him to give her his hand and she would show him. He gave some kind of numeric code to the driver that later became apparent was the code for "take us to Bellevue psych ward".

293.        When Plaintiff arrived at the hospital she could not believe what was happening. Her belongings were taken from her and she was locked in a room against her will and with absolutely no cause.  After she cleared the completely unnecessary and illegal psychological evaluation, she walked over to the ER were, indeed, the doctor was able to document the abrasion and lump on her head.

294.        The entire psych ward trip was a truly despicable act of retaliation for Plaintiff trying to

file a complaint against a police officer.

295.     When Plaintiff broke her back and got her head injury, she ended up in the homeless

shelter system while waiting on Social Security to process her case.

296.     During that time Plaintiff was abusively retaliated against by staff who used this system

of forced psychological evaluations to punish and intimidate anyone who challenged their own

unlawful behavior.

297.     On the second of the shelter assaults, Plaintiff had, little more than a week earlier, on

September 17, 2016, been hit by a car on Canal St. while heading to physical therapy for her

broken back.  Despite three doctors' notes explaining to the shelter that Plaintiff needed access

to her bed during the day, the shelter was refusing her this accommodation.   Eleven days later,

on September 28, 2016, Plaintiff's back was in severe spasm when the staff of the shelter

entered her room and demanded she leave the bed.  When Plaintiff was in too much pain to

comply, they ripped the sheets from beneath her, grabbed her pillow and then cut the lock

from her locker and empty her belongings into a garbage bag.  Plaintiff was left sobbing in

agony on a bare, cold, plastic mattress without even a pillow for comfort.  Hours later, when

she was able to stand and walk more easily, she went to confront the shelter director.  But, as

soon as Plaintiff exited the elevator, the in-house Department of Homeless Services ("DHS")

police violently grabbed Plaintiff, brutalized her and then handcuffed her.  She was forced into

a chair and then onto a stretcher when the EMT's arrived.  Plaintiff's back started to spasm

again as she laid on her side with her arms handcuffed behind her.  Her desperate pleas, to

release her arms to ease the spasms, were completely ignored.  Plaintiff was treated like an

animal.  Even as she sobbed and screamed in pain in the intake area of the hospital, she was

ignored.

298.      The incident cause further injury to Plaintiff's chest muscles, which led to two more

interim trips to the ER for chest pains and, ironically, ultimately led to another assault by the

DHS police.  The first return trip to the ER was on October 18, 2016.

299.    Six days later, on October 24, 2016, Plaintiff was informed she was part of a group being

transferred, from the Manhattan shelter she was in, to a shelter in East New York.  This was a

retaliatory punishment.  Each person in the group had filed complaints with the Coalition for

the Homeless or threatened legal action.

300.    Plaintiff was still recovering from the previous assault with injury to muscles in her

chest and Plaintiff's thoracic spine was already broken from her original disabling injuries.

301.    That night, while preparing to leave, Plaintiff was attempting to pack her belongings

when she started having chest spasms so intensely painful that she could barely breath.  An

ambulance had to be called and Plaintiff spent the night in the ER.  The doctors had to

administer BOTH morphine AND delauden before Plaintiff stopped hyperventilating and could

breath normally.

302.    The next morning, on October 25, 2016, Plaintiff returned to the shelter, exhausted and

nauseated from the medication.  She was told to lie down and would be informed when the van

arrived to take all of the transfer group to the new shelter.  Five minutes after the van left the

shelter staff informed Plaintiff.  They laughed and said since Plaintiff missed the van, she would

now have to take the subway... with all her bags and belongings... no matter how disabled,

infirmed or in pain she was.  This was against shelter protocol and the staff knew it.  Plaintiff

sat down in a chair and got on her cell phone attempting to contact a friend with a car to help.

She even called a rep at Sen. Nadler's office, whom she had been dealing with, and then called

the Coalition.  But, no one would pick up the phone and call the director of this shelter and ask,

"What the hell was going on over there?"  While Plaintiff was still trying to reach a friend with

a car... the staff called the EMT'S AGAIN.

