UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
KELLY MACNEAL,                                        :

                            Plaintiff,      :          No. 24-CV-6017-LGS-JW
                                  :

                                  :          AFFIDAVIT IN
              -against-         :          OPPOSITION TO
                                  :          THE CITY OF NEW YORK
THE CITY OF NEW YORK,                            :          MOTION TO DISMISS
                 Defendant(s),      :
------------------------------------------------------------ X

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii
PRELIMINARY STATEMENT ................................................,........................1
   The Bigger Picture, With Societal Implications..................................................3
STATEMENT OF FACTS .............................................................................. 5
   Factual Pleading Considerations for *Pro Se* Litigant....................................5
   Critical Facts....................................................................................................6
      Background........................................................................................6
      Interaction with the 10th Precinct of the NYPD.................................6
      Forcible Arrest..................................................................................9
      NYPD and FDNY EMS Policy / Custom and Training........................10
LEGAL STANDARD...................................................................................10
ARGUMENT
   Defendant's Principal Argument Is Wrong..........................................................11
   DIRECT OPPOSITION TO CITY'S ARGUMENTS: ......................................13
   POINT I
      PLAINTIFF PROPERLY PLEADED MULTIPLE CLAIMS FOR
      RELIEF UNDER 42 U.S.C. § 1983................................................................13
        A.  The Amended Complaint States Claims for Municipal Liability
            Under *Monell*
            (1) Proving a Policy or Custom.............................................13
                (i) Policy or Custom.....................................................14
                (ii) So Consistent policymaker's must be aware..........................15
                (iii) A failure to train....................................................15
            (2) Causation......................................................................17
            (3) Deprivation of Constitutional Rights................................18
        B.  The Amended Complaint States a Claim for Unlawful Imprisonment
            (a) Officers Did NOT Have Sufficient Probable Cause to Detain
               Plaintiff for a Mental Health Evaluation and Should NOT Have
               Relied on a Hearsay Reports.............................................18
            (b) Individual Officers Are NOT Protected by Qualified Immunity……...20
        C.  The Amended Complaint States a Claim for Unlawful Search
            (a) Warrantless Entry into Plaintiff's Apartment Was NOT Justified
               by Emergency Circumstances Because Officers' Were Informed
               in Advance that NO Mental Health Crisis Existed and Plaintiff
               was NOT Home...............................................................20
            (b) Individual Officers Are NOT Entitled to Qualified Immunity for
               the Warrantless Entry.....................................................21
         D.  The Amended Complaint's Stated Claims Based on a Retaliation Theory....21
   POINT II
      PLAINTIFF PROPERLY STATES CLAIMS BASED ON THE AMERICANS
      WITH DISABILITIES ACT (ADA) ........................................................23

POINT III
     PLAINTIFF PROPERLY STATES CLAIMS UNDER STATE LAW...................25
     A.  The Plaintiff Fully Complied with New York's Notice of Claim
         Requirements...................................................................25
     B.  The Amended Complaint States a Claim for Defamation............................25
     C.  The Amended Complaint States Claims for Negligent or Intentional
         Infliction of Emotional Distress
         (a) The Alleged Conduct Rises to the Level of
            "Extreme and Outrageous" Behavior Required Under
            New York Law to Support a Claim for Intentional Infliction
            of Emotional Distress............................................................26
         (b) Plaintiff Has Properly Alleged Negligence, and a
            Special Duty or Recognized Type of Negligence
            That Causes Extreme Emotional Distress............................................27
     D.  The Amended Complaint States a Claim for Negligent Supervision
         under New York Common Law...............................................27
     E.  The Court Should Not Decline to Exercise Supplemental Jurisdiction
         Over Any Remaining State Law Claims ........................................27

CONCLUSION.......................................................................................27

## PRELIMINARY STATEMENT

This case is underpinned by circumstances surrounding the disabled Plaintiff's desperate attempt to seek protection and legal enforcement of the ADA from both City and State law enforcement entities.  All claims in the complaint arise out of the City and State's, unhelpful and unlawful, responses to Plaintiff's multiple requests for assistance.  Plaintiff will offer a separate affidavit, responding to the State's motion to dismiss, in which Plaintiff will address the most recent attempt she made to obtain assistant from that Defendant.  However, the City has had a longer history of abusive behavior toward the Plaintiff.  This affidavit, responding to the City, will be addressing that broader scope and timeline, as well as, a consistent pattern of behavior on the part of the City.  These claims act as a supplement to claims in Plaintiff's related case currently before the Court (MacNeal v. New York City, et al. 23-cv-05890(LGS0(JW)).

Unfortunately, what has consistently ensued, whenever Plaintiff has sought enforcement of her disability rights from either the State or the City, has been:

1) A refusal to enforce disability laws or offer protection to Plaintiff; constituting a denial of "service" (law enforcement) and Plaintiff's need for the legal "accommodation" (legal protection) she is entitled to under the American's with Disabilities Act.  Such disregard of a disabled person's need (for enforcement of the law) is equivalent to discrimination.  In Olmstead v. L.C., 527 U.S. 581 (1999) The Supreme Court held that the ADA requires states to provide community-based services to individuals with disabilities when such services are appropriate, and the state's failure to do so can be seen as discrimination.  Surely, law enforcement of the ADA is the most basic of such "appropriate" services.  Unfortunately, Plaintiff has found enforcement of her rights elusive. The State has, most recently, deny Plaintiff assistance, but the City Commission on Human Rights (CCHR) has, thusly, denied Plaintiff

assistance on three separate occasions, concerning three separate claims. That pattern of behavior is central to claims in the related case.

2) The manner in which Defendants, in both cases, have disposed of Plaintiff's claims include lying to her about her rights and misrepresenting the law "under color of law."

