**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

KELLY MACNEAL,

                             Plaintiff,

                 -against-

STATE OF NEW YORK, et al.,

                         Defendant.

-------------------------------------------------------------X

**REPORT &**
**RECOMMENDATION**

**24-CV-6017 (LGS) (JW)**

**To the Honorable Lorna G. Schofield, United States District Judge:**

On August 1, 2024, *pro se* Plaintiff Kelly MacNeal ("Plaintiff" or "MacNeal")
filed this case against the State of New York, the New York State Division of Human
Rights ("DHR"), the New York City Police Department ("NYPD"), the New York City
Fire Department EMS ("NYFD"), Chelsea John, Gina Martinez, Elena Perlongo, John
Herrion, Candace Tyndall (collectively "DHR employees"), Lt. Corde, P.O. Castro,
P.O. Orellana, P.O. Quintuna-Guaman, John Doe EMT 1, and John Doe EMT 2. Dkt.
No. 1. The Complaint alleges the above-mentioned Defendants unlawfully conspired
to deny Plaintiff's rights under the Americans with Disabilities Act ("ADA") and the
Fair Housing Act ("FHA"). Id. The Complaint also alleges DHR employees John and
Tyndall made a false risk of suicide report about Plaintiff to the NYPD, which led to
NYPD officers and EMS workers falsely imprisoning Plaintiff and unlawfully
searching her residence. By order dated August 14, 2024, Chief Judge Swain granted
Plaintiff leave to proceed *in forma pauperis.* Dkt. No. 5.

On August 19, 2024, Judge Schofield issued an order (1) dismissing the claims against DHR as redundant to the claims against the State of New York and (2) dismissing the claims against the NYPD and FDNY for failure to state a claim on which relief may be granted. Dkt. No. 7. In the same order, the Court also directed the Attorney General of the State of New York and Corporation Counsel of the City of New York to ascertain and provide Plaintiff with the identities of the John Doe Defendants. Id.

On October 21, 2024, Plaintiff moved for leave to amend the complaint, which the Court granted. See Dkt. No. 22, 27. On November 29, 2024, Plaintiff filed the first amended complaint ("FAC"). Dkt. No. 37. The FAC includes claims under 42 U.S.C. §§ 1981, 1983, 1985, 1986, Section 504 of the Rehabilitation Act, as amended 29 U.S.C. §704 ("RA"), the Americans with Disabilities Act ("ADA"), and a First Amendment Retaliation Claim against the State of New York, Chelsea John, Gina Martinez, Elena Perlongo, John Herrion, Candace Tyndall, and Elizabeth Ortiz ("State Defendants"). The FAC also includes state law claims of intentional and negligent infliction of emotional distress, negligent supervision, and lack of training against the State of New York. Id. Against the City of New York, Lt. John Corde, P.O. Grey Castro, P.O. Christian Orellana, P.O. Jose Quintuna-Guaman, EMS Frank Tarsillo, and EMS Ryan Stack ("City Defendants"), the FAC, includes claims of unlawful imprisonment, unlawful search, and retaliation under 42 U.S.C. § 1983, as well as a discrimination claim based on the ADA. Id. Lastly, the FAC includes claims

of defamation, negligent or intentional infliction of emotional distress, negligent supervision under state law against the City of New York. Id.

Before this Court for report and recommendation is State of New York and City of New York Defendants' Motions to Dismiss the FAC pursuant to Federal Rules of Civil Procedure 12 (b)(1) and 12(b)(6). Dkt. Nos. 73 and 75. For the reasons stated below, the Court recommends State Defendants' Motion to Dismiss be **GRANTED** in full. The Court recommends City Defendants' Motion to Dismiss be **DENIED** as to Plaintiff's unlawful imprisonment § 1983 claim and **GRANTED** as to all other claims.

## I.    <u>BACKGROUND</u>

The following facts are taken from the FAC, Plaintiff's oppositions to the Motions to Dismiss, exhibits one and two attached to the opposition to the State Defendant's motion, and State Defendants' Motion to Dismiss.[1]

Plaintiff is a Caucasian female who has a physical disability. Plaintiff's physical disability is due, in part, to a traumatic brain injury. FAC ¶ 99. The traumatic brain injury causes "migraines and vertigo triggered by exposure to chemical irritants including cigarette smoke and vape fumes…and dehydrating chemical[s] such as formaldehyde." Id. at ¶ 100. Plaintiff's disability also includes mobility issues caused by an accident. Id. at ¶ 147.

---

[1] State Defendants attached a declaration of Defendant John along with eight exhibits as part of its Motion to Dismiss. The Court addresses whether those documents should be considered in section II(B)(1) of this Report and Recommendation.

### A.    Plaintiff's Grievances Against the Landlord

Due to Plaintiff's disabilities, she resides in an affordable unit that is also a "disability unit" that she obtained through the housing lottery. Id. at ¶ 96.  The unit is equipped with wheelchair accessible appliances and additional safety features. Id. Smoking is prohibited in all units and any part of the apartment building. Id. The front of the building also has "disability doors" that provide an accessible entrance. Id. at ¶ 291.

Plaintiff has had several problems with her apartment since the beginning of her lease in September 2017.  Id. at ¶ 95.  The issues include multiple apartment leaks and unusable accessible entrance doors. Id. at ¶¶ 283-91.  Plaintiff's chief grievance is fumes in the building from cigarette smoke, vape smoke, and from the burning of cleaning agent Fabuloso, all of which she alleges are caused by a downstairs neighbor.  Id.  When Plaintiff raised these concerns with her landlord, she was "met with ridicule and retaliatory abusive denials of service and hostile treatment from staff and management.²" Id.  As a result, Plaintiff sought assistance from the New York City Commission on Human Rights ("CCHR").  Id.

### B.    Plaintiff's Related Case Against the City of New York

On July 7, 2023, Plaintiff brought a lawsuit against the City of New York based on CCHR's refusal to file a complaint for her against her landlord and because CCHR made a suicide report that caused Plaintiff to be forcibly removed from her home and

---

² Plaintiff does not specify a timeframe for when she raised concerns with her landlord but based on FAC ¶¶ 283-91, it occurred between her lease start date of September 2017 and her Complaint to CCHR on July 7, 2023.

to undergo an involuntary psychological evaluation. <u>MacNeal v. City of New York</u>, No. 23 Civ. 5890 (LGS) (JW), Dkt. No. 1 (S.D.N.Y. July 7, 2023) ("MacNeal 1). The complaint included allegations that CCHR told Plaintiff no discrimination claim could be brought on her behalf based on her status as an affordable tenant "because that legal status was only meant to protect minorities" and Plaintiff was not a minority, so she "was not protected by the law." <u>MacNeal v. City of New York</u>, No. 23 Civ. 5890 (LGS) (JW), 2025 WL 640666, at *2 (S.D.N.Y. Feb. 27, 2025). Shortly after CCHR declined to bring a claim against Plaintiff's landlord, Plaintiff emailed CCHR and her landlord stating, among other things, "I am go[i]ng to kill myself if this doesn't stop!" <u>Id.</u> Following that email, NYPD officers and NYFD EMS personnel responded to Plaintiff's apartment, detained her, and transported her to the hospital for psychological evaluation, where she was deemed not suicidal and released the next day. <u>Id.</u>

The City of New York brought a motion to dismiss all claims under Rule 12(b)(6) and the Court granted the motion as to every claim except the claim of racial discrimination based on CCHR's failure to bring a complaint on behalf of Plaintiff as a subsidized tenant.

### C. Plaintiff's Complaint to DHR

After CCHR refused to bring a complaint on her behalf, Plaintiff sought assistance from the U.S. Department of Housing and Urban Development ("HUD"). FAC ¶ 154. On April 10, 2023 HUD referred the complaint to DHR to investigate, pursuant to a work share arrangement between HUD and DHR. State Mem. Ex. 1.

DHR is an agency that "receives and investigates complaints alleging violations of the New York State Human Rights Law." State Mem. at 2.

HUD sent a letter to Plaintiff, after referring Plaintiff's complaint to DHR, that stated if DHR "fails to begin processing your complaint within 30 days, HUD may take up your complaint again." State Mem. Ex. 1. Plaintiff interpreted the letter to require DHR to act within 30 days and was unsatisfied with the amount of time DHR was taking to investigate the complaint. FAC ¶ 157.

On May 17, 2023, DHR mailed Plaintiff a complaint to sign. Id. at ¶ 212. On September 14, 2023, DHR investigator Perlongo contacted Plaintiff to interview her about the case. Plaintiff offered to send evidence and contact information for witnesses to Perlongo, who told Plaintiff she would send a list of what was needed later, which never occurred. Id. at ¶¶ 220-21.

On October 10, 2023, DHR contacted Plaintiff to submit a rebuttal to the landlord's response to the DHR complaint. Id. at ¶ 222. Plaintiff was given until October 23rd to submit a rebuttal, even though DHR had the landlord's response since July 19th. Id. Plaintiff asked for a 30-day extension due to her disability stemming from her head injury but was granted only two weeks by John. Id. at ¶ 225. Plaintiff appealed the denial of the full extension to the disability department and Herrion, the Director of Disability Rights, granted the full extension. Id. at ¶ 229. Subsequently, Plaintiff requested the complaint be transferred to the disability department, which John denied. Id. at ¶¶ 230-31.