303.    The shelter tried to claim Plaintiff was trespassing unless she allowed them to put her

and all her belongings out on the sidewalk... regardless of her inability to get to the next

location.   When the EMT's failed to talk Plaintiff into allowing the shelter to dump her onto the street, the in-house DHS police lost their patience.  Two in-house DHS Police ... who knew Plaintiff and were fully aware that she was disabled and knew she had a broken back and head injury and even knew she had, just hours earlier, returned from the ER.... grabbed her out of the chair, slammed her head into the wall, snatched her phone from her hand and then intentionally jammed their elbows into Plaintiff's broken back while handcuffing her.   Plaintiff was screaming in pain... so much pain that she urinated on herself.  The EMT then had the nerve to tell Plaintiff how disgusting she was for urinating.... it was so unbelievable... so traumatizing... so inhuman....everything that was happening was like a nightmare for Plaintiff.

304.     The EMT's and DHS police were threatening to take Plaintiff for another fake psych evaluation. But, by the time they reached the hospital, it was clear Plaintiff needed to be taken to the ER instead.

305.     Some of the same doctors Plaintiff had just left were still on shift. They were horrified to see what was being done to the Plaintiff and called 9-1-1.   Unfortunately, when the police arrived they informed the doctors and Plaintiff that, since the DHS Police are a division of NYPD, they could not take an assault complaint.

306.     Plaintiff thought once she survived her hellish experience in the shelter, her problems would end.  Unfortunately, ever since Plaintiff moved into her new apartment, she has endured seven years of a different kind of hell and abuse from her landlord and her downstairs neighbor.

307.     And it seems Plaintiff has been unable to stop the police and EMS from allowing themselves to be used by any number of bad actors who have discovered that using the City protocols on mental hygiene is a powerful weapon for intimidation, abuse and retaliation.

308.     The city must train their employees and install safeguards to stop this rampant abuse of innocent people's civil rights.

309.    And City employees must be better educated about disability rights.


## CAUSES OF ACTION

310.    Plaintiff, brings this action against the State of New York for its municipal liability in

DHR and against it's named employees, Chelsea John, Candace Tyndall, Elena Perlongo, John

Herrion, Gina Martinez and Elizabeth Ortiz, in their official and individual capacities, under 42

U.S.C. § 1985(3), for these multiple agents colluding, under color of law, to misrepresent FHA

law and Plaintiff's corresponding disability rights and, by which means did, in concert, conspire

to deny, and did deprive Plaintiff her rights to equal protections afforded by the FHA; and did

also hinder other authorities of the State Of New York from properly enforcing similar

protections, which should have protected Plaintiff under the laws by New York City Admin

Code Title 8 Civil Rights et seq. and New York Consolidated Laws. Civil Rights Law – CVR § 1 et

seq.; by producing an inaccurate report and faulty determination which wrongly dismissed the

complaint referred to them by HUD.

311.    Plaintiff, brings this action against the State of New York for its municipal liability in

DHR and against it's named employees, Chelsea John and Candace Tyndall, in their official and

individual capacities, under 42 U.S.C. § 1985(2), for these multiple agents, conspiring to make a

false report to authorities about Plaintiff being suicidal, which intentionally caused Plaintiff's

false imprisonment and extreme emotional distress, resulting in intimidation and interference

with her lawful attempt to seek enforcement of her right under the Fourteenth Amendment to

the equal protection of the laws of the United States which codify her disabilities rights with

regard to the Fair Housing Act.  The false report, which led to Plaintiff's false imprisonment,

also caused violations of due process and the illegal entry and search of Plaintiff's apartment,

causing Plaintiff terror, severe trauma, intimidation and lasting emotional distress.

312.    Plaintiff, brings this action against the State of New York for its municipal liability in DHR

and against it's named employees Chelsea John, Candace Tyndall, Elena Perlongo, John Herrion, Gina Martinez and Elizabeth Ortiz in their official and individual capacities , under 42 U.S.C. § 1981,1983, 1985(3), 1986 for multiple agents misrepresenting the law, under color of law, in concert, and by which mode, did conspire to deny, and did deny, Plaintiff equal protection under the law with regard to her rights under the Americans with Disabilities Act (ADA) and the Fair Housing Act (FHA) and did show negligence to prevent her abuse and harm due to such lack of protection by these laws and  42 U.S.C. Chapter126. This is particularly egregious as, protecting citizen's civil rights, is the stated purpose of the existence of DHR.