3) Germane to this (City) portion of this case is that, when Plaintiff has pushed back against the misrepresentations of the law, Plaintiff has been consistently subjected to both physical and emotional abuse at the hands of NYPD and FDNY EMS.  This has happened on numerous occasions. Plaintiff has been forced into unnecessary psychological evaluations five times and been physically assaulted by officers four times. City defendants have, not only denied Plaintiff proper protections under disability laws, but have doubled down to dissuade her expectations of help by heaping on their own violations of her rights.  They have intimidated and frightened Plaintiff, leaving her with permanent physical and emotional injuries.  And since Plaintiff's limited disability income does not afford her the ability to hire a lawyer to privately police her rights, and no other legal aid outlet has availed themselves to her, this has left Plaintiff no safe venue to bring her disability claims.

4) The City and State's failures to enforce disability laws have also allowed Plaintiff's abusers, such as her landlord (from whom she was seeking her most recent request for protection and enforcement by, first the City and then, the State), to continue violating her disability rights. This has caused permanent injury and ongoing, life disrupting, physical pain and suffering due to these violations remaining unresolved.

But, to be clear, this complaint seeks damages for the role NYPD and FDNY EMS played in the horrific responses to Plaintiff's requests for help in enforcing her disability rights.  The complaint is based on **repeated** actions by NYPD and FDNY EMS over many years

… a pattern of behavior and a continuous cause of action outlined in Plaintiff's Amended Complaint.

The City has access to further details related to the earlier incidents, as claims were timely filed with the Comptroller's office and claims were filed with CCHR, not so ironically, the defendants, in the related case before this Court. The related case was brought seeking damages against CCHR's pattern of behavior that included denying Plaintiff disability protections and mishandling her prior cases… including the prior claims against NYPD and FDNY EMS being brought here now.

The claims against the City in this case now seek damages for, not only what CCHR failed to pursue in the past, but the behavior NYPD and FDNY EMS have continued to engage in with regard to the Plaintiff. CCHR dismissed, for administrative convenience, the older cases, where Plaintiff was literally beaten by the police while trying to defend her disability rights. They stated that it was not in the public interest to pursue. A desire for the City to avoid public shame and embarrassment would have been a more honest excuse.

Therefore, through CCHR and the Comptroller's office, the City has the information needed to address the prior incidents and a pattern of behavior claimed in Plaintiff's Amended Complaint. The City's motion to dismiss only addresses the most recent incident and seeks to address it as a lone occurrence. Their failure to address the pattern of behavior must then allow the claims to withstand any motion to dismiss as they are unopposed.

### The Bigger Picture, With Societal Implications

The portion of this action, directed at the City, centers on Plaintiff's repeated unlawful imprisonment, physical abuse and being subjected to numerous, unnecessary, forced

psychological evaluations while she was pursuing the defense and enforcement of her disability rights.  These actions ultimately punished and interfered with Plaintiff's pursuit, violating her Constitutional Rights, the American With Disabilities Act (ADA) and the Rehabilitation Act of 1973.

In particular, the weaponization of forced psychological evaluations is an issue that is more important than ever, considering the most recent actions of the State of New York to ease the legal restrictions and parameters by which authorities can claim the right to forcibly retain persons for medical treatment, and even psychiatric committal, under ever more draconian mental hygiene laws.   And while the Plaintiff, fully understands the challenges to public safety posed by the truly mentally unstable population loosed on the streets, it does not justify the abuse of these powers.   Policymakers responsible for the training programs of Police and EMS workers, who are tasked with implementing these actions, must assure that these workers are highly trained with an emphasis on the Constitutional Rights of those they will be dealing with in the public sphere.   The possibility of abuse by third parties must always be questioned in determining the legitimacy to claims for a need of such drastic interventions.   Even if the encounter is free of excessive physical force, the emotional damage and fear-induced trauma can be life altering to any person.   But, there exist a particular trauma when a person can be taken without cause.   The Kafkaesque helplessness of being victimized, without justification, by a government body can have a devastating impact on one's trust in rational civil society.   For such reasons, any actions of this nature must be handled with an elevated duty of care.

But, in the case of the Plaintiff, the outrageousness of the actions was two fold. Not only was Plaintiff **REPEATEDLY** abused by these policies, but the initiating excuse to take these actions was consistently born out of reactions to Plaintiff filing complaints about her

disability rights being violated. The Defendant's participation in interfering with Plaintiff's ability to defend her rights is itself a violation of the American with Disabilities Act, particularly 42 U.S. Code §12203.

And on numerous of the occasions for which this complaint is brought (under continuous cause of action doctrine), Plaintiff was physically brutalized with gross disregard of her disability needs, causing her physical pain and further injury. This constituted "discrimination" and refusal to "accommodate" to its most disgraceful limits. The elevated duty of care required was, not only ignored, but was knowingly violated with relish after the Defendants were put on notice of Plaintiff's needs.

The City's motion to dismiss makes a disgraceful attempt to paint Plaintiff as a crackpot conspiracy theorist, instead of the disabled person she is, fighting for her rights. They unapologetically double down on the abusive attitude Plaintiff has been subjected to in her battle for these rights. The City's shamefully untrue allegations attempt to distract the Court, while sidestepping Plaintiff's claims of repeated violations, by quietly insinuating that the falsely claimed aberrant behavior could justify their actions. If you need to resort to a lie, something is awry. This is not a conspiracy theory, just the painful truth. And when Plaintiff says painful, she is not speaking figuratively.

## STATEMENT OF FACTS

**Factual Pleading Considerations for *Pro Se* Litigant**

In construing Plaintiff's response, Plaintiff asks that the Court read any new additional facts asserted in this opposition brief as supplementing the operative complaint, as the Court may do with pro se litigants. *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) (overturning the district court's grant of dismissal where the complaint and opposition papers to a motion to

dismiss when combined stated a claim upon which relief could be granted).