On April 11, 2025, Plaintiff's complaint was dismissed by DHR after a finding of no probable cause. State Mem. Ex. 8.  As part of the investigation, DHR spoke to Respondents, and also reviewed email correspondence between Plaintiff and her landlord, text message correspondence between Plaintiff and a former neighbor, audio recordings of phone calls between the parties, video recordings of Plaintiff's interactions with the doormen, and other documents.  Id.  DHR also spoke to a witness for Respondent and a witness for Plaintiff and made twenty-nine tenant calls, two of which were successful.  Id.  DHR ultimately concluded that the "record does not contain sufficient evidence that Respondents engaged in unlawful discrimination against Complainant because of her disability."  Id.  The decision was based partially on the fact that "[r]espondents engaged in the interactive process with Complainant by offering her a transfer to a mobility impaired unit, an air purifier at Respondents' expense, and…to change the air filters and clean out drains that may be emanating unpleasant fumes and odors."  Id.  The Determination and Order After Investigation informed Plaintiff of her right to appeal the decision to the New York State Supreme Court.  Id.

### D.    DHR's Suicide Report

During the time period in which Plaintiff was waiting for the investigation to commence, she had a telephone conversation with DHR employees Tyndall and John about her frustrations.  FAC ¶¶ 153-63.  In that phone call, on May 2, 2023, Plaintiff was told her case would be investigated in the order in which it was submitted and that "there were no disability accommodations available to prioritize any case."  Id.

at ¶ 158.  During the phone call with Tyndall and John, Plaintiff "perhaps a bit emotional from having to relive the traumatizing events in her mind, made a last tearful plea imploring DHR to take her suffering seriously…" Id. at ¶ 161.  In that conversation, Plaintiff recounted her experience with CCHR and the suicide report. Later, Plaintiff learned that Defendant John was previously employed by CCHR. Id. at ¶ 172.

On May 2, 2023, after the phone call with Plaintiff in which she recounted the previous suicide report by CCHR, Defendants Tyndall and John called the NYPD to report Plaintiff as suicidal.  Id. at ¶ 164.  Plaintiff was out at an event with friends and had turned her cell phone off. Id. at ¶¶ 178-80.  Around midnight Plaintiff received a phone call from an NYPD officer who indicated the police were at Plaintiff's apartment because a suicide threat had been reported to the police. Id.  Plaintiff arrived home and was met by Lt. Corde, Officer Castro, Officer Orellana, and Officer Quintuna-Guaman.  Id. at ¶ 185.  Plaintiff attempted to dissuade the police that any intervention was needed but was unsuccessful and the NYPD officers called FDNY EMS.  Id.  at ¶ 191. Plaintiff continued to try to persuade the NYPD officers and FDNY EMS workers that she was not suicidal but ultimately, Plaintiff agreed to take the ambulance to the hospital "for no other reason than complete terror and fear of another assault by the officers and further injury to her existing injuries."  Id. at ¶ 195.  Plaintiff was deemed not suicidal at the hospital but had to spend the night in the psychiatric ward until she was able to return home.  Id. at ¶ 200.

### E.    The Search of Plaintiff's Home

When Plaintiff returned home from the hospital, she believed her apartment had been entered in her absence.  Plaintiff's items were on the floor, "boxes overturned and even some banners, from a peace really [sic] Plaintiff had attended [was] partially unrolled…" Id. Plaintiff suspected her apartment was illegally searched by the police without a warrant. Id.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

#### 1.    12(b)(1)

If a court lacks subject matter jurisdiction to adjudicate a claim, it is subject to dismissal under Rule 12(b)(1).  Fed. R. Civ. P. 12 (b)(1).  To resolve a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidence outside of the complaint.  Walker v. NYS Justice Center for Protection of People with Special Needs, No. 18 Civ. 7757 (NSR), 493 F.Supp.3d 239, 245 (S.D.N.Y. Oct. 8, 2020).

#### 2.    12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a Complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Garner v. Behrman Bros. IV, LLC, No. 16 Civ. 6968 (PAE), 260 F. Supp. 3d 369, 375 (S.D.N.Y. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009)).  A complaint may be properly dismissed, where,

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." Id. (quoting Twombly, 550 U.S. at 558).

Although the Court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.  Further, "dismissal with prejudice is appropriate when the flaws in the pleading are incurable." Kling v. World Health Org., No. 20 Civ. 3124 (CS), 532 F. Supp. 3d 141, 154 (S.D.N.Y. 2021) (internal quotation marks omitted).

## B.    Judicial Notice of Exhibits

As a threshold matter, the Court must determine which documents should be relied on.  Both State Defendants and Plaintiff have attached several documents as exhibits.

Though motions to dismiss are typically constrained to the Complaint, Courts in this District routinely consider outside documents in several instances.  First, when a plaintiff proceeds *pro se* a court may, in addition to the complaint, consider documents attached to the complaint, documents incorporated in the complaint by reference, and allegations asserted in the opposition to the motion to dismiss. Harris v. N.Y.C. Hum. Res. Admin., No. 20 Civ. 2011 (JPC), 2022 WL 3100663, at *1 n.1 (S.D.N.Y. Aug. 4, 2022).  Courts may also consider materials outside the complaint to the extent that they are consistent with the allegations in the Complaint. Alsaifulla

v. Furco, No. 12 Civ. 2907 (ER), 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal citations omitted).

Second, in cases involving administrative agencies, courts may take judicial notice of state administrative records. Sahni v. Staff Attorneys Ass'n, No. 14 Civ. 9873 (NSR), 2016 WL 1241524, at *5 (S.D.N.Y. Mar. 23, 2016), recons. in part on other grounds. Courts in this District have found it proper to consider records from DHR investigations, including the Determination and Order After Investigation, in deciding motions to dismiss. Evans v. N.Y. Botanical Garden, No. 02 Civ. 3591 (RWS), 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002) (NYSDHR Complaint and Determination and Order After Investigation constitute public records of an administrative body and the court can take judicial notice without converting the motion to dismiss into to a motion for summary judgement). A court may not, however, consider "facts unearthed in discovery, depositions, affidavits, statements, and any other relevant form of evidence," at the motion to dismiss stage. Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006).

**1. Exhibits Attached to State Defendant's Motion to Dismiss**

State Defendants filed a declaration of Defendant John along with eight exhibits as part of its Motion to Dismiss. Exhibit one is a copy of the letter HUD mailed to Plaintiff dated April 10, 2023, including the HUD complaint form and the summary Plaintiff submitted to HUD. Exhibit two is the cover letter HUD sent to Plaintiff's landlord. Exhibit three is the cover letter DHR sent to Plaintiff after receiving the HUD referral. Exhibit four is Plaintiff's DHR complaint dated June 6,

2023. Exhibit five is an excerpt of the event history for the investigation of Plaintiff's DHR complaint (case no. 10224864), including a log of communications between Plaintiff and DHR employees. Exhibit six is an excerpt of the event history for the investigation of Plaintiff's DHR complaint (case no. 1022494).[3] Exhibit seven is a letter DHR sent to Plaintiff and Plaintiff's landlord informing them that the investigation was unable to be brought to conclusion within 100 days and stating the reasons for the delay. Exhibit eight is DHR's Determination and Order After Investigation dated May 10, 2024.

This Court takes judicial notice of the documents that constitute the public record of the DHR investigation (exhibits one through four, and seven and eight) without converting the Motion to Dismiss into a Motion for Summary Judgement. Evans, 2002 WL 31002814, at *4. The Court declines to take judicial notice of Defendant John's Declaration and the two excerpts of the event history with internal notes from communications with Plaintiff maintained by DHR (exhibits five and six), as they are forms of evidence appropriate for summary judgement motions, not motions to dismiss. Global Network Commc'ns, 458 F.3d at 155.

## 2. Exhibits Attached to Plaintiff's Opposition Brief to State Defendants' Motion to Dismiss

Plaintiff attaches four exhibits to her State Opposition Brief. Exhibit one is an excerpt of responsibilities for recipients of Fair Housing Assistance Program ("FHAP") funds from HUD's website. Exhibit two is a memorandum with guidance

---

[3] Case no. 10224994 is a duplicate complaint logged by DHR for Plaintiff before DHR began filing all correspondence under case no. 10224864.

and general requirements for FHAP assistance.  Exhibit three is a report by the Office of the State Comptroller after an audit of the DHR housing investigations from April 2019 through February 2024.  Exhibit four is a list of annual case logs from 2018 to 2020, which are publicly available on DHR's website.

This Court will take judicial notice of exhibits one and two but declines to take judicial notice of exhibits three and four.  Exhibits one and two, while not integral to the Complaint, are consistent with the allegations in the Complaint, and the mandate to "read the papers of *pro se* litigants generously makes it appropriate to consider [the] additional materials." Alsaifulla, 2013 WL 3972514, at *4 n.3.  Plaintiff's FAC and Opposition Brief allege a contract between HUD and DHR to investigate housing complaints and exhibits one and two are public documents that elaborate on that contractual relationship, including establishing that DHR housing investigations are federally funded.  Exhibit three, a report primarily about DHR investigations closed between April 1, 2019 and October 31, 2023 is not relevant to Plaintiff's DHR investigation, which was finalized on May 10, 2024.  The report has no bearing on Plaintiff's claims against State Defendants that she was discriminated against, denied due process, and denied accommodations during her individual DHR investigation and that her rights were violated by the actions of DHR employees who called the police to report her as suicidal.  Finally, the Court declines to consider exhibit four because the logs of DHR cases from 2018 to 2020 are not relevant to Plaintiff's claims.