313.     Plaintiff, brings this action against the State of New York for its municipal liability in DHR and against their named employees Chelsea John, Candace Tyndall, Elena Perlongo, John Herrion, Gina Martinez and Elizabeth Ortiz in their official and individual capacities, under 42 U.S.C. § 1983, 1988 and/or New York common law for intentional and negligent infliction of emotional distress by making false reports to authorities about Plaintiff being suicidal and by  intentionally denying her protection under disability law.

314.     Plaintiff, brings this action against the State of New York for its municipal liability in DHR and against their named employees Chelsea John, Candace Tyndall, Elena Perlongo, John Herrion, Gina Martinez and Elizabeth Ortiz in their official and individual capacities, under 42 U.S.C. § 1983, 1988 and/or New York common law for retaliation, carried out with malice, for the intended purpose of intimidating Plaintiff and damaging her credibility with regard to her claims, by making false reports to authorities about Plaintiff being suicidal

315.     Plaintiff, brings this action against the State of New York for its municipal liability in DHR and against their employees Chelsea John, Candace Tyndall, Elena Perlongo, John Herrion, Gina Martinez and Elizabeth Ortiz in their official and individual capacities under 42 U.S.C. § 1983, 1988 and/or New York common law for negligent supervision and lack of appropriate training of DHR named employees for failure to properly understand and enforce disability laws.

316.    Plaintiff, brings this action against the State of New York for its municipal liability in DHR and against its named employees Chelsea John, Candace Tyndall, Elena Perlongo, John Herrion, Gina Martinez and Elizabeth Ortiz in their official and individual capacities under 42 U.S.C. § 1981, 1983 for discrimination on the basis of race, in violation of the Fourteenth Amendment of the U. S. Constitution.

317.    Plaintiff, brings this action against the State of New York for its municipal liability in DHR and against it's named employees Chelsea John, Candace Tyndall, Elena Perlongo, John Herrion, Gina Martinez and Elizabeth Ortiz in their official and individual capacities for violation of the Rehabilitation Act of 1973 for denying Plaintiff full protection of her disability right under the laws and access to the agency's enforcement powers, while DHR was in receipt of federal funding.

318.    Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and against its named employees Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363), Police Officer Jose Quintuna-Guaman (Shield No. 7157), Frank Tarsillo and Ryan Stack, in their official and individual capacities, under 42 U.S.C. § 1983, 1988 and New York common law for unlawful imprisonment in violation of the Fourteenth Amendment of the U. S. Constitution and New York common law, for abducting her from her home under threat of force and causing her to be unlawfully detained and imprisoned for the purpose of an unnecessary psychological evaluation.

319.    Plaintiff, brings this action against the City of New York for its municipal liability in the NYPD and NYFD EMS and against its named employees Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363), Police Officer Jose Quintuna-Guaman (Shield No. 7157), Frank Tarsillo and Ryan Stack, in their official and individual capacities, under 42 U.S.C. § 1983 and 42 U.S.C. Chapter126 for violating her rights under the Americans with Disabilities Act (ADA). For failure to properly assess Plaintiff, and take due care, before wrongfully and forcibly taking her from her home and violating her due

process rights in violation of the Fourteenth Amendment of the U. S. Constitution and disability law.

320.    Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and against its named employees Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363), Police Officer Jose Quintuna-Guaman (Shield No. 7157), Frank Tarsillo and Ryan Stack, in their official and individual capacities, under 42 U.S.C. § 1983, 1988 and/or New York common law for intentional and negligent infliction of emotional distress for failure to properly assess Plaintiff, and take due care, before wrongfully and forcibly taking her from her home for an unnecessary psychological evaluation.

321.    Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and against its named employees Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363), Police Officer Jose Quintuna-Guaman (Shield No. 7157), Frank Tarsillo and Ryan Stack, in their official and individual capacities, under 42 U.S.C. § 1983, 1988 and/or New York common law for defamation, with damage to reputation and causing extreme embarrassment due to creating an unwarranted spectacle in the lobby of Plaintiff's home in front of friends, neighbors and her building staff.

322.    Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and against its named employees Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363), Police Officer Jose Quintuna-Guaman (Shield No. 7157) for unlawful entry and search of Plaintiff home and papers without cause, in violation of The Fourth Amendment.