Plaintiff notes that the Court has the operative complaint which sets out the relevant facts. Plaintiff refrains from unnecessarily re-stating those same facts here, except to supplement the complaint, clarify and summarize complaint facts, and refute misstates of the allegations by Defendant.

**Critical Facts**

### Background

To be sure, Plaintiff alleges Defendants— New York City and it's employees — have repeatedly violated Plaintiff's Constitutional Rights to Due Process by taking her for unnecessary psychological evaluations, as well as denying her Right to Equal Protection under ADA law by denying and/or ignoring her need for accommodations for her disabilities. See Amended Complaint (AC) ¶¶ 178–208 and 292-309.

### Interaction with the 10th Precinct of the NYPD

Plaintiff's ongoing struggles to enforce her disability rights in her apartment have led to numerous interactions with the 10th Precinct of the NYPD.  P.O. Castro, named in this complaint, even noted that he recognized Plaintiff, though she did not recognize him, during the May 2-3, 2023 incident cited in this complaint.  Plaintiff only made the connection later when viewing a video she recorded of her previous encounter with him.  In that encounter, on May 31, 2022 Plaintiff was, as usual, respectful and cooperative, even as he and the other responding officer offered her no help. As usual, they stood up for the management of the building, who were refusing to respond to Plaintiff's complaints of smoke and vape fumes entering her apartment in her supposedly smoke-free building.  This was in violation of Plaintiff disability needs, as the fumes continually triggered unbearable migraine headaches, from which Plaintiff

was desperately seeking reprieve.  However, each time the police came, usually at the behest of building management, seeking to intimidate Plaintiff from lodging her complaints, the various responding officers would tell Plaintiff to simply leave the lobby of her own building and pursue her complaints in court.  They would inform the Plaintiff that there was nothing they could do to help her, but if she did not leave the area, they would take an harassment complaint from the building staff against her.  Plaintiff continually explained that she was indeed pursuing legal avenues through, first CCHR and then DHR… to no avail.   On one particularly horrible day, December 16, 2021, Plaintiff was at the front desk speaking with the doorman about a completely unrelated subject, when the Superintendent, Jerry Rozkowski, burst through the front doors and, without provocation, began screaming at the Plaintiff and calling her a "bitch."  He then told her to "get the fuck away from the doorman and leave the lobby."  That doorman was then pulled into a backroom and became the third in a string of doormen the Super threatened to fire if they so much as engaged Plaintiff in conversation.  Plaintiff was so horrified, frightened and intimidated by this constant abuse, she called the police to file her own harassment complaint.  An officer with the surnamed Colon took the report and swore he would file it.  However, after numerous calls to retrieve a complaint number, it became clear that, not only did he not file the complaint, but he had no intention of doing so and refused to return any calls to Plaintiff.   This was despite Plaintiff making it clear that she was going to have to take legal action against the building and needed the report for her records.  The police were regularly taking the side of the scofflaw owner and management of Plaintiff's building, not the least of which was evidenced in their response time.  With any given call to 911, the police would respond to management within 10 minutes or less, whereas calls from Plaintiff would leave her waiting up to an hour for a response.  So, records will show, that it is not some fanciful delusion

on the part of the Plaintiff that the NYPD were allowing themselves to be used as tools of intimidation. To be sure the owners of Plaintiff's building, Lalezarian Properties, exert their influence in the neighborhood. The father, Frank Lalezarian, of the father and son duo that make up Lalezarian Properties, lives in the Penthouse of Plaintiff's sprawling three building, 300+ unit complex. He and his son own numerous large buildings around the city, including more than one of the newly constructed glass towers in the Hudson Yards neighborhood where Plaintiff resides. The veneer of affluence has not kept them from running these brand new buildings like high-end slumlords, causing the structures to prematurely rot from neglect and mismanagement. This has been evidenced by 26 leaks in Plaintiffs apartment, caused by both bad plumbing and poor constructions. The walls in Plaintiff's apartment have been seriously damaged again and again from water seeping in through both exterior and interior walls. With regard to Plaintiff's apartment alone, the DOB inspector twice fine the owners for failure to maintain the building. The damage also caused Section 8 to suspend Plaintiff's rent payments. At least HPD and the DOB have held the landlord to account. Unfortunately, the NYPD and FDNY EMS (along with DHR and CCHR) have acted only as obliging stooges to further intimidate this Plaintiff as she is victimized by her landlord in their attempts to constructively evict her out of retaliation for filing her well-founded complaints with the other city agencies. The level of hostility escalated to violence when Plaintiff's doorman physically assaulted her on September 2, 2023. But, because of the 10th Precinct's history of ignoring Plaintiff's complaints and turning her pleas for help into unlawful excuses to haul her off for unnecessary psychological evaluations, Plaintiff did not feel it would be safe or productive to call the police to report the crime. Plaintiff did, however, send video of the assault and photos of resulting bruises to both her landlord and DHR. DHR's lack of ANY response to the video is, in-part, the reason for Plaintiff's claims against the State.

**Repeated Forcible Arrest**

Unfortunately, Plaintiff's landlord's use of the Police to intimidate the Plaintiff from exerting her disability rights was a tactic Plaintiff first became aware of while in the shelter system. That is also where Plaintiff became aware of City and State agencies, and their subcontractors, using the mental hygiene laws as a similar weapon of intimidation. It was there, where, on three separate occasions Plaintiff was wrongfully hauled off for unnecessary psychological evaluations … for no reason other than she was attempting to exert her disability rights. This abuse of the mental hygiene laws served, not only to intimidate Plaintiff from asserting her rights, but, in fact, the shelters stood to profit from reclassifying any "client" from general population to "MICA," defined as mentally-ill/chemically-addicted. Shelters receive triple the reimbursements from the government for housing a "MICA" client as opposed to a general population person. It became more than clear that the shelters were abusing the mental hygiene laws for their own financial benefit and not for the wellbeing or safety of their clients.