### C.    *Pro Se* Litigants

Courts "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." McLeod v. Jewish Guild for the Blind, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam). "The policy of liberally construing pro se submissions is driven by the understanding that implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." Id. (quoting Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007)).

While courts are "obligated to draw the most favorable inferences that plaintiff's complaint supports, we cannot invent factual allegations that [a *pro se* plaintiff] has not pled." Costabile v. New York City Health & Hosps. Corp., 951 F.3d 77, 81 (2d Cir. 2020); Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010).

## III.    DISCUSSION

### A.    Claims Against the State of New York

#### 1. Claims Against State Defendants Sued in Their Official Capacity

State Defendants argue that the Eleventh Amendment bars Plaintiff's claims against all state actors sued in their official capacity under 42 U.S.C. §§ 1983, 1985 and 1986. State Mem. at 13-14. State Defendants concede that claims under the RA are not barred by the Eleventh Amendment. Id. at 20. Plaintiff, in response, argues

14

that she seeks prospective injunctive relief and the State has waived sovereign immunity by accepting federal funds. Pl.'s State Opp'n. at 25-26.

The Eleventh Amendment bars federal court jurisdiction over suits against a state or its agencies, absent consent or express abrogation of "the constitutionally guaranteed immunity of the several States," by Congress. Penhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99 (1984) (quoting Quern v. Jordan, 440 U.S. 332, 342 (1979)). The bar extends to state officials sued in their official capacities because such suits are not "against the official but rather [] against the official's office." Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)). If the Eleventh Amendment bars a claim for lack of subject matter jurisdiction, it must be dismissed under Rule 12(b)(1).

The Ex Parte Young doctrine provides an exception to Eleventh Amendment immunity afforded to states and state actors sued in their official capacity. The limited exception is reserved for when the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Walker, 493 F.Supp.3d at 247 (internal citations and quotations omitted).

First, Courts in this District have repeatedly held that Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. §§ 1983, 1985, or 1986. Keitt v. New York City, No. 09 Civ. 8508 (GBD) (DF), 882 F.Supp.2d 412, 447 (S.D.N.Y. Sept. 29, 2011); Qader v. Cohen & Slamowitz, No. 10 Civ. 1664 (GBD), 2011 WL 102752, at *3 (S.D.N.Y. Jan. 10, 2011). Second, it is well-established that New York has not waived its immunity under the Eleventh Amendment by consenting to

§§ 1983, 1985, or 1986 lawsuits in federal court. <u>Asensio v. DiFiore</u>, No. 18 Civ. 10933 (RA), 2019 WL 4392743, at *6 (S.D.N.Y. Sept. 13, 2019) ("New York has not waived its Eleventh Amendment immunity to being sued in federal court. Nor did Congress abrogate the state's immunity in enacting 42 U.S.C. §§ 1983, 1985, or 1986.") (internal citations omitted).

Third, no <u>Ex Parte Young</u> exception applies here. <u>Ex Parte Young</u> created an exception to Eleventh Amendment immunity when the relief requested is prospective, not retroactive. 209 U.S. 123 (1908). Plaintiff argues the request for relief is injunctive, qualifying for the Eleventh Amendment carve out. Specifically, Plaintiff "seeks, among other things, an order compelling DHR to re-investigate her complaint under proper, nondiscriminatory procedures and timelines." Pl.'s State Opp.'n at 25. But "it is the nature of [the] requested relief, not the label placed on it, which determines its availability in light of the Eleventh Amendment." <u>New York City Health & Hosps. Corp. v. Perales</u>, 50 F.3d 129, 136 (2d Cir. 1995). "In determining whether <u>Ex Parte Young</u> applies, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" <u>Caruso v. Zugibe</u>, 646 Fed.Appx. 101, 105 (2d Cir. 2016). Relief that addresses "the past by an action of the state or an arm of the state is barred." <u>Id.</u>

Courts have repeatedly held that requests for future relief including claims for reinstatement to previous employment or claims to remedy the ongoing medical needs of incarcerated people satisfy the <u>Ex Parte Young</u> exception to the sovereign

immunity bar.  See e.g., State Employees Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 96 (2d Cir. 2007) (collecting cases); Vega v. Semple, 963 F.3d 259, 282 (2d Cir. 2020).  However, claims to reverse a past denial of a claim fall outside of Ex Parte Young's purview.  See e.g., T.W. v. New York State Board of Law Examiners, 110 F.4th 71, 92 (2d Cir. 2024) (finding Plaintiff's claim about denial of accommodations under the ADA was retrospective in nature); Jones v. New York, 2025 WL 453415, *1, *2 (2d. Cir. 2025) ("Although Jones claims to seek prospective relief for ongoing harm, he asks us to reverse the denial of his reinstatement motions and to expunge his disciplinary record. Such relief would be retrospective.").

Plaintiff frames her request as prospective, but as State Defendants point out, the request to vacate DHR's previous order and reopen the investigation is retrospective in nature. A subsequent investigation on the same issue, would necessitate the reversal of the no probable cause finding made by DHR.  Accordingly, the relief requested is retroactive.  DHR is a New York State agency, and therefore, retrospective claims against DHR and its employees in their official capacity under §§ 1983, 1985 and 1986 are barred and the Court recommends the State Defendants' Motion to Dismiss be **GRANTED.**

### 2.    1981 Claim

42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcing of contracts.  42 U.S.C. § 1981(a).  The FAC does not support the existence of any contract between Plaintiff and State Defendants.  Plaintiff, in her opposition brief, withdraws the § 1981 claim.  Pl.'s Opp'n at 1 ("Section 1981 (racial-contract claims)

plainly fails and should be dismissed…).  Thus, the Court recommends that State Defendant's Motion to Dismiss the § 1981 claim be **GRANTED.**

### 3.    1983 Claim

"To state a claim under § 1983, a plaintiff must allege two elements: (1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law." DiPizio v. Empire State Dev. Corp., 745 Fed. App'x 385, 388 (2d Cir. 2018).  Plaintiff brings her § 1983 claims against State Defendants John, Perlongo, Martinez, Tyndall, and Herrion in their individual capacities.  All of them were DHR employees during Plaintiff's housing investigation.

Before addressing the individual rights Plaintiff alleges were infringed upon under § 1983, the Court must first answer the threshold question of whether the named employees were acting "under color of" state law.  "A public employee acts under color of state law for § 1983 purposes 'while acting in his official capacity or while exercising his responsibilities pursuant to state law.'" Cahill v. O'Donnell, No. 97 Civ. 4420 (BDP), 7 F.Supp.2d 341, 348 (S.D.N.Y. May 21, 1998) (internal citations omitted).  However, not every action taken by a state employee qualifies.  Rather, an action that is not supported "by the authority of the individual's position as a state employee is not taken under color of law." Id.  The claims against the DHR employees Plaintiff alleges that are related to the DHR investigation process, fall squarely within the DHR employees' job functions.  As such, Plaintiff sufficiently pleads that

State Defendants acted under color of state law when making decisions about the housing investigation.

In the FAC and opposition to State Defendants' Motion to Dismiss, Plaintiff alleges three separate § 1983 claims against DHR employees. First, Plaintiff alleges DHR employees discriminated against her on the basis of race in violation of the Equal Protection Clause. Second, Plaintiff alleges she was not afforded due process in violation of the Due Process Clause. Third, Plaintiff brings a § 1983 claim for discrimination in violation of the ADA. The Court addresses each in turn.

### i.    Equal Protection Claim

The Fourteenth Amendment to the United States Constitution declares that "[n]o State shall…deny any person within its jurisdiction the equal protection of the laws." U.S. CONST. Amend. XIV, § 1. In <u>Brown v. City of Oneonta</u>, the Second Circuit outlined three ways for a plaintiff to plead intentional discrimination. The Court explained:

> A plaintiff could point to a law or policy that expressly classifies persons on the basis of race. Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory matter. A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.

221 F.3d 329, 337 (2d. Cir. 2000).

To establish that a neutral law or policy has been "applied in a discriminatory manner," as Plaintiff alleges here, a plaintiff must plausibly allege that "discriminatory intent was a motivating factor" behind the equal protection violation. <u>See</u> <u>Okin v. Village of Cornwall-on-Hudson Police Dept.</u>, 577 F.3d 415, 438 (2d Cir.

2009) (internal citations omitted).  A plaintiff can do so "by 'pointing to animus on the part of individual' state actors, or to a pattern of failing to adequately serve members of a protected class." Baker v. Peters, No. 23 Civ. 1069 (LTS), 2023 WL 5053159, at *4 (S.D.N.Y. Aug. 8, 2023) (internal citations omitted).

The requisite "discriminatory intent" at the motion to dismiss stage, requires a plaintiff to allege facts that "[1] directly show discrimination or… [2] that indirectly show discrimination by giving rise to a plausible inference of discrimination." Buon v. Spindler, 65 F.4th 64, 83 (2d Cir. 2023).  While Plaintiff "need only give plausible support to a minimal inference of discriminatory motivation, Id., a complaint alleging an equal protection violation on the basis of race must include "meaningful specifics" and cannot rest on "bare allegations which do not present circumstances that give rise to an inference of unlawful discrimination." Benjamin v. Town of Islip, No. 20 Civ. 56 (ENV) (LB), 2021 WL 8344132, at *7 (E.D.N.Y. Aug. 12, 2021) report and recommendation adopted, No. 20 Civ. 56 (ENV) (LB), 2022 WL 1090608 (E.D.N.Y. Apr. 12, 2022) (citing Burgis v. New York City Dep't of Sanitation, 798 F.3d 63, 69 (2d Cir. 2015)).