323.    Plaintiff, brings this action against the City of New York for its municipal liability in NYPD and NYFD EMS and against its named employees Lieutenant John Corde, Police Officer Grey Castro

(Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363), Police Officer Jose

Quintuna-Guaman (Shield No. 7157), Frank Tarsillo and Ryan Stack, in their official and individual

capacities, under 42 U.S.C. § 1983, 1988 and/or New York common law for retaliation, carried out

with malice, for the intended purpose of intimidating Plaintiff with regard to her prior threats of

legal actions against the City and their agencies.

324.    Plaintiff, brings this action against the City of New York for its municipal liability under

42 U.S.C. § 1983, 1988 and/or New York common law for negligent supervision and lack of

appropriate training of Lieutenant John Corde, Police Officer Grey Castro (Shield No. 26994),

Police Officer Christian Orellana (Shield No. 15363), Police Officer Jose Quintuna-Guaman

(Shield No. 7157), Frank Tarsillo and Ryan Stack in the appropriate manner by which to assess

subjects for whom they are receiving third-party reports of suicidal behavior or any other

activity they can not verify on scene.

325.    Plaintiff, brings this action against the City of New York for its municipal liability in the

NYPD and NYFD EMS and against its named employees Lieutenant John Corde, Police Officer

Grey Castro (Shield No. 26994), Police Officer Christian Orellana (Shield No. 15363), Police

Officer Jose Quintuna-Guaman (Shield No. 7157), Frank Tarsillo and Ryan Stack, in their official

and individual capacities, under 42 U.S.C. § 1983 and 42 U.S.C. Chapter126 for violating her

rights under the Americans with Disabilities Act (ADA) and the Constitution by participating in

a string of false abductions of Plaintiff over 10 years, which have included such horrifying

excessive force, that the mere suggestion of the repeated force, as was done in the most recent

case, served to intimidate and terrify Plaintiff and cause mental anguish equivalent to the

repeated force itself, in violation of the Fourth Amendment.

## JURY DEMAND

326.    Plaintiff demand a trial by jury on all questions of fact raised by this complaint.

**RELIEF**

327.    Plaintiff seeks compensatory and punitive damages for the physical pain and suffering she has endured due to failures of the State to enforce her disability rights.  The debilitating, life destroying, migraines that have stolen all peace and happiness from Plaintiff, have been unnecessarily triggered and/or intensified by circumstances that should have been brought to an end, had the State Of New York and DHR taken care to uphold their responsibilities in implementing and enforcing ADA and FHA laws.

328.    Plaintiff seeks punitive and compensatory damages for the negligent and intentional infliction of extreme emotional distress associated with 1) the denial of protection of her disability rights 2) falsely reporting Plaintiff to authorities as suicidal 3) causing Plaintiff to be taken from her home for an unnecessary psychological evaluation 4) knowingly causing a repeated trauma by instigating a false police action and 5) exhibiting an apparent racial bias toward Plaintiff.

329.    Plaintiff seeks punitive and compensatory damages from all Defendants for the infliction of fear and terror when she was forcible taken from her home and held against her will for an unnecessary psychological evaluation.

330.    Plaintiff seeks punitive and compensatory damages for the act of retaliation that prompted the suicide call to the police by DHR.  It was vindictive and in no reasonable way could be construed as an attempt to offer any kind of aid or assistance that the Plaintiff was in dire need of.  As a matter of fact it only amounted to further abuse of Plaintiff, which has left her with deep emotional scars.

331.    Plaintiff seeks punitive and compensatory damages for the fact that both the anti-Caucasian bias and the disregard for Plaintiff's disability needs have been a pattern of behavior displayed, not only within DHR, but was also such an insurmountable problem with their local off-shoot CCHR in New York City.   It is a cultural problem and clearly due to systemic policies

and/or negligent supervision from the top of this municipality through all of it's agencies.

332.    Plaintiff seeks punitive and compensatory damages from the City of New York and their named employee Defendants for repeatedly violating Plaintiff's civil and disability rights and demonstrating a clear pattern of behavior, over years, which proves by act, and as stated directly by Officer Castro, are policies and protocol of the city, even as they stand in opposition of Plaintiff's Constitutional rights.

333.    Plaintiff also seeks an annulment of the Determination handed down by Chelsea John, without which HUD refuses to countermand DHR's decision.

334.    Plaintiff seek any other relief that this Court deems just and proper.


                        Respectfully Submitted,


Dated: New York, New York              Kelly MacNeal
       November 29, 2024               Pro Se Plaintiff
                                       507 W 28th St
                                       New York, NY 10001