On a fourth occasion of this unscrupulous abuse in the shelter (chronologically the 2nd incident of 4), an attempt to drag Plaintiff off was foiled by a properly trained EMT worker who was strictly abiding Constitutional law. He explained to the shelter staff that it was obvious for a rational person to see that there was nothing mental wrong with the Plaintiff and, therefore, it was clearly illegal for him to abide their request to force the Plaintiff into an evaluation. Plaintiff contends that the rest of the EMT and Police force should be as well trained as that particular gentlemen. Had they been, Plaintiff would not now bear the physical and emotional scars of continued egregious violations of her rights.

But the worst of the actions, for which this complaint is brought, the incidents occurring on September 28, 2016 and October 26, 2016, resulted in lasting physical injury to

9

Plaintiff due to the brutal assaults of the officers involved.  Photographs and medical records will be presented to the jury to substantiate these claims.  Plaintiff attempted to pursue these claims with the City at the time of occurrence, but her complaint was dismissed for "administrative convenience" by the City Commission on Human Rights (CCHR), the defendants in the case for which this case is file as related (23-cv-05890 (LGS)(JW).   CCHR's (the City's) most recent offenses, named in the other complaint, were, in part, based on blatant and overtly stated anti-white racial discrimination.   Plaintiff contends that their dismissal of her 2016 claims was equally bases on such a disposition, as the officers were all African American and the Plaintiff identifies as white.

### NYPD and FDNY EMS Policy / Custom and Training

The very fact that Plaintiff has been so ***repeatedly*** abused by the NYPD and FDNY EMS, with regard to their interpretation of the standards by which they claim to have a right to force Plaintiff into a psychological evaluation, demonstrate on it's face a "policy/custom."    However, the fact that these actions are so commonly misapplied, as to become "normalized", does not justify them or alter the un-Constitutionality of them. If anything it proves a need for better training or a change of policy/custom.

### <u>LEGAL STANDARD</u>

On a motion to dismiss for "failure to state a claim upon which relief can be granted," the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Williams v. Cnty. of Orange*, 2019 WL 1244509, at *1–2 (S.D.N.Y. Mar. 15, 2019). "A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570

(2007)). Importantly, "*pro se* complaints are held to less stringent standards than those drafted by lawyers." *See id*. "[T]he [C]ourt should construe pro se complaints liberally 'to raise the strongest arguments it suggests.'" *Id*. Defendant cites to summary judgment opinions throughout their motion to dismiss, but those "opinions are not relevant in this early stage of the case." *See Marin v. Dave & Buster's, Inc.*, 159 F. Supp. 3d 460, 463 (S.D.N.Y. 2016).

## ARGUMENT

### Defendant's Principal Argument Is Wrong

Defendant's principal argument for dismissal appears to be that since Plaintiff "fails to plausibly allege that her purported constitutional injuries resulted from a municipal policy, custom, or practice." … Plaintiff is not entitled to relief against the City. This is not so— a plaintiff "need not identify any express rule or regulation." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004). "A policy, custom, or practice may also be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), *cert. denied*, 520 U.S. 1155 (1997)). And Plaintiff's repeated victimization as outlined in her complaint demonstrate "allegations of multiple instances of police misconduct against the same individual [which] raise[s] significant questions about the existence of a custom or policy within the department that leads to constitutional violations." Davis v. City of New York, 2014 WL 1011070 (S.D.N.Y. Mar. 14, 2014). "The repeated instances of false arrest and excessive force against the same plaintiff suggest a pattern of behavior that may indicate a failure in training or policy, supporting the Monell claim." Baker v. City of New York, 2015 WL 4393000 (E.D.N.Y. July 15, 2015).

The City Defendants also claim qualified immunity relying solely on a claim of

probable cause for their repeated actions. This is though circumstance in each case were very different with the exception that, in every case, "probable cause" relied on third party hearsay, which was demonstrably untrue when City employees encountered the Plaintiff in person. While it is true that officers are not required to accept a person's assurances at face value, they must still engage in a reasonable assessment of the situation. In Barkai v. Mendez, the court acknowledged that officers must consider all available information, including the individual's statements, when determining the necessity of detention. For example, the Plaintiff's verbal denial of suicidal intent should have prompted the officers to conduct a more thorough investigation rather than relying solely on hearsay. The failure to do so indicates a lack of reasonable judgment, which undermines the claim of qualified immunity. The officers had a duty to investigate the credibility of the information before taking action that would significantly impact the Plaintiff's liberty. The absence of direct evidence or corroboration of the claims made by the third party undermines the assertion of probable cause.

Therefore, the assertion that the officers are entitled to qualified immunity fails due to a proper claim of probable cause. As established in Wright v. City of Philadelphia, 409 F.3d 595, 603 (3d Cir. 2005), the existence of probable cause is a prerequisite for the lawful detention of an individual. If the officers lacked probable cause, as the Plaintiff contends, then their actions cannot be deemed reasonable, and qualified immunity cannot apply. The officers' disregard for the Plaintiff's explicit denials of suicidal intent, in the last two of the many encounters, coupled with their reliance on unverified hearsay, fails to meet the standard of reasonableness required for qualified immunity. And the prior incidents were based on even thinner claims asserted by third parties.