The FAC is devoid of facts necessary to establish a claim based on racial discrimination by any of the named DHR employees.  Plaintiff alleges the "lawless, lease-violating neighbors," who are the cause of the smoke and chemical fumes, are Hispanic.[4]  FAC ¶ 273-74.  Plaintiff alleges DHR "inexplicably and irrationally"

---

[4] Plaintiff does not explain how she knows which neighbors are the source of the fumes. "Plaintiff [] began having so much trouble sleeping that she was up all night.  At that point it became clear what was happening.  The downstairs neighbor was heating a floor cleaner called Fabuloso and using it to cover the smell of her and her daughter's lease-violating cigarette and vape smoke." FAC ¶¶ 106-07.

showed more concern for them and she speculates that "[t]he only explanation that seems obvious, and fits into these agencies stated DEI goals, is the fact that the neighbors are Hispanic minorities." Id. at ¶ 274. Plaintiff makes the assumption in the FAC that the denial of her claim to DHR "must be motivated by something," and "the most likely reason is born from the stated anti-Caucasian racist priorities espoused by both CCHR and DHR…hence racial discrimination." Id. at ¶ 277. Plaintiff further alleges, without providing any detail, that the DHR employees insinuated Plaintiff was guilty of harassing the elderly Hispanic neighbor, but admits DHR made no statements about Plaintiff's race. Id. at ¶ 269. Furthermore, there is no mention of Plaintiff's race or the neighbor's race in the Determination and Order After Investigation. State Mem. Ex. 8.

There are no facts to support an allegation of unlawful racial discrimination, either by pointing to animus by individual state actors, or by failing to serve members of a protected class. Instead, the allegation that the finding of no probable cause was based on Plaintiff's race is speculative, conclusory, and exactly the kind of "bare allegation" that does not give rise to an inference of discrimination. Therefore, the Court recommends the Motion to Dismiss the § 1983 claim based on a violation of the Equal Protection Clause be **GRANTED.**

### ii.    Due Process Claim

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of

---

Plaintiff also states another neighbor moved units to escape the fumes of the downstairs neighbor but "[h]er problem, ironically, got worse." Id. at ¶ 136.

law." U.S. CONST. Amend. XIV, § 1; <u>Town of Castle Rock, Colorado v. Gonzales</u>, 545 U.S. 748, 755 (2005).  A procedural due process violation claim under § 1983 requires a showing that the plaintiff first "possessed a protected liberty or property interest," and then "that [s]he was deprived of that interest without due process." <u>Hynes v. Squillace</u>, 143 F.3d 653, 658 (2d Cir. 1998).

For a procedural due process claim, "[t]he appropriate process depends on the balancing of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of erroneous deprivation of such interest through the procedures used;' and (3) 'the Government interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" <u>Akinde v. New York City Health and Hosp. Corp.</u>, No. 16 Civ. 8882 (GHW), 2019 WL 4392959, at *5 (S.D.N.Y. Sept. 13, 2019) (quoting <u>Matthews v. Eldrige</u>, 424 U.S. 319, 335 (1976)).

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit…'" To have a property interest in a benefit requires "a legitimate claim of entitlement to it." <u>Castle Rock</u>, 545 U.S. at 756. The Supreme Court has ruled that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." <u>Id</u>.

Plaintiff alleges State Defendants violated her due process rights by (1) the "failure to consider Plaintiff's circumstances (financial, physical and mental) when determining her ability to appeal," and (2) DHR's call to law enforcement requesting

a wellness check on Plaintiff after her phone call with DHR referencing suicide. Pl.'s State Opp'n at 35. The Court addresses each in turn.

The first due process violation alleged by Plaintiff is a deprivation of procedural due process. The appeal Plaintiff refers to is an Article 78 proceeding, which provides a mechanism to challenge outcomes of administrative agency decisions under New York State Article 78 of the civil practice law and rules. C.P.L.R. § 7803; Akinde, 2019 WL 4392959, at *6. An Article 78 proceeding examines "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion…" C.P.L.R. § 7803(3).

As to the first alleged due process violation, Plaintiff offers no facts to support her assertion that State Defendants failed to consider her financial, physical, and mental circumstances when determining her ability to appeal. Pl.'s State Opp'n at 35. Plaintiff fails to reference the appeal process at all in the FAC. The DHR record shows that Plaintiff was not denied the opportunity to appeal the determination by DHR. The Determination and Order After Investigation gave Plaintiff timely and clear notice of her right to appeal the determination. Plaintiff was given 60 days to file a notice of petition and petition with the New York State Supreme Court. State Mem. Ex. 7, at 4. Plaintiff articulates no facts that would indicate that any act or omission by State Defendants led to her failure to appeal. Instead of appealing the determination and following the process provided by Article 78, Plaintiff filed the Complaint in this case. Plaintiff pleads no facts to convince this Court that her choice

to forgo an appeal with the New York State Supreme Court, or request an accommodation, was the result of a due process violation by State Defendants.

The second due process violation Plaintiff alleges is the call made by DHR employees to the police to conduct a mental health check on Plaintiff which resulted in her detention, but not civil commitment. First, Plaintiff does not meet the threshold requirement under § 1983 of establishing State Defendants acted under color of law when reporting her as suicidal to the NYPD. "To act under color of state law or authority for purposes of Section 1983, the defendant must 'have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Monsky v. Moraghan, 127 F.3d 243, 245 (2d Cir. 1997) (citing West v. Atkins, 487 U.S. 42, 49 (1988)). "It is firmly established that a defendant in a § 1983 a suit acts under color of state law when he abuses the position given to him by the State." West, 487 U.S. at 49-50. Because there is "no bright line test for distinguishing personal pursuits from activities taken under color of law," a court looks to the "nature of the act," to make that determination. Savarese v. City of New York, No. 18 Civ. 5956 (LJL), 547 F.Supp.3d 305, 337 (S.D.N.Y. July 2, 2021) (An off-duty traffic agent was not acting under color of state law when he called the police using a state issued radio to report a crime.)

While there is no dispute State Defendants John and Tyndall are state employees, there are no facts to suggest they used their state authority to call the police, nor that they abused their positions given to them by the state in doing so. Certainly, the call to the police was not made possible only because they were "clothed

with the authority of state law." Monsky, 127 F.3d at 245. Accordingly, the FAC does not establish State Defendants John and Tyndall acted under "color of state law" required to allege a § 1983 claim.

Assuming *arguendo,* that State Defendants acted under color of law, calling the police to request a mental health check on Plaintiff, did not deprive Plaintiff of any of the enumerated rights protected by the Due Process Clause. A due process violation requires a deprivation of "life, liberty, or property." U.S. Const. Amend. XIV, § 1. The FAC does not allege State Defendants ordered Plaintiff to be transported to the hospital for a mental health evaluation, only that they called the police to report suicidality. FAC at ¶ 164. But even if State Defendants had, "[u]nlike civil commitment, ordering transport [] to the hospital for a psychiatric evaluation does not constitute a significant deprivation of liberty requiring due process protection." Doe v. Rosenberg, 97 Civ. 3205 (RWS), 996 F.Supp. 343, 357 (S.D.N.Y. May 7, 1998). Therefore, this Court recommends State Defendants' motion to dismiss the § 1983 claim based on a due process violation be **GRANTED**.

### iii.    ADA Claim

Finally, Plaintiff brings a § 1983 claim against the State Defendants under Title II of the ADA. "An ADA violation is not actionable under Section 1983," because the "statute itself creates a remedial scheme that is sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983." George v. New York City Transit Authority, No. 13 Civ. 7986 (DLC), 2014 WL 3388660, at *3 (S.D.N.Y. July 11, 2024) (internal quotations and citations omitted).

Title II of the ADA "contains a comprehensive remedial scheme," therefore, "Courts have uniformly held the ADA's comprehensive remedial scheme precludes Section 1983 claims predicated on ADA violations." Id.

Given the comprehensive remedial scheme provided by Title II of the ADA, this Court agrees with State Defendants that Plaintiff cannot use the ADA "as a source of rights against DHR Defendants," State Mem. at 22, under ¶ 1983 and recommends Defendants' Motion to Dismiss the § 1983 ADA claim be **GRANTED.**

### 4.    1985 and 1986 Claims

Plaintiff brings conspiracy claims against the DHR employees under §§ 42 U.S.C. 1985(2) and (3) and 1986. The Court addresses each claim below.

### i.    § 1985

A conspiracy claim under § 1983(2) requires a plaintiff to allege (1) a conspiracy; (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner; (3) the due course of justice in any State or Territory; (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.  42 U.S.C. § 1985(2); Rodriguez v. City of New York, No. 05 Civ. 10682 (PKC) (FM), 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008).  Subsection (3) of § 1985 requires "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws…; (3) an act in furtherance of the conspiracy; (4) whereby a

person is...deprived of any right of a citizen of the United States." <u>Id.</u> (internal citations omitted).