The right to be free from unlawful imprisonment is a clearly established

constitutional right. Courts have consistently held that individuals cannot be detained without probable cause, as articulated in Dunaway v. New York, 442 U.S. 200, 213 (1979). The officers' actions in this case, based on insufficient evidence and a failure to consider the Plaintiff's statements, constitute a violation of this established right.

## DIRECT OPPOSITION TO CITY'S ARGUMENTS:

## POINT I

## PLAINTIFF PROPERLY PLEADED MULTIPLE CLAIMS FOR RELIEF UNDER 42 U.S.C. § 1983

**A.     The Amended Complaint States Claims for Municipal Liability Under *Monell*.**

"[A] plaintiff seeking to hold a municipality liable under § 1983 must prove: (1) an official policy or custom [t]hat (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Savarese v. City of New York*, 547 F. Supp. 3d 305, 354 (S.D.N.Y. 2021) (internal quotations and citation omitted).

**(1) Proving a Policy or Custom**

In addition to identifying a policy or custom, "a plaintiff can satisfy the 'policy or custom' requirement by alleging . . . actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question . . .; or [] a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Id*. quoting (*Johnson v. Paul*, 2018 WL 2305657, at *3 (S.D.N.Y. May 21, 2018)).

Plaintiff has properly pleaded three paths to a "policy or custom" that caused her deprivation and violation of constitutional rights: (i) a particular policy or

13

custom, (ii) a practice so consistent a supervising policy-maker must have been aware; or (iii) a failure to train.

### (i) Policy or Custom

"Under Section 1983, municipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to governmental custom, policy, ordinance, regulation, or decision." *Anderson v. City of New York*, 2024 WL 183103, at *9 (S.D.N.Y. Jan. 17, 2024). The NYPD and FDNY EMS have developed a custom or policy of wrongly accepting hearsay reports that a person is in need of psychological evaluation, and using force or the threat of force to subject the said person to the said procedure without giving proper due process to allow the person in question to challenge such an initiating report. The responding officers made arguments, on video that will be submitted as evidence, stating that they refused to, and "by policy were not required' to hear any pleadings from Plaintiff to contradict the hearsay on which they were taking action to deprive Plaintiff of her liberty and constitutional rights.

### (ii) So Consistent policymaker's must be aware

A ***pattern*** of the above mentioned behavior was established by the fact that the Plaintiff has been thusly violated on six separate occasions without once being shown to be in actual need of any such psychological evaluation. The lack of need for the evaluations is borne out in the resulting medical records, which will be presented in evidence at trial. Each time the Plaintiff was taken, it was unnecessary and lacking cause. Plaintiff filed complaints and claims with the City Comptroller's Office, CCHR, The Public Advocate's Office, and the Civilian Complaint Review Board, all of which would have put policymaker's on notice of the repeated adverse consequences of the actions born

14

of their policies and the manner in which those policies were being implemented.

### (iii) A failure to train

As Defendant correctly states, a municipality's failure to train or adequately supervise its employees "is a permissible theory of liability under § 1983." *See Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). The Second Circuit has prescribed three requirements for a failure to train or supervise theory to reach the requisite: "deliberate indifference" to impute "a policy, custom, or practice." *Id.* "***First***, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation. ***Second***, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. ***Finally***, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (citations and internal quotations omitted) (emphasis added). If a plaintiff properly pleads "deliberate indifference," "[a] policy, custom, or practice may also be inferred." *Michel v. Orange Cnty., N.Y.*, 2024 WL 461693, at *2 (2d Cir. Feb. 7, 2024) (quoting *Patterson*, 375 F.3d at 226. "There are a number of ways that plaintiffs can plausibly allege a section 1983 claim for municipal liability premised on a failure to train theory without having detailed knowledge of a municipality's training programs." *T.J. on behalf of B.W. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.*, 2019 WL 13170168, at *12 (S.D.N.Y. Sept. 30, 2019) (alterations omitted). "The operative inquiry is whether the facts demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." *An v. City of New York*, 230 F. Supp. 3d 224, 230

(S.D.N.Y. 2017) (alterations omitted).

Importantly during the court's inquiry at this motion to dismiss stage, the Plaintiff's allegations must be viewed "in the generous light afforded to *pro se* plaintiffs" and determine whether the "'plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Michel*, 2024 WL 461693 at *2 (quoting *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022)).

***First***, the NYPD and FDNY EMS policymakers knew "to a moral certainty" that its agencies would regularly encounter situations in which a third party report of a person being suicidal or in need of psychological intervention would turn out to be inaccurate, exaggerated or, in some cases, simply false.  This holds true, as much for this class of reporting, as it does for criminal reporting.  In re J.B., 2013 IL App (1st) 120202, the court stated: "The standard for involuntary commitment is not less than the standard for a criminal arrest."  This flies in the face of assertions made by defendants, that they were trained to take, by force if necessary, "anyone for whom they received a suicide report" and that they were "not required" to listen to anything the accused had to say or take into account anything to counter such a hearsay allegation.  This is not the same standard by which other types of reports are handled by police to ensuring that individuals are not deprived of their liberty without sufficient justification.  Therefore, the officers' assertions represent either a faulty policy or improper training on their part.

***Second***, it would then be reasonable to expect that proper training of first responders, to access hearsay reports of suicide or psychological crisis with the same standards as other criminal reports, would serve to protect citizens from false arrest or

unlawful detainment. This is exactly the same procedure police officers engage in on practically every other type of call they respond to, be it criminal reports or any other report of unlawful or disruptive activity. Hearsay, is insufficient on it's own in any case, and should be particularly cautioned against when the ensuing action on the part of the City employees will deprive someone of their liberty. Due process requires clear and convincing evidence for civil commitment, just as it does for a criminal arrest. The Court has emphasized that hearsay evidence alone is not sufficient to meet this standard, stating, "The evidence must be more than mere hearsay or speculation." and "The standard of proof for civil commitment must be 'clear and convincing evidence' that the individual poses a danger to themselves or others. Hearsay alone does not meet this standard." Addington v. Texas, 441 U.S. 418 (1979). Proper training and guidance on appropriate standards of establishing probable cause when assessing hearsay reports of the need of a forced psychological evaluation would have prevented the Plaintiff rights from being repeatedly violated.