A conspiracy, the first element required by both subsection (2) and (3), requires "some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve an unlawful end." <u>Webb v. Goord</u>, 340 F.3d 105, 110 (2d Cir. 2003) (quoting <u>Romer v. Morgenthau</u>, No. 99 Civ. 9052 (VM), 119 F.Supp.2d 346, 363 (S.D.N.Y. Sept. 26, 2000)).   Additionally, Plaintiff must provide "some 'details of time and place and the alleged effects of the conspiracy.'" <u>Id.</u>

Plaintiff's allegations of conspiracy in the FAC are conclusory.  Plaintiff alleges DHR employees John, Tyndall, Perlongo, Herrion, Martinez, and Ortiz "conspire[d] to deny, and did deprive Plaintiff her rights to equal protections afforded by the FHA; and"...prevented other authorities from "properly enforcing similar protections..." FAC ¶ 310.  Plaintiff first alleges that "Ms. John and Ms. Perlongo's disregard of the disability law was evident." <u>Id.</u> at ¶ 233.  But there are no facts in the FAC to even suggest an agreement between the two of them, much less an agreement to deprive Plaintiff of equal protection under the law.  Plaintiff also alleges DHR employees John and Tyndall conspired to make a false report to NYPD about Plaintiff's suicidality. Pl.'s State Opp.'n at 38.  There are no additional facts in the FAC to support this theory.  Neither conclusory allegation includes any facts to show an agreement existed to deprive Plaintiff of equal protection of the law required to establish a conspiracy claim.

Plaintiff additionally alleges a conspiracy between the DHR employees and the City of New York. "Both City and State agencies have continually conspired to convince Plaintiff that her rights as a disabled person do not exist and the laws of the United States and the laws of the State and City of New York do not offer her any protection." FAC ¶ 237. There are no facts to establish any communication to form an agreement, tacit or explicit, between the State Defendants and City Defendants. The fact that John was previously employed by CCHR does not amount to any conspiratorial agreement between the agencies. Plaintiff has not made a factual showing to meet a conspiracy claim between the State Defendants and City Defendants that amounts to more than unsubstantiated speculation. Accordingly, the Court recommends the State Defendants' Motion to Dismiss the § 1985 claims be **GRANTED**.

### ii.    § 1986

As a threshold matter, a valid § 1985 claim is a prerequisite for a § 1986 claim. Brown, 221 F.3d at 341. Because the Court recommends Plaintiff's §1985 claims be dismissed, the Court recommends the State Defendants' Motion to Dismiss the § 1986 claim be **GRANTED** as well.

### 5. Rehabilitation Act and ADA Claim

"Both the Rehabilitation Act and the ADA protect disabled persons from discrimination in the provision of public services." Weixel v. Board of Educ. of City of New York, 287 F.3d 138, 146 (2d Cir. 2002). The Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability…shall, solely by reason of her or

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" <u>Id.</u>  Title II of the ADA similarly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Given the similarities, the Second Circuit has determined claims made under the RA and the ADA should be analyzed together.  <u>Id.</u> at 146, n.6 ("[T]he reach and requirements of both statutes are precisely the same…therefore, it is not necessary to consider plaintiff's claims under each statute separately.").

A claim under Title II and the RA requires a plaintiff to establish that "(1) [s]he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and that (3) [s]he was denied the opportunity to participate in or benefit from the defendant's services programs, or activities, or was otherwise discriminated against by the defendant because of [her] disability." <u>Galarza v. City of New York</u>, No. 19 Civ. 10898 (LAK) (KHP), 2025 WL 1303866, at *12 (S.D.N.Y. Jan. 6, 2025), <u>report and recommendation adopted</u>, (quoting <u>McElwee v. County of Orange</u>, 700 F.3d 635, 640 (2d Cir. 2012)).

To be a qualified individual with a disability one must be "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices…meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." <u>Id.</u> § 12131(2).

29

A public entity is "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State…" Id. § 12131(1)(A)-(B).

"Under both statutes, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services.'" McElwee, 700 F.3d at 640. Reasonable accommodations require "meaningful access," but they do not require "every accommodation [an individual] requests or the accommodation of [her] choice." Id. at 641. The inquiry is a fact-specific one, "that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Mary Jo C. v. New York State & Loc. Ret. Sys., 707 F.3d 144, 153 (2d. Cir. 2013).

The Second Circuit addressed the proper standard of causation for a reasonable accommodation ADA claim in Henrietta D. v. Bloomberg. 331 F.3d 261, 278-80 (2d Cir. 2003). The standard established by the Circuit requires a plaintiff show that their "disabilities were a substantial cause of their inability to obtain services," and that inability was not "so remotely or insignificantly related to their disabilities as not to be 'by reason' of them." Id. at 279. In other words, "the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." Id. at 277.

As a threshold matter, this Court must address State Defendants' assertion that they cannot be sued in their individual capacities under the RA or ADA. State

Mem. at 20.  This Court agrees and recommends the State Defendants' Motion to Dismiss the RA and ADA claims against State Defendants in their individual capacities be **GRANTED** because "[i]ndividuals in their personal capacities are not proper defendants on claims brought under the ADA or the Rehabilitation Act." Keitt, 882 F.Supp.2d at 426.

Turning to the elements required for Plaintiff's claims, the first question is whether Plaintiff is disabled under the RA and ADA.  Plaintiff suffers from migraines and vertigo in connection with a traumatic brain injury Plaintiff sustained several years ago.  FAC ¶¶ 99-100.  Additionally, Plaintiff "has been classified as physically disabled by the Social Security Administration since April 2015." Id. at ¶ 12.  This Court is satisfied that Plaintiff has pled sufficient facts to establish that she is a qualified individual with a disability.  Second, it is undisputed that DHR's investigatory process on behalf of HUD is a program that receives federal financial assistance, subjecting State Defendants to both the ADA and RA.

The question for this Court is whether State Defendants failed to provide a reasonable accommodation to Plaintiff, such that she was (1) excluded from participation in the investigatory process; (2) denied the benefits of the investigatory process; or (3) discriminated against during the investigatory process.  The crux of Plaintiff's failure to accommodate claim is based on an initial denial of a request for an extension to file a rebuttal.  On October 11, 2023, Plaintiff requested a thirty-day extension of time to file a rebuttal because she was "struggling with her daily migraines and other associated problems with her head injury, including double

vision and vertigo…" FAC ¶ 223.  Plaintiff did not receive an immediate response to the request she made via email and phone. Id. at ¶ 224.  On October 18, 2023 Defendant John contacted Plaintiff to inform her she would be granted a two-week extension. Id. at ¶ 225.  In response, Plaintiff made an accommodation request for a longer extension based on her disability, which Defendant John denied.  Id. at ¶¶ 227-28.  Plaintiff appealed Defendant John's denial and was granted the full requested extension by Defendant Herrion, the Director of Disability Rights at DHR. Id. at ¶ 229.  After the denial of Plaintiff's request for accommodations by Defendant John, Plaintiff requested her investigation be transferred to the disability department, which was denied by Defendant John, and the housing investigation unit retained the investigation and made the ultimate determination of no probable cause. Id. at ¶¶ 230-31.

First, Plaintiff was not ultimately denied the thirty-day extension request to file her rebuttal.  Though Defendant John first denied her request for the accommodation, Defendant Herrion reversed course and granted the request for extension, giving Plaintiff the requested time to file her rebuttal.

Second, State Defendants' decision to deny Plaintiff's request to transfer the housing investigation from the housing unit to the disability unit did not exclude Plaintiff from the ability to participate in the investigation process, nor deny Plaintiff the benefit of the investigation, and did not constitute discrimination under the RA or ADA.  Plaintiff participated fully in the investigatory process.  She submitted her complaint with documentation, spoke to DHR employees several times, provided

information to the DHR investigator, submitted a rebuttal, and was given the opportunity to appeal the finding. FAC ¶ 219; State Mem. Ex. 8. Reasonable accommodations do not require that every requested accommodation or the accommodations of Plaintiff's choice be granted. Because Plaintiff was not deprived of meaningful access to the investigatory process, this Court finds no discrimination in violation of the ADA or RA based on DHR's decision not to transfer a housing investigation from the housing unit to the disability unit and recommends the State Defendants' Motion to Dismiss the ADA and RA claims be **GRANTED**.

### 6. Retaliation Claim

To state a First Amendment retaliation claim, a plaintiff "must plausibly allege that: (1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech." Quinones v. City of Binghamton, 997 F.3d 461, 466 (2d Cir. 2021) (internal citations omitted). The New York City Human Rights Law ("NYCHRL") also prohibits retaliation. N.Y.C. Admin. Code § 8-107(7). A retaliation claim under the NYCHRL requires "a causal connection between the protected activities and the conduct alleged to be retaliatory." MacNeal, 2025 WL 64066, at *20 (citing Akinde v. N.Y.C. Health & Hosps. Corp., 92 N.Y.S.3d 883, 884 (1st Dep't 2019)).

The FAC's only language regarding retaliation reads as follows: "Plaintiff wonders whether the suicide report was made to retaliate against Plaintiff on behalf of Ms. John's former employer, and sister agency [CCHR], or simply done to intimate

33

Plaintiff and 'put her in her place' for daring to think she deserved any prioritization due to her disability and pain." FAC ¶ 172. Plaintiff's conjecture falls short of the requirement to establish a causal connection between the adverse action and the protected speech. The speculative nature of the word "wonder" used by Plaintiff in her FAC belies any notion that facts exist to support Plaintiff's theory of retaliation by State Defendants. Therefore, the Court recommends State Defendants' Motion to Dismiss the retaliation claim be **GRANTED**.