   ***Third and finally***, defendants' decision to ignore proper standards for establishing probable cause, and relying solely on hearsay, led to Plaintiff being **repeatedly** and unlawfully held against her will and subjected to unnecessary psychological evaluations, in violation of her constitutional right of due process and her right to liberty.

## (2) Causation

   Plaintiff properly alleged, in her Amended Complaint, that it was the actions of DHR, NYPD and FDNY EMS that directly caused Plaintiff to be wrongfully removed from her home, held against her will and forced to be psychologically evaluated without

any legitimate provocation.    The State admits to initiating the report which spurred the City's response. John Decl. ¶ 10.  However, as the Plaintiff contends that the report was slanderous, false and done out of retaliation, the manner in which the response was carried out by the City leaves the City responsible for denying Plaintiff due process.  The City's failure to properly assess probable cause or heed Plaintiff's demonstrable assertions about the falsity of the States report then led the City to further violate Plaintiff's constitutional and civil rights.  This, and the fact that the City has repeatedly … six times … violated Plaintiff's rights thusly, without cause, regardless of the sources of the initiating reports, place the City as a uniquely common denominator in continually carrying out the civil rights violating behavior.   Plaintiff has properly plead that this behavior is a pattern caused by the City's failure to ensure due process.

**(3) Deprivation of Constitutional Rights**

The City has forced Plaintiff to be held against her will and subjected to unnecessary psychological evaluations without proper cause, on numerous occasions, violating her constitutional right to due process and her right to liberty.  She has been the victim of unlawful entry into her home and search of her papers and property without a warrant, even after defendants were notified that Plaintiff was not home. The latter detail, making the entry explicitly in violation of the Fourth Amendment, for it lacked even the excuse of "exigent circumstances."

**B.**      **The Amended Complaint States a Claim for Unlawful Imprisonment**

**(a) Officers Did NOT Have Sufficient Probable Cause to Detain Plaintiff for a Mental Health Evaluation and Should NOT Have Relied on a Hearsay Reports**

In Spinelli v. United States (1969), the Supreme Court ruled that the information

provided by an informant was insufficient to establish probable cause. The Court stated, "The informant's tip, standing alone, is not enough to establish probable cause." The Court emphasized that the lack of corroborating evidence undermined the totality of the circumstances.

The City's assertion that the source of their "tip," stating that Plaintiff was suicidal, was credible solely because it came from a State agency (DHR) is insufficient to allow them to disregard contradicting information. Both Plaintiff AND her companion/witness Tony Girard made it very clear that the Plaintiff was not in any kind of psychological crisis or a danger to herself or anyone else. Plaintiff's comportment and ability to rationally explain herself, and the circumstances, should also have caused a reasonable person to question the voracity of the "tip." The lack of corroborating evidence in this case clearly negates probable cause under the "totality of the circumstances" doctrine and therefore, fails to justify Plaintiff's seizure and unwilling detention for the purpose of an unnecessary psychological evaluation.

The City shamefully attempts to mislead the Court by claiming that Plaintiff was spouting "elaborate explanations about purported government conspiracies against her…" (City MTD prelim statement). This is ridiculous and can be disproven by Plaintiff's phone captured video of the entire encounter. This evidence will be presented in court in spite of the fact that the City has apparently attempted to hide this truth by refusing to release the bodycam footage Plaintiff requested through the Freedom Of Information Laws over a year ago.

But. primarily, "the question is one of reasonability, which cannot be resolved on Defendant's motion to dismiss." *Ault v. J.M. Smucker Co.*, 2014 WL 1998235, at *6 (S.D.N.Y. May 15, 2014). Especially because there are a number of occasions where welfare calls did not lead to a privileged arrest. *See, e.g.*, *Livingston v. Kehagias*, 803 F. App'x 673, 689 (4th Cir. 2020) ("[A] 911 call reporting a suicide risk has been held insufficient to establish probable

cause for a mental health seizure.") Therefore the court should not even consider Defendant arguments about the "reasonableness" of the imprisonment.

### (b) Individual Officers Are NOT Protected by Qualified Immunity

The assertion that the officers are entitled to qualified immunity is incorrect in this case, as there exists the absence of probable cause. As established in Wright v. City of Philadelphia, 409 F.3d 595, 603 (3d Cir. 2005), the existence of probable cause is a prerequisite for the lawful detention of an individual. If the officers lacked probable cause, as the Plaintiff contends, then their actions cannot be deemed reasonable, and qualified immunity cannot apply. The officers' disregard for the Plaintiff's explicit denial of suicidal intent, coupled with their reliance on unverified hearsay, fails to meet the standard of reasonableness required for qualified immunity.

**C.**     **The Amended Complaint States a Claim for Unlawful Search**

**(a) Warrantless Entry into Plaintiff's Apartment Was NOT Justified by Emergency Circumstances Because Officers' Were Informed in Advance that NO Mental Health Crisis Existed and Plaintiff was NOT Home.**

There was no probable cause here. The entry was made after the Police made contact with Plaintiff and she informed them that she was not home, but was on her way back and would be happy to speak with them upon her return. Officer Orellana, also informed Plaintiff that they were given a full description of the Plaintiff, including what she was wearing. This could only have been possible if the information came from Plaintiff's doorman, who would have seen her exiting the building. This would have been corroborating evidence that Plaintiff was not inside her apartment, and therefore, there was no probable cause to enter looking for her.