### B.    Claims against the City of New York

#### 1.    Claims Against Individual City Defendants

"The law is clear that Plaintiffs must plead individual and personal involvement by each Defendant." Haynes v. Exec. Chamber for Off. of Govenor of New York, No. 23 Civ. 8051 (MKV), 2025 WL 935100, at *8 (S.D.N.Y. Mar. 27, 2025). Courts in this District have found that identifying Defendants, their positions, and their role in the alleged violations satisfy that requirement. Goldring v. Davidson, No. 18 Civ. 6201 (ALC), 2020 WL 1547464, at * 5 (S.D.N.Y. April 1, 2020). But if a complaint "refer[s] generally to the individual defendants and cite[s] no specific facts," it is insufficient to sustain a claim of individual liability. Haynes, 2025 WL 935100, at *8.

Plaintiff names NYPD officers Castro, Orellana, Quintuna-Guaman, and Lieutenant Corde, and NYFD EMS personnel Tarsillo and Stack as individual City Defendants in her FAC. Plaintiff alleges "the officers confirmed that this was their policy and protocol" when they detained her during a mental health check without

allegedly considering her explanation. FAC ¶ 188.  Plaintiff further specifies that officer Castro "got very aggressive and threatened to handcuff Plaintiff to a stretcher and take her by force" if she did not get into the ambulance.  FAC ¶ 193.  Because Plaintiff does not plead any individual actions taken by officers Orellana, Quintuna-Guaman, and Lt. Corde, this Court recommends the City Defendants' Motion to Dismiss these Defendants be **GRANTED.**

Plaintiff similarly does not allege specific individual actions by EMS personnel Tarsillo or Stack in the FAC.  Plaintiff alleges she provided Tarsillo and Stack with the same explanation she gave to police regarding her mental health, <u>Id.</u> at ¶ 192, but there are no individual or specific acts pled to support Plaintiff's claims against them.  Because of the lack of factual allegations against Tarsillo and Stack, this Court recommends the City Defendants' Motion to Dismiss these Defendants be **GRANTED.**

### 2.    1983 Claim

To state a Section 1983 claim against a municipality, a plaintiff must adequately plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." <u>Torraco v. Port Auth. of New York & New Jersey</u>, 615 F.3d 129, 140 (2d Cir. 2010); <u>see</u> <u>also</u> <u>Jones v. Town of E. Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012) ("a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis

for the tort of its employee." <u>Jones</u>, 691 F.3d at 80 (citing <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 691 (1978)).

The policy or custom requirement can be satisfied by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of the those who come into contact with the municipal employees.

<u>Malfatone v. Neal</u>, No. 24 Civ. 2131 (LTS), 2024 WL 3876495, at *3 (S.D.N.Y. Aug. 19, 2024) (citing <u>Brandon v. City of New York</u>, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. Mar. 30, 2010) (collecting cases) (quotation marks omitted)).

Once one of the four circumstances is established, a plaintiff must satisfy the causation requirement, that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." <u>Newton v. City of New York</u>, No. 07 Civ. 6211 (SAS), 681 F.Supp.2d 473, 487 (S.D.N.Y. Jan. 27, 2010) (citing <u>Bd. of County Com'rs of Bryan County, Okla. v. Brown</u>, 520 U.S. 397, 404 (1997).

Where a plaintiff alleges that a custom or practice, rather than an explicit policy caused the harm, the custom or practice "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." <u>Pluma v. City of New York</u>, No. 13 Civ. 2017 (LAP), 2015 WL 1623828 at *9 (S.D.N.Y. Mar. 31, 2015) (citing <u>Sorlucco v. New York City Police Dep't.</u>, 971 F.2d 864, 871 (2d Cir. 1992)).

The Supreme Court has made clear the bar to meet a failure to train claim is high, noting "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Conick v. Thompson, 563 U.S. 51, 61 (2011). A failure to train claim must amount to "deliberate indifference to the rights of the persons with whom the police come into contact" to be sustained. City of Canton, Ohio v. Harris, 378, 489 U.S. 388 (1989). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality" can a city be liable for a failure to train claim. Id. at 389. The municipality must have "actual or constructive notice, generally from a pattern of similar constitutional violations by untrained employees, that its training program is deficient." Hernandez v. United States, 939 F.3d 191, 207 (2d Cir. 2019) (internal quotations and citations omitted).

Finally, Plaintiff must adequately plead that the government actors in question violated the Constitution. Davila v. Johnson, No 15 Civ. 2665 (AJN), 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015).

Plaintiff submits several theories of Monell liability and several alleged constitutional harms in her FAC and briefing. The Court addresses each in turn.

### A. Policy Alleged

First, the FAC alleges a formal policy endorsed by the municipality. "When Plaintiff pointed out the danger of violating her civil rights by allowing any stranger or unknown person, with ulterior motives, to file a false report and then refuse her, as the accused, any right to refute the claim before being wrongfully taken by force, the officers confirmed that this was their policy and protocol." FAC ¶188. City

Defendants characterize this allegation as conclusory rather than factual. City Mem. at 14-15. The Court disagrees. That officers told Plaintiff during the mental health check that it's their policy to deny her the opportunity to refute a report of suicidality before forcing her to be involuntarily hospitalized is factual, not conclusory.

City Defendants' reliance on New York Mental Hygiene Law does not directly address Plaintiff's allegation that officers told her their policy is to refuse to allow Plaintiff to refute a report of suicidality. City Defendants argue that police are authorized to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others," N.Y. Mental Hyg. Law § 9.41(a). However, the facts alleged in the FAC are not that police took Plaintiff into custody because she appeared to be mentally ill and was acting in a way that was likely to cause serious harm to herself or others. The allegation is that police refused to consider Plaintiff's explanation for the report of suicidality. FAC ¶ 190. Therefore, City Defendants' argument fails.

Plaintiff's allegations of a formal policy of refusing to allow an individual to refute a report of suicidality, taken as true, are sufficient at this stage to satisfy the official policy or custom element. The next question is whether Plaintiff pled sufficient facts to establish the municipality was the "moving force" behind the alleged injury.

Plaintiff acknowledges in the FAC that she agreed to go to the hospital despite the inaccuracy of the report that she was suicidal. FAC ¶ 195. However, Plaintiff alleges the only reason she agreed was because Officer Castro "got very aggressive

and threaten[ed] to handcuff Plaintiff to a stretcher and take her by force if she didn't walk herself out of the building and get in the ambulance." Id. at ¶ 193. Though Plaintiff was not handcuffed or forced into the ambulance, under the Fourth Amendment, a seizure occurs "when the officer, by means of physical force *or show of authority,* has in some way restrained the liberty of a citizen." California v. Hodari D., 499 U.S. 621, 625 (1991) (quoting Terry v. Ohio, 392 U.S. 1, 19, n. 16 (1968)). Based on the facts pled in the FAC, there is an affirmative link between the policy employed by officers who refused to allow Plaintiff to refute the report of suicidality, and the constitutional injury alleged sufficient to satisfy the "moving force" element of Monell.

### B. *De Facto* Policy Alleged

In addition to the formal custom or policy allegation, Plaintiff alleges a *de facto* policy in that the NYPD "exhibit[ed] a pattern of behavior, whereby, on more than one occasion, they have, without sufficient cause, unlawfully moved Plaintiff, falsely detained and imprisoned her and violated [her] rights of due process." FAC at ¶ 87.

The March 2, 2023 incident central to this case was the sixth time Plaintiff was transported to the hospital pursuant to a wellness check. Id. at ¶ 17. The first time Plaintiff was involuntarily taken to the hospital for a mental health evaluation was in 2014 when employees at the Human Resources Administration called the police after she refused to leave. Id. at ¶ 292. Plaintiff recounts several instances from 2016 in the FAC wherein officers with Department of Homeless Services called EMS personnel to transport Plaintiff to the hospital involuntarily. Id. at ¶¶ 297-305. The

final incident prior to the instant case was in 2022, when CCHR employees called to request a wellness check on Plaintiff after she emailed them saying "I am go[i]ng to kill myself if this doesn't stop!" See MacNeal, 2025 WL 64066, at *5.

Plaintiff has not established that the six incidents constitute a pattern or practice "so widespread" to sustain a Monell claim under §1983. Several of the six events Plaintiff described in her Complaint that span from 2014 to 2023 occurred in varying settings under varying circumstances. This Court agrees with City Defendants that the incidents that occurred under dissimilar circumstances over the course of nearly a decade are too sparse to "imply the constructive acquiescence of senior policy-making officials." Pluma, 2015 WL 1623828, at *9.

## C. Failure to Train

Finally, Plaintiff has not established a failure to train claim under Monell. Plaintiff's Complaint is devoid of any facts that the NYPD failed to train its officers on how to properly respond to reports of suicidality. Plaintiff does not specify what training the officers lacked or how any lack of training amounted to "deliberate indifference."

## D. Constitutional Violations

### i.    Unlawful Imprisonment Claim

The first constitutional injury Plaintiff alleges she suffered under §1983 is unlawful imprisonment. Unlawful imprisonment claims require federal courts to "look to the law of the state in which the arrest occurred – not federal law." Barkai v. Mendez, No. 21 Civ. 4050 (KMK), 629 F.Supp.3d 166, 190 (S.D.N.Y. Sept. 20, 2022).