**(b) Individual Officers Are NOT Entitled to Qualified Immunity for the Warrantless Entry**

Again, the assertion that the officers are entitled to qualified immunity is incorrect in this case, as there exists the absence of probable cause.  The entry was made after the Police made contact with Plaintiff and she informed them that she was not home.

**D.        The Amended Complaint's Stated Claims Based on a Retaliation Theory**

The Plaintiff does not allege that retaliation was **initiated** by the NYPD and FDNY EMS in the most recent incidents.  Rather, she asserts that they are willing participants in acts of retaliations instructed by others … DHR most recently and CCHR before that.  However, numerous court cases have established that law enforcement cannot act in concert with state agencies to carry out unlawful actions. For example, in Bivens v. Six Unknown Named Agents, the Supreme Court recognized the right to sue federal agents for constitutional violations, establishing a precedent for holding law enforcement accountable for their actions.

Plaintiff claims that NYPD and FDNY EMS physically carried out the actions, which served as a means by which others intimidated and punished the Plaintiff, while she was in the act of defending her disability rights.  NYPD and FDNY EMS facilitated retaliation and are liable for abetting bad actors.  The repetitive nature of the acts would suggest, to a reasonable person, that the NYPD, particularly the 10th Precinct, had some awareness of the manner in which they were being used and so can not claim to be completely unwitting.  Officer Castro, even admitted on Plaintiff's video recording form May 3, 2023, which will be submitted at trial, to being cognizant of previous interaction with the Plaintiff.

Since becoming disabled, Plaintiff has been subjected to countless police interactions …

many more than just those in which she was taken for psychological evaluations.  Plaintiff will present video evidence of these encounters at trial.  Each encounter succeeded in its purpose of stopping and interfering with Plaintiff's free speech and pursuit of making complaints about violations of her disability rights 1) in the shelter system 2) in her apartment building and 3) while pursuing legal protection from CCHR and DHR.  This pattern of police intervention, always defending the offenders of Plaintiff's disability rights, demonstrate something seriously wrong with how disabled people are allowed to be victimized by the City and NYPD.  NYPD and FDNY EMS have continually acted on false reports and engaged in unwarranted and unlawful threats of arrest or forced psychological evaluations when the Plaintiff has attempted to make complaints against people violating disability law.

The earlier incidents, in the shelter system, were a bit more directly retaliatory on the part of the police, and were carried out by officers who knew the Plaintiff and were actively and knowingly participating in violating Plaintiff's disability rights. The violence of Plaintiff's beatings were carried out with increasing vigor each time she tried to stand up for her rights. Those were quite direct retaliatory actions carried out with a particular vengeance and brutality to punish Plaintiff's challenge to their "authority."

All of these actions, whether initiated directly or indirectly by NYPD and/or FDNY EMS, resulted in these agencies and individuals being the acting force which ultimately achieved the desired intimidation of Plaintiff.  That makes them liable for violating both Title V of the ADA and the Rehabilitation Act of 1973 (RA).  The NYPD receive Federal funding and so are bound to the RA as well as the ADA.

**POINT II**

**PLAINTIFF PROPERLY STATES CLAIMS BASED ON THE AMERICANS WITH DISABILITIES ACT (ADA)**

Every aspect of this complaint has to do with Plaintiff's disability, her struggles to enforce her disability rights and her abuse at the hands of those either failing to enforce the law or interfering and punishing her for making demands that the law be enforced. Plaintiff's Amended Complaint (at ¶ 13-33, 195-201, 207-208, 295-309) provides lengthy and detailed accounts of the abuses she was subjected to by the Defendants BECAUSE she was attempting to exert her disability rights. Every action complained of, was taken in the course of Defendants either 1) overtly denying Plaintiff's rights to accommodations … primarily not to be assaulted and caused additional harm to preexisting injuries, 2) interfering in her right to file complaints about others violating her rights or 3) retaliating against her for seeking protection and enforcement of her disability rights. All of these actions are violations of the ADA and RA.

The City makes a Title II *straw man* defense bases on standard disability complaints, related to access, such as physical barriers. Plaintiff has asserted that the "access" she was denied was not a physical barrier, but access to the **law** and protection through enforcement which government bodies are obligated to provide. Plaintiff lacks financial resources to pay for private lawyers to enforce the law. Enforcement by government bodies is a "service" that is required to ensure protection of the disabled. As such, being "denied the benefits of the services" is a direct violation of language included in Title II. Failure to enforce the law for the Plaintiff's protection is its own form of discrimination and denial of service and has allowed ongoing and unchecked abuse of the disabled Plaintiff in violation of her rights. And while this sort of denial of service falls under Title II, many of Plaintiff's claims are better addressed by

Title V and The Rehabilitation Act of 1973 which address a) retaliation and b) interference, coercion or intimidation.

The City and State have continually violated both of these Acts while, not only protecting Plaintiff's landlord and actively refusing to enforce Plaintiff's rights to legal protections from the landlord's violations, but they then actively participated in punishing and abusing the Plaintiff for pursuing her rights.  When the Plaintiff has pressed for both the City and State to enforce the Fair Housing Act (FHA) and ADA, they have used forced psychological evaluations and threats of arrest to intimidate and dissuade Plaintiff from her pursuit of her disability rights.  This violates Title V and RA.

Denying Plaintiff protection afforded by FHA and ADA laws is also a constitution violation of equal protection and enforcement "services" of the State.  While the City and State's interference and intimidation of Plaintiff while in her pursuit of ADA rights violated both the ADA and the Fourteen Amendment.