Under New York law, a plaintiff alleging false imprisonment must show that "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." Id.  If probable cause existed at the time of confinement, the imprisonment is privileged and a claim for unlawful imprisonment fails. Id.; Covington v. City of New York, 171 F.3d 117, 122 (2d Cir. 1999) (probable cause is "a complete defense to an action for false arrest, whether that action is brought under state law or under §1983.").

"The [c]ourts that have addressed seizures under a state's mental hygiene or mental health laws have applied the concepts of 'probable cause' that have arisen in criminal Fourth Amendment seizure cases." Barkai, 629 F.Supp.3d. at 191 (internal citations omitted).  Therefore, it follows that if probable cause existed at the time of the confinement, Plaintiff's claim of unlawful imprisonment fails as a matter of law.

Before addressing whether there was probable cause to detain Plaintiff and transport her to the hospital for further assessment, this Court first turns to the concept of probable cause in the criminal context.  "Probable cause exists when, based on the totality of circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  The concept of probable cause should be "centered on 'probabilities' rather than 'hard certainties.'" Illinois v. Gates, 462 U.S. 213, 231 (1983).  Courts have been instructed, when conducting an *ex post facto*

analysis, to consider "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. at 241. Furthermore, probable cause can exist even "based on mistaken information," Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994), because officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Walcyzk v. Rio, 496 F.3d 139, 160 (2d Cir. 2007) (internal citation omitted).

The question for the Court in this case is whether officers had probable cause to detain Plaintiff for transport to the hospital for an involuntary mental health assessment. New York Mental Hygiene Law required City Defendants to have probable cause that Plaintiff was "mentally ill and [] conducting [herself] in a manner [] likely to result in serious harm to [herself] or others." NYMHL §9.41(a). New York law defines "likely to result in serious harm" as:

> a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

NYMHL § 9.01.

On May 2, 2023, the NYPD responded to Plaintiff's home after receiving a call reporting a potential suicide risk. FAC ¶¶ 185-187. Per the FAC, "[a]fter 20 minutes of Plaintiff trying to reason with both the police and the EMT's [sic], Police Officer Grey Castro, got very aggressive and threaten[ed] to handcuff Plaintiff to a stretcher

and take her by force if she didn't walk herself out of the building and get in the ambulance." Id. at ¶ 193.

The question of whether probable cause existed to transport Plaintiff to the hospital for an involuntary hospital assessment "requires a fact-intensive analysis, 'converg[ing] on whether facts and circumstances known to the officers at the time they seized [P]laintiff were sufficient to warrant a person of reasonable caution to believe that [Plaintiff] might be mentally ill and conducting [herself] in a manner likely to result in serious harm to [herself.]'" Kaplan v. County of Orange, No. 20 Civ. 1382 (KMK), 528 F.Supp.3d 141, 163 (S.D.N.Y. Mar. 23, 2021) (internal citations omitted). City Defendants cite only cases where Courts have dismissed unlawful imprisonment claims at the summary judgement stage. See Guan v. City of New York, 37 F.4th 797, 807 (2d Cir. 2022); Barkai v. Mendez, No 21 Civ. 4050 (KMK), 2024 WL 81156, *at 50 (S.D.N.Y. Feb. 21, 2024). In those cases, the court had the benefit of discovery to evaluate the officers' decision. In Guan, the court was able to review officer observations, Guan's exact words and actions, and medical professionals' statements to officers to assess whether officers had the requisite probable cause. 27 F.4th at 810. In the Barkai summary judgement order, the court had the ability to consider "the specific observations and information available at the time of seizure." 2024 WL 81156 at *16 (internal quotation marks and citations omitted).

This Court agrees with Barkai that at this stage of the litigation, the "Court is not yet in a position to conclude as a matter of law that there existed probable cause

43

to extend Plaintiff's confinement after [s]he was initially seized." 629 F.Supp.3d at 197.  The Court must, at this stage, credit all of Plaintiff's factual assertions in the FAC.  Plaintiff alleges she was "perfectly lucid" and that she "rationally explained" the situation and that she "showed no signs that there was any merit to the report the police received." FAC ¶ 191.  Given Plaintiff's factual assertions and the lack of discovery at this stage, this Court cannot determine as a matter of law, that officers had probable cause to detain and transport Plaintiff to the hospital for a mental health assessment.

City Defendants move the Court to find the individual officers are entitled to qualified immunity, even if the Court declines to find probable cause existed at this stage. City Mem. at 16-17.  Qualified immunity "protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d. Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The threshold question for the Court is whether Plaintiff has alleged a constitutional violation.  Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001).  For the reasons stated above, the first requirement is satisfied.  The next question for the Court is whether the officers' actions were objectively reasonable. City Defendants argue it was objectively reasonable for officers to believe they had probable cause to detail Plaintiff for a mental health evaluation, City Mem. at 17, and rely again on Guan, Barkai, and Kerman to support their argument.  All three cases address the issue of qualified immunity at the summary judgement stage.  This

Court agrees with the <u>Barkai</u> decision not to extend qualified immunity to individual officers at the Motion to Dismiss stage of litigation without the benefit of discovery and recommends City Defendants' Motion to Dismiss the unlawful imprisonment § 1983 claim, as to the City of New York and Officer Castro be **DENIED**. 629 F.Supp.3d at 197.

### i.    Unlawful Search Claim

The second constitutional harm Plaintiff alleges under § 1983 is the right to be free from lawful searches. Warrantless searches of the home are presumptively unreasonable under the Fourth Amendment. <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980). Critically, the Fourth Amendment protects against unreasonable searches by law enforcement. "A private person cannot act unilaterally as an agent or instrument of the state; there must be some degree of governmental knowledge and acquiescence." <u>See</u> <u>United States v. Cacace</u>, 796 F.3d 176, 189 (2d Cir. 2015) (quoting <u>United States v. Bennett</u>, 709 F.2d 803, 805 (2d Cir. 1983)). The FAC states "[i]t was obvious that her personal things had been illegally searched. There were items on the floor, boxes overturned and ever some banners, from a peace really [sic] Plaintiff had attended, partially unrolled…" ¶ 204. But the FAC lacks any facts to establish it was in fact the police who entered and searched her apartment without a warrant. Without any facts to establish who entered and searched Plaintiff's apartment, there is no government action and the Court therefore recommends City Defendants' Motion to Dismiss the unlawful search claim be **GRANTED**.

###### ii.    Retaliation Claim

The third claim Plaintiff brings under §1983 is retaliation. The First Amendment's guarantee of freedom of speech is enforceable through §1983. The Court discusses the elements required to plead a retaliation claim *supra,* in the State Defendant Section III(A)(6).

Plaintiff's retaliation theory is that City Defendants are "willing participants in acts of retaliations [sic] instructed by others…DHR most recently and CCHR before that." Pl.'s City Opp'n at 21. The only communication alleged between DHR and City Defendants is the phone call to report suicidality. FAC ¶ 164. The FAC contains no causal connection between the adverse action of transporting Plaintiff to the hospital for a mental health assessment and any protected speech. This Court agrees with City Defendants that there are no facts to support "an elaborate inter-agency conspiracy" to retaliate against Plaintiff. City Reply Mem. at 7. Accordingly, the Court recommends City Defendants' Motion to Dismiss the ¶1983 retaliation claim be **GRANTED.**

##### 3.    ADA Claim

This Court discusses the legal standard under the ADA *supra* in the State Defendant section III(A)(5). The elements to consider are whether Plaintiff established "(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or

discrimination was due to her disability," at the outset.  Tardif v. City of New York, 991 F.3d 394, 404 (2d Cir. 2021) (internal citations omitted).

First, as discussed above, Plaintiff has pled sufficient facts to establish that she is a qualified individual with a disability.  FAC ¶ 12 ("Plaintiff is a Caucasian female and has been classified as physically disabled by the Social Security Administration since April 2015.").  Second, there is no dispute that the City Defendants constitute a "public entity."

The operative question for the Court is whether Plaintiff established that she was discriminated against and denied reasonable accommodations by City Defendants due to her disability.  Plaintiff alleges that City Defendants "1) overtly den[ied] Plaintiff's right to accommodations…primarily not to be assaulted and caused additional harm to preexisting injuries, 2) interfere[ed] in her right to file complaints about others violating her rights or 3) retaliate[ed] against her for seeking protection and enforcement of her disability rights." Pl.'s City Opp'n at 23.

Applying the standard established by Henrietta D., discussed *supra*, this Court finds Plaintiff failed to establish a reasonable accommodation claim under the ADA. This Court agrees with the Court in MacNeal 1, that "the Amended Complaint does not allege that Plaintiff's 'disability made it difficult in any way for her to access benefits…that were available to [similarly situated persons who were not disabled].'" MacNeal v. City of New York, WL 640666, at *17. (quoting Tardif, 991 F.3d at 405). Rather, the FAC alleges that the NYPD officers responded to Plaintiff's apartment after receiving a report of suicidality to do a wellness check.  FAC ¶¶ 185-87.  The

47

officers called EMS from the fire department to respond to further evaluate Plaintiff. Id. at ¶ 191. The officers then detained Plaintiff and required her to be transported to the hospital in an ambulance for further assessment. Id. at ¶193. By her own account Plaintiff was permitted to "walk herself out of the building and get in the ambulance." Id. Accordingly, there are no facts to support an allegation that City Defendants denied her right to accommodations "not to be assaulted and cause[] additional harm to preexisting injuries." Pl.'s City Opp'n at 23. Furthermore, Plaintiff pleads no facts to support the vague and conclusory assertion that City Defendants "interfere[ed] in her right to file complaints about others violating her rights" when they responded to the report of suicidality and Plaintiff's retaliation claim is addressed *supra*. Therefore, the Court recommends City Defendants' Motion to Dismiss the ADA claims be **GRANTED.**

## C.    State Law Claims

The FAC includes state law claims for defamation, negligent or intentional infliction of emotional distress, and negligent supervision. The Court addresses each state law claim in turn.