As to the earlier assaults by officers in the shelter system, which Plaintiff outlined in her Amended Complaint ¶ 297-305, the physical violations were much more severe.  They went far beyond simply failing to accommodate and engaged in outright, intentional, abuse of a vulnerable person.  In those instances, because the shelters were subcontractors of the City, the City was the housing provider.  Therefore, the City was **directly** liable for the ADA housing violations… which included 1) failure to accommodate 2) physical and psychological abuse and 3) intimidation and retaliation after Plaintiff filed complaints for 1) and 2).

24

**POINT III**

**PLAINTIFF PROPERLY STATES CLAIMS UNDER STATE LAW**

**A.    The Plaintiff Fully Complied with New York's Notice of Claim Requirements**

The City is fully aware that Plaintiff has timely complied with all Notice requirements. Attached are receipts for notices of all claims brought in the Amended Complaint, including those Plaintiff seeks under continued cause of action.  Although, the most recent claim should be enough to stand alone, as it makes specific reference to the claim being based on the pattern of behavior and the all encompassing history of abuse including the prior, never resolved, claims that were wrongfully dismissed for administrative convenience by CCHR.  Plaintiff can also provided emailed correspondence between herself and the Comptroller's office in which she requested 50-h hearings.  Instead of scheduling a hearing, Plaintiff was sent a request for information, along the lines of an interrogatory, with which she fully complied.

**B.    The Amended Complaint States a Claim for Defamation**

Section 1983 defamation is possible only if the facts are pled that tend to show: "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, followed by (2) a material state- imposed burden or state-imposed alteration of the plaintiff's status or rights. The state-imposed burden or alteration of status must be in addition to the derogatory statement (i.e., the loss of reputation coupled with some deprivation of liberty or property interest).

DHR's false utterance stating that Plaintiff was suicidal, and transmitting that to the third party authorities, which brought NYPD and FDNY EMS to Plaintiff's apartment, surely satisfies the first criteria. And the fact that it cost Plaintiff her freedom and a deprivation of liberty when she was unnecessarily taken for an involuntary psychological evaluation surely meets the second

criteria. But the core of this claim can be shown by Plaintiff through video and text evidence demonstrating the stigma, she is now forced to live with. The incidents as they occurred caused her ongoing mental anguish and embarrassment within her own residential building and among her neighbors. The false report from DHR, that Plaintiff was suicidal, and the subsequent actions of NYPD and FDNY EMS, gave the appearance that Plaintiff was criminally removed from the building. The hostile doormen and superintendent, who were objects of Plaintiff's original complaints brought to DHR, then used the "scene" to reinforce their own attempts to harass and humiliate Plaintiff by telling other tenants that Plaintiff was "arrested" and was "mentally ill". The current level of public embarrassment would not have existed had DHR not made their false statements in the first place. These claims should not be dismissed at this stage or even decided by summery judgment, as there are triable questions at issue.

**C.    The Amended Complaint States Claims for Negligent or Intentional Infliction of Emotional Distress**

**(a) The Alleged Conduct Rises to the Level of "Extreme and Outrageous" Behavior Required Under New York Law to Support a Claim for Intentional Infliction of Emotional Distress**

Everything Plaintiff outlines about numerous officers, on numerous occasions, violating her disability needs with impunity, and on several occasions actually brutalizing her without regard for her prior injuries and disabled vulnerable state, easily rise to the level of "extreme and outrageous" behavior to any decent and reasonable person.  Assaulting an able bodied person is unacceptable.  But to exert such force on a vulnerable, non-combatant person is truly "outrageous."  Yet, Plaintiff has been subjected to such treatment multiple times.  Plaintiff also bears the physical daily reminder of her assaults in the form of a lump on her clavicle that

resulted from the second of the shelter incidents.  After an MRI and sonogram, doctors have been

unable to fully identify exactly what the lump is.  Either some sort of herniation or a trauma

induced lipoma.  This, in addition to the impact on her previously existing other injuries.  And,

though it has now been years since the worst of the assaults, the injuries and their aftermath, both

physically and emotionally, remain.  And each addition violation has increased the impact.

**(b) Plaintiff Has Properly Alleged Negligence, and a Special Duty or Recognized**

**Type of Negligence That Causes Extreme Emotional Distress**

Again, it is Plaintiff's disability at the heart of this action.  Plaintiff's disability required a

Special Duty of Care.  The officers in incident after incident neglected to properly demonstrate

any concern for Plaintiff's, plainly stated, needs concerning her back, neck, head and other

injuries.  This neglect lead to pain and further physical injury to Plaintiff.  The trauma of which,

caused deep and lasting emotional distress, with continuing fear of future interactions with police

… as her disability rights struggle with her landlord remains unresolved and ongoing.

**D.    The Amended Complaint States a Claim for Negligent Supervision under New York**

**Common Law**

Please see section POINT  I A 1) **(ii)** So Consistent policymaker's must be aware, and (iii)

Failure to train, above.

**E.    The Court Should Not Decline to Exercise Supplemental Jurisdiction Over Any**

**Remaining State Law Claims**

It is in the interest of justice for the Court to include consideration on State Law claims.

**CONCLUSION**

For the reasons set forth herein, Plaintiff, Kelly MacNeal respectfully requests that the Court

deny the City's motion to dismiss any and all claims against the City, Chandler Castro, John

Corde, Christian Orellana, Jose Quintuna-Guaman, Ryan Stack and Frank Tarsillo in her

Amended Complaint, with prejudice, together with such other and further relief as the Court

deems just and proper.

Dated:   New York, New York          Respectfully submitted,
         June 9, 2025


                                     Kelly MacNeal
                                     *Pro se* Plaintiff
                                     507 W 28th St.
                                     New York, NY 10001
                                     Tel: 212-581-3223