### 1.    Defamation

"To state a claim for defamation under New York law, a plaintiff must allege there was (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on the part of the publisher; (4) that either constitutes defamation per se or cause 'special damages.'" Gargiulo v. Forster & Garbus Esqs., No. 06 Civ. 2461 (MGC), 651

F.Supp.2d 188, 192 (S.D.N.Y. Sept. 3, 2009) (citing <u>Dillon v. City of New York</u>, 261 A.D.2d 34, 38 (1st Dept. 1999).

### a.    City Defendants

Plaintiff's defamation claim against City Defendants is based on the "actions of NYPD and FDNY EMS," who "gave the appearance that Plaintiff was criminally removed from the building." Pl.'s City Opp'n at 26.  Specifically, Plaintiff alleges they "creat[ed] an unwarranted spectacle in the lobby of Plaintiff's home in front of friends, neighbors, and building staff." FAC ¶ 321.  Plaintiff fails to meet element one of a defamation claim, that there was a false statement made by City Defendants.  The FAC does not allege any false statements made by City Defendants to create the "unwarranted spectacle."

To the extent that the FAC also alleges a federal defamation claim, that claim fails as well.  A defamation claim under § 1983 by itself is not actionable.  <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976).  A federal defamation claim requires the additional element of "a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." <u>Sadallah v. City of Utica</u>, 383 F.3d 34, 38 (2d Cir. 2004). Because Plaintiff has failed to plead the first element of a defamation claim based on New York law, Plaintiff also fails to meet the more stringent requirements of a federal defamation claim.  For the foregoing reasons, the Court recommends that City Defendants' Motion to Dismiss the defamation claim be **GRANTED.**

### 2.    Intentional or Negligent Infliction of Emotional Distress

### i.    Intentional Infliction of Emotional Distress

The Court of Appeals of New York has enumerated four required elements to

plead intentional infliction of emotional distress ("IIED"):

> (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of
> a substantial probability of causing, severe emotional distress; (iii) a
> causal connection between the conduct and injury; and (iv) severe
> emotional distress.

Chanko v. Am. Broad. Cos., 27 N.Y.3d 46, 57 (2016). "Liability has been found only

where the conduct has been so outrageous in character, and so extreme in degree, as

to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community." Id.

### ii.    Negligent Infliction of Emotional Distress

"Under New York law, a plaintiff may establish [a claim of negligent infliction

of emotional abuse] in one of two ways: (1) the 'bystander' theory; or (2) the 'direct

duty theory.'" Mortise v. U.S., 102 F.3d 693, 696 (2d Cir. 1996). The "bystander

theory," which requires Plaintiff to observe serious physical injury or death of an

immediate family member, is inapplicable. Under the "direct duty" theory, "a

plaintiff suffers emotional distress caused by the 'defendant's breach of a duty which

unreasonably endangered [plaintiff's] own physical safety.'" Baker v. Dorfman, 239

F.3d 415, 421 (2d Cir. 2000) (internal citations omitted).

### a. State Defendants

Plaintiff fails to establish an IIED or NIED claim against State Defendants for

calling the police to conduct a mental health check on Plaintiff. DHR employees

Tyndall and John's concern after Plaintiff's phone call does not constitute conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Chanko, 27 N.Y.3d at 57. Additionally, the FAC is devoid of any facts to support the bystander theory or establish Defendants breached any duty owed to Plaintiff. The Court accordingly recommends State Defendants' Motion to Dismiss both the IIED and NIED claims be **GRANTED.**

### b. City Defendants

Plaintiff fails to establish any conduct by City Defendants that was outrageous, extreme, or atrocious to support an IIED claim. Plaintiff's opposition brief states that "[a]ssaulting an able bodied person is unacceptable. But to exert such force on a vulnerable, non-combatant person is truly 'outrageous.'" However, the FAC lacks any facts to establish City Defendants assaulted Plaintiff on May 2, 2023, when she was detained and transported to the hospital for a mental health assessment.

This Court further agrees with City Defendants that the FAC alleges only intentional, not negligent conduct. New York law is clear that intentional conduct cannot serve as the basis for a negligence claim. Mees v. Stibbe New York B.V., 146 N.Y.S.3d 481, 481-82 (1st Dep't 2021). Plaintiff alleges the police intentionally disregarded her "attempt to clarify the story" and intentionally disregarded their own "obligation to properly assess the situation" during the mental health check. FAC ¶¶ 186, 189. The Court therefore recommends City Defendants' Motions to Dismiss both the intentional and negligent infliction of emotional distress claims be **GRANTED.**

### 3.    Negligent Supervision

Plaintiff's final state law claim against State and City Defendants alleges negligent supervision under New York law.  A negligent supervision claim that relates to an employer's retention and supervision of an employee, must include allegations that:

> (1) the employer had actual or constructive knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm; (2) the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control; and (3) the employee engaged in tortious conduct on the employer's premises or using property or resources available to the employee only through their status as an employee...

Moore Charitable Foundation v. PJT Partners, Inc., 40 N.Y.3d 150, 157 (2023).  An employer is "on notice of an employee's propensity to engage in tortious conduct when it knows or should know of the employee's tendency to engage in such conduct. Id. at 158; see e.g., Belcastro v. R.C. Diocese of Brooklyn, N.Y., 213 A.D.3d 800, 802 (2d Dep't 2023) ("The complaint's allegations that the Diocese, the school, and the Church knew of the sexual abuse and condoned it, covered it up, and intentionally failed to prevent it were sufficient to allege a cause of action to recover damages for gross negligence...").  A reasonably prudent employer should know of an employee's tendency to engage in tortious conduct if when "exercising ordinary care under the circumstances, [the employer] would have been aware of the employee's propensity to engage in the injury-causing conduct." Moore Charitable Foundation, 40 N.Y.3d at 158-59.  In other words, "the employer's negligence lies in having placed the employee in a position to cause foreseeable harm," which would have otherwise likely not

occurred had the employer not hired and retained the employee.  <u>Druger v. Syracuse University</u>, 172 N.Y.S.3d 304, 306 (4th Dep't 2022).

### a.  State Defendants

Plaintiff's FAC alleges "negligent supervision and lack of appropriate training of DHR named employees for failure to properly understand and enforce disability laws." FAC ¶ 315. Plaintiff does not allege any facts that DHR had actual or constructive knowledge that DHR employees working on Plaintiff's housing complaint had a "propensity for the sort of behavior which caused the injured party's harm."  <u>Moore Charitable Foundation</u>, 40 N.Y.3d at 157. The initial denial of the accommodation request that was ultimately granted is the alleged tortious conduct Plaintiff alleges is the basis for the negligent supervision claim against State Defendants.  The FAC does not include facts sufficient to establish DHR employees committed a tortious act against Plaintiff, an essential element of a negligent supervision claim. As such, the Court recommends State Defendants' Motion to Dismiss the negligent supervision state law claim be **GRANTED.**

### b.  City Defendants

The FAC does not plead actual knowledge of the City Defendants that individual NYPD officers were engaged in allegedly tortious conduct.   Nor does the FAC state any facts that the City should have known that the individually named officers have a tendency to improperly detain individuals during mental health checks.  Because Plaintiff fails to establish actual or constructive knowledge, the

Court recommends City Defendants' Motion to Dismiss the negligent supervision claim be **GRANTED.**

## IV. <u>RECOMMENDATION</u>

For the reasons stated above, the Court respectfully recommends that State Defendants' Motion to Dismiss (Dkt. No. 75) be **GRANTED in its entirety.** The Court recommends City Defendants Motion to Dismiss (Dkt. No. 73) be **DENIED** as to Plaintiff's unlawful imprisonment § 1983 claim and **GRANTED** as to all other claims**.**

## V. <u>LEAVE TO AMEND</u>

Generally, "*pro se* litigants should be given leave to amend a complaint if a liberal reading of the complaint gives any indication that a valid claim might be stated." <u>Cuoco v. Moritsugu</u>, 222 F.3d 99, 112 (2d Cir.2000) (citing <u>Gomez v. USAA Fed. Sav. Bank</u>, 171 F.3d 794, 795 (2d Cir.1999)).

While Plaintiff has already amended the Complaint once, she has not yet done so with the benefit of a judicial decision. <u>See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC</u>, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). Therefore, this Court recommends that Plaintiff be **GRANTED** leave to amend.

## VI. <u>FILING OF OBECTIONS TO THIS REPORT AND RECOMMENDATION</u>

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6.  Such objections, and any responses to objections shall be filed with the Clerk of Court and on ECF.  Any requests for an extension of time for filing objections must be directed to Judge Schofield.  **Failure to file objections within fourteen days will result in a waiver of objections and will preclude appellate review**.  See <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cephas v. Nash</u>, 328 F.3d 98, 107 (2d Cir. 2003).

SO ORDERED.

DATED:    New York, New York
          January 21, 2026

*Jennifer E. Willis*
JENNIFER E. WILLIS
United States Magistrate Judge