**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **KELLY MACNEAL,** | : | **No. 24-CV-6017 (LGS) (JW)** |
| Plaintiff, | : | |
| | : | |
| **v.** | : | **PLAINTIFF'S OBJECTIONS** |
| | : | **TO MAGISTRATE JUDGE'S** |
| **STATE OF NEW YORK, et al.,** | : | **REPORT & RECOMMENDATION** |
| Defendants. | : | |

**Table of Contents**

**Specific Objections to the Report and Recommendation**……………………………………...1

**I. Preliminary Objections to R&R's Procedural and Evidentiary Rulings (R&R pp. 9–13)**.1

    **Failure to liberally construe pro se pleadings and opposition papers**……………………1

    **Erroneous refusal to take judicial notice of Plaintiff's public-record exhibits** …………..1

**II.  Objections to Eleventh-Amendment / Sovereign-Immunity Analysis (R&R pp. 14–15)**..3

    **The R&R errs in its Eleventh Amendment analysis**. ………………………………………...3

    **Individual-capacity** …………………………………………………………………………3

    **RA § 504 claims are expressly waived** ……………………………………………………..3

**III.  Objections to the § 1983, § 1985/1986, and Due-Process / Equal-Protection Analysis**…4

    **Plaintiff states viable § 1983 claims, while R&R ignores supporting evidence and applicable authorities**…………………………………………………………………..4

        **a)  Due-Process / Equal-Protection :** DHR's authorizing statutes, regulations, and …..4

        **b)  Disability-based Animus: **…………………………………………………………..4

**IV. Plaintiff States a Viable Claim Under Section 504 of the Rehabilitation Act – Failure to Accommodate and Third-Party/ProgrammaticDiscrimination**…………..7

    **DHR subjected Plaintiff to discrimination in its federally funded program in two related ways.** ………………………………………………………………………7

**V. Plaintiff's Disability Claims Are Not Limited to Classic "Animus" Discrimination – R&R Ignores Evidence Supporting Failure-to-Accommodate and Programmatic Enforcement Theories**……………………………………..8

    **a)  Failure to Accommodate / Reasonable Modifications (ADA Title II and RA § 504)**……………………………………………………………………9

    **b)  Programmatic / Third-Party Enforcement Discrimination (Primarily RA § 504)**……………………………………………………………………..12

**VI. DHR's FHAP Violations Reinforce All Claims**………………………………………......12

**VII. Objections to Assessment of City related claims  - Expanded Monell Liability**……...14

    **a)  Monell Liability – Policy, Custom, and Failure to Train**………………………14

  **i.**  **Widespread Custom or Practice So Persistent It Constitutes Official Policy……14**

  **ii.**  **Failure to Train or Supervise Rising to Deliberate Indifference……………….....15**

  **iii.**  **So Consistent That Policymakers Must Have Been Aware………………………..16**

  **b)** **Qualified Immunity Does Not Protect Individual Officers or City at This Stage..16**

  **c)** **City Actions Reinforce ADA Title II/V and RA Claims…………………….....…17**

**VIII. Request for Relief……………………………………………………………………...17**

Plaintiff Kelly MacNeal, proceeding pro se, respectfully submits these Objections to the

Magistrate Judge's Report & Recommendation dated January 21, 2026 (Dkt. 126) ("R&R").

Plaintiff objects **in full** to the recommendation that State Defendants' Motion to Dismiss (Dkts.

75-78)  be **GRANTED** in its entirety. Plaintiff also objects to R&R recommendation to **GRANT**

the City Defendants' Motion to Dismiss (Dkts. 73-74) for all claims (except the claim related to

unlawful imprisonment).  Plaintiff agrees that the unlawful imprisonment claim should survive;

and the recommendation to Amend is welcome.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), Plaintiff requests **de novo** review of

all objected-to portions. Because Plaintiff is pro se, the Court must liberally construe her

pleadings and opposition papers (Dkts. 37, 96 and 101) to raise the strongest arguments they

suggest. *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017).

### Specific Objections to the Report and Recommendation

**I. Preliminary Objections to R&R's Procedural and Evidentiary Rulings (R&R pp. 9–13)**

1. **Failure to liberally construe pro se pleadings and opposition papers**

   The R&R correctly recites the standards for pro se litigants and judicial notice but fails to

   apply them consistently. Plaintiff's First Amended Complaint (FAC) (Dkt. 37) and

   Opposition briefs (Dkts. 96 and 101) together plead viable claims when read generously.

   *Nielsen v. Rabin*, 746  F.3d 58, 63 (2d Cir. 2014).

2. **Erroneous refusal to take judicial notice of Plaintiff's public-record exhibits**

   The R&R selectively takes notice of exhibits. The R&R takes judicial notice of State

   Defendants' exhibits beneficial to their argument, while disregarding the State's own

   exhibits when Plaintiff used those exhibits to corroborate her claims.  This was evident in

such examples as, Plaintiff pointing out in the DHR records, her numerous requests for their investigator to contact her witnesses and their refusal to do so.   DHR's submitted documents record this happening, even as DHR prepared to close Plaintiff's case. Plaintiff had to stop the premature closure and make further demands for them to contact witnesses.  The records show that one of Plaintiff's two witnesses was never contacted at all.

The R&R also declines to notice Plaintiff's public-record exhibits, including the New York State Comptroller Audit Report 2023-S-26 (Dkt. 101 Ex. 3) and DHR annual case logs (Dkt. 101 Ex. 4). These are proper subjects of  judicial notice as government records whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201; *Evans v. N.Y. Botanical Garden*, 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002). The Audit Report documents systemic failures in DHR's housing investigations that directly corroborate Plaintiff's pattern-or-practice and custom-or-policy allegations.  The R&R mischaracterizes the applicability of these submissions by claiming the dates don't align with activities underlying Plaintiff's claims.  This is incorrect.  The Comptroller's investigation of  DHR, which produced the Audit Report, took place simultaneous to the year-long interaction between Plaintiff and DHR; while DHR was supposedly "investigating" Plaintiff's complaint referred to them by HUD.  The Audit accurately documented DHR's pattern of failing to properly investigate claims.  These are the exact sort of failings Plaintiff has complained of here and show that those failures were not unique to the Plaintiff, but the norm by which DHR operated.  And, while (Ex 4) contained logs from years prior to Plaintiff's interaction with DHR, these logs did, in fact, corroborate the assertions of both Plaintiff and the Audit Report; they showed that a

2

pattern existed of DHR dismissing almost ALL cases brought to them.  The logs

demonstrated that, rather than some anomaly during the year in question, a pattern

existed of DHR dismissing an inexplicable percentage of cases year after year without

change.  The logs submitted were the most recent publicly published recorded from

DHR's own website and should have been considered, along with the Comptroller's

Audit, in assessing claims of a pattern or custom.

## II.  Objections to Eleventh-Amendment / Sovereign-Immunity Analysis (R&R pp. 14–15)

3.  **The R&R errs in its Eleventh Amendment analysis**. Plaintiff seeks **prospective

   injunctive relief** — vacatur of DHR's defective "no probable cause" Determination and

   Order (Dkt. 76  Ex. 8) and remand for a proper, expedited investigation. This alleges an

   ongoing violation of federal law and falls squarely within the *Ex parte Young* exception.

   *Ex parte Young*, 209 U.S. 123 (1908); *Walker v. NYS Justice Center*, 493 F. Supp. 3d

   239, 247 (S.D.N.Y. 2020).  The request bears a striking resemblance to the action this

   Plaintiff brought in this District Court when she had to sue the Social Security

   Administration to obtain a vacatur and remand after an improper denial of her benefits.

   The validity and success of that case resulted in Plaintiff finally being properly approved

   to receive her SSD benefits.

4.  **Individual-capacity damages** claims under § 1983 against DHR employees are not

   barred. *Hafer v. Melo*, 502 U.S. 21 (1991).

5.  **RA § 504 claims are expressly waived** by the State's acceptance of federal FHAP funds.

   42 U.S.C. § 2000d-7.

3

**III.  Objections to the § 1983, § 1985/1986, and Due-Process / Equal-Protection Analysis**

6.  **Plaintiff states viable § 1983 claims, while R&R ignores supporting evidence and applicable authorities.**

a)  **Due-Process / Equal-Protection :** DHR's authorizing statutes, regulations, and FHAP obligations create an "individual entitlement" to prompt, thorough, and non-discriminatory processing of disability housing complaints. Evidentiary submissions demonstrate DHR's arbitrary delays, refusal to accommodate Plaintiff's traumatic brain injury (TBI), selective presentation of evidence, failure to interview witnesses, biased tenant survey, and refusing to acknowledge Plaintiff's disability rights as defined by the Fair Housing Act, the Americans with Disability Act, the Rehabilitation Act while DHR arrived at their final Determination and Order.  DHR's behavior, as documented by these evidentiary submissions, constituted denial of due process and denial of equal-protection. The Comptroller Audit Report establishes a custom or policy concerning this inappropriate manner of handling cases.  The false report to authorities that Plaintiff was suicidal also grossly violated Plaintiff's right to due-process. Wherefore, the SAC and Opposition brief, supported by evidence presented by both sides, state viable § 1983 claims for denial of due process, equal protection, and municipal/custom-or-policy liability. *Locurto v. Safir*, 264 F.3d 154 (2d Cir. 2001).

b)  **Disability-based Animus:** In addition to denying Plaintiff protection from third-party offenders, DHR Housing Unit Director Chelsea John demonstrated her own disability-animus based discrimination in three instances which were born out in the exhibits presented by the State and ignored in the R&R**.**

4

**Firstly**, John's call to the police to demand an unnecessary psychological evaluation of the Plaintiff was a direct retaliatory act of contempt for Plaintiff and her stated disability needs.  John's spiteful act followed Plaintiff's pleas for prioritizing her case as an accommodation due to the ongoing pain Plaintiff was in and its relation to her disability and the claims underpinning her complaint.

**Secondly**, claims of John's disability –based animus were reinforced when she refused every accommodation Plaintiff requested and demonstrate a overt hostility toward any suggestions that Plaintiff had special needs.  John refused to appropriately accommodate Plaintiff's TBI when she denied Plaintiff's request for maximum allowable time to rebut (30 days).  The denial of this request came after DHR sat on Plaintiff's Landlord's response for months without notifying Plaintiff.  After this long delay, John suddenly claimed that urgency to meet resolution deadlines would prevent her granting of Plaintiff's request… regardless of Plaintiff's disability.  The fact that Plaintiff had to win her right to the extension through an appeal to the Disability Department does not relieve John of her hostile actions or her disregard of Plaintiff's rights.  John confirmed the consistency of her hostility when she refused  to approve Plaintiff's request to have her entire case transferred to the Disability Department for processing;.  Plaintiff made this request BECAUSE of John's hostility and the fact that it had become clear that John lacked understanding or expertise in the area of law governing Plaintiff's disability related claims against her Landlord.

**Thirdly**, the dismissive and spiteful tone of John's final Determination and Order (Dkt 76 Ex 8) displayed an overt animus and disregard toward Plaintiff's disability rights… and even attempted to shame Plaintiff while exhibiting contempt for Plaintiff's expectation that her rights be enforced.  Whether John's disregard was born of sheer contempt or was, in any part, rooted in her ignorance of the law does not relieve her of the well pled claims that she exhibited animus toward Plaintiff's disability needs throughout the process and ultimately denied Plaintiff protection as a result of that animus.

7. **Sections 1985(3) and 1986 conspiracy claims** are adequately pleaded based on coordinated acts among DHR employees with disability-related animus or effect.  These acts have caused, and continue to cause, harm to Plaintiff.  The harms have included trauma from Plaintiff's false imprisonment, which was instigated by an intentional lie documented and transmitted to police by multiple DHR employees when Plaintiff pressed too hard for emergency action on her case. This "meeting of minds" to take action against the Plaintiff was documented in DHR's own submissions, yet ignored by the R&R. But, the worst of the harms against the Plaintiff remain the physical and mental anguish resulting from the ongoing abuse of Plaintiff's disability rights by her landlord; a situation that has gone unresolved while all State actors, including the Attorney General's Office, knowingly and collectively, refuses to give Plaintiff equal protection under the very laws meant to shield her from such abuse.  This has resulted in Plaintiff living in excessive pain and unable to function and participate in daily life in the same manner as others in the community.

6

**IV. Plaintiff States a Viable Claim Under Section 504 of the Rehabilitation Act – Failure to Accommodate and Third-Party/Programmatic Discrimination**

8. **Section 504 of the Rehabilitation Act** provides: "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

9. **To state a claim**, Plaintiff must allege: (1) she is a qualified individual with a disability; (2) the defendant is a recipient of federal financial assistance; and (3) she was excluded from participation in, denied the benefits of, or subjected to discrimination under the program "solely by reason of" her disability. *Alexander v. Choate*, 469 U.S. 287, 304 (1985).

10. **Plaintiff satisfies these elements**: **(1)** She has a TBI causing migraines and vertigo triggered by chemical irritants (including cigarette and vape smoke) and mobility impairments. FAC ¶¶ 99-100, 147. **(2)** DHR receives federal FHAP funds to investigate and enforce HUD-referred disability housing complaints. (Dkt. 76  Ex. 1;  and Dkt. 101 Exs. 1–2 (HUD-DHR Worksharing Agreement)).  **(3)** as follows:

11. **DHR subjected Plaintiff to discrimination in its federally funded program in two related ways.**

    a) **First**, DHR refused Plaintiff reasonable accommodations in its own investigative process, they then refused to transfer the case to the disability unit, ignored her documentary evidence and video of the doorman assault, delayed or failed to interview key witnesses, and relied on a biased tenant "survey" of only two non-

7

disabled individuals. FAC ¶¶ 225, 230-31; Dkt. 101 pp. 9–14. These failures denied Plaintiff meaningful access to DHR's complaint-processing program.

b) **Second**, DHR failed to protect Plaintiff from the landlord's ongoing disability discrimination (smoke/vape fumes and inaccessible doors) through the FHAP-funded program designed to remedy such violations. DHR credited the landlord's "interactive process" offers… each of which were either unlawful (building code violation, constructive eviction) or ineffective … while ignoring Plaintiff's evidence, conducted no meaningful conciliation, and issued a "no probable cause" determination without thorough investigation. This constitutes programmatic or "third-party" discrimination: DHR, as a federal fund recipient, discriminated against Plaintiff **in the administration of its funded program** by failing to enforce her disability rights against the third-party landlord.

12. **Sovereign immunity is waived for § 504 claims** by acceptance of federal funds. 42 U.S.C. § 2000d-7. Plaintiff seeks both damages (for intentional discrimination) and prospective injunctive relief (vacatur and remand for FHAP-compliant processing).

## V. Plaintiff's Disability Claims Are Not Limited to Classic "Animus" Discrimination – R&R Ignores Evidence Supporting Failure-to-Accommodate and Programmatic Enforcement Theories

13. The R&R appears to interpret Plaintiff's ADA Title II and RA § 504 claims as requiring proof that DHR acted with explicit hostile animus "**because**" Plaintiff is disabled. That is **not the correct or complete standard**. Plaintiff's claims rest primarily on two well-recognized theories mentioned above and further explored below, with specific details corroborated by evidentiary submissions that were ignored in the R&R. Those claims do

**not** demand proof of animus: **(a) failure to provide reasonable accommodations/modifications in DHR's own processes**, and **(b) discrimination in the administration of a federally funded program through failure to enforce Plaintiff's disability rights against a third party** (the landlord).

### a)  Failure to Accommodate / Reasonable Modifications (ADA Title II and RA § 504)

ADA Title II prohibits public entities from discriminating "on the basis of disability" in any "service, program, or activity." 42 U.S.C. § 12132. The statute's implementing regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

The Second Circuit has interpreted Title II broadly: it covers "anything a public entity does." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44–45 (2d Cir. 1997) (zoning decisions are covered because they are a normal governmental function). DHR's housing-complaint investigation and processing is unquestionably a "program or activity" of a public entity.

Plaintiff requested three reasonable modifications/accommodations for her known TBI and its associated pain 1) that DHR meet the 30 day deadline to begin processing her case (if not sooner) due to the pain she was in; 2) allow Plaintiff a 30-day extension to rebut and; 3) transfer of Plaintff's case to the disability unit.

1) Chelsea John and DHR, not only did not meet the 30 day deadline ascribed by HUD, but when Plaintiff pressed for action to accommodate the fact that she was in physical pain, John called the police and ordered Plaintiff be subjected to an unnecessary psychological evaluation. DHR proceeded to ignore Plaintiff's suffering and took 37 days to take even the first step of mailing the complaint to Plaintiff for a signature. They then took 1 year and 1 month to issue a baseless dismissal. At no point did they ever consider or accommodate Plaintiff's pain or disability needs. Not in timely processing or in the crafting of their final determination dismissing Plaintiff's claims.

2) On July 19, 2023 Plaintiff's Landlord's responded to Plaintiff's complaint, but DHR did not notify Plaintiff until nearly three months later on October 10, 2023. Plaintiff was then told she had until October 23, 2023, only 13 days, to rebut. The following day, on October 11, 2023 Plaintiff asked for a 30 day extension. No one responded to Plaintiff until October 18, a week later. Chelsea John then proceeded to inform Plaintiff that a 30 day extension would not be allowed regardless of her disability. This was despite John, earlier informing Plaintiff that a 30 day extension was standard for the Landlord. After much distress Plaintiff was finally able to appeal to the Disability Department Director, who, after another two days of arguing with John, forced her to oblige Plaintiff's need for the accommodation. And while the accommodation was ultimately offered, requiring Plaintiff to beg and fight for her rights was a source of extreme distress, frustration and humiliation. That is a violation of Plaintiff right to be

10

free from intimidation, interference or retaliation while exercising her rights to request an appropriate accommodation.

3) John maintained her hostility toward Plaintiff's requests for accommodations when she refused to accommodate Plaintiff's request to have her case transferred to the disability department. John's animus toward Plaintiff's requests for any accommodation remained consistent throughout the Plaintiff's interaction with DHR; and ultimately showed up in the bias evident in the Determination and Order John authored dismissing Plaintiff's case without taking any genuine account of Plaintiff's rights or needs as they related to her disability.

DHR denied or limited every request Plaintiff made for accommodations; and the only one offered had to be wrenched out of John against her will.  DHR ignored Plaintiff's mountain of evidence and retaliated with a false suicide report after she pressed for an accommodation to prioritize her case. These actions denied Plaintiff meaningful access to DHR's complaint-processing program. No proof of hostile animus is required — only that DHR knew of the disability and the need for modification but failed to provide it. *Alexander v. Choate*, 469 U.S. 287 (1985) (focus is on equal opportunity and meaningful access).  And, ultimately, DHR carried their "refusal to accommodate" philosophy through to their final Determination and Order dismissing Plaintiff's case.

RA § 504 imposes parallel obligations in federally funded programs and is interpreted consistently with Title II.

11

**b) Programmatic / Third-Party Enforcement Discrimination (Primarily RA § 504)**

Because DHR receives federal FHAP funds to investigate and remedy disability-based housing discrimination (24 C.F.R. Part 115), its failure to do so properly can itself constitute discrimination against a disabled complainant **in that funded program**. DHR's delays, ignored witnesses, biased survey, lack of effective conciliation, and "no probable cause" finding without thorough investigation denied Plaintiff the benefits of the very program HUD paid DHR to administer. This is programmatic discrimination and includes failure to protect against third-party (landlord) violations within the funded scheme.

The New York State Comptroller Audit 2023-S-26 (Dkt. 101 Ex 3) confirms these failures are systemic, not isolated, supporting a custom-or-policy theory under § 1983 as well.

These theories are standard and do not require Plaintiff to prove DHR acted with classic "because I am disabled" animus. The R&R's apparent focus on animus alone was error. Plaintiff's FAC and (Dkt. 101) plead facts satisfying both failure-to-accommodate and programmatic theories under ADA Title II and RA § 504.

## VI. DHR's FHAP Violations Reinforce All Claims

14. DHR's participation in HUD's Fair Housing Assistance Program (24 C.F.R. Part 115) required timely, thorough, and effective processing, including reasonable accommodations in the investigative process and effective conciliation. Plaintiff's HUD-

12

referred complaint triggered these obligations, which DHR violated as detailed in the table below and the Comptroller Audit (Dkt. 101 Ex. 3):

| FHAP Requirement Violated | Facts from Plaintiff's Case | Citation |
|---|---|---|
| Timely processing | 37+ day delay initiating action violated 30 day limit; Took more than a year to process complaint (April 10, 2023 – May 10, 2024) | 24 C.F.R. § 115.206(e) |
| Thorough investigation | Delayed/ignored witnesses; biased 2/29 tenant survey; ignored assault video, texts, emails, photographs and audio recordings | § 115.206(c) |
| Accommodations in process | Denied full TBI extension until forced to comply on appeal to disability director; refused transfer to disability-unit | RA § 504 / FHAP fair process |
| Effective conciliation/enforcement | No conciliation attempted; straight "no probable cause" | HUD Worksharing Agreement (Dkt. 101 Ex. 2) |
| Non-retaliatory process | False suicide report after frustrated call asking for accommodation | FHAP integrity requirements |

15. These violations independently support RA § 504 programmatic discrimination, § 1983 claims, and the need for prospective injunctive relief.

13

**VII. Objections to Assessment of City related claims  - Expanded Monell Liability**

16.  Although the R&R recommends allowing Plaintiff's unlawful-imprisonment § 1983 claim against City Defendants to proceed, the District Court must conduct de novo review of the full record, including Plaintiff's detailed Opposition to the City Motion to Dismiss (Dkt. 96). That Opposition establishes a **clear, persistent, and unconstitutional custom or policy** under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that goes far beyond a single incident. The City's repeated weaponization of NYPD and FDNY EMS responses to intimidate and punish Plaintiff for asserting her disability rights constitutes deliberate indifference and is the moving force behind the constitutional violations. The R&R's narrow focus on only the most recent incident ignores the broader pattern pleaded and documented in Dkt. 96, which must be considered on de novo review.

a)    **Monell Liability – Policy, Custom, and Failure to Train**
A municipality is liable under § 1983 when a policy or custom causes the constitutional deprivation. *Monell*, 436 U.S. at 694. Plaintiff has plausibly alleged **multiple independent paths** to *Monell* liability, any one of which survives dismissal:

i.    **Widespread Custom or Practice So Persistent It Constitutes Official Policy.**
Over many years numerous incidence have shared a common thread — EACH TIME Plaintiff was confronted by NYPD and NYFD EMT's while asserting her disability rights (in the shelter system, at HRA and in her apartment building)

14

Plaintiff has been subjected to (**six) unnecessary forced psychological evaluations**, (four) physical assaults by officers, and repeated warrantless entries (one into her apartment in her absence and a separate incident entailing entering of her bag without her knowledge). (Dkt. 96 at 6–9, 12–13.)  Each time, NYPD and FDNY EMS relied on unverified third-party hearsay (including from DHR/CCHR) without corroboration or assessment of Plaintiff's on-scene denials and rational explanations. Officers explicitly stated on video that they were "not required" to listen to Plaintiff and acted "by policy."

The Second Circuit recognizes that "allegations of multiple instances of police misconduct against the same individual raise significant questions about the existence of a custom or policy." *Davis v. City of New York*, 2014 WL 1011070, at * (S.D.N.Y. Mar. 14, 2014); see also *Baker v. City of New York*, 2015 WL 4393000 (E.D.N.Y. July 15, 2015) (repeated false arrests and excessive force against same plaintiff support *Monell*). A pattern this consistent and directed at one disabled individual who repeatedly asserts her rights is not random — it is a custom. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (failure to investigate complaints can establish custom of nonsupervision amounting to deliberate indifference).

ii.    **Failure to Train or Supervise Rising to Deliberate Indifference**

Policymakers knew "to a moral certainty" that officers would confront hearsay reports of suicidal risk or mental-health crises. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)). Yet the City failed to train officers to apply the same probable-cause

15

scrutiny required for any liberty deprivation — including assessing credibility, considering the subject's statements, and demanding corroboration rather than relying on hearsay alone. *Addington v. Texas*, 441 U.S. 418 (1979) (clear and convincing evidence required for civil commitment); *Spinelli v. United States*, 393 U.S. 410 (1969) (hearsay alone insufficient).

The City's own officers admitted on video they were trained **not** to listen to the person being seized. This is deliberate indifference, not mere negligence. When the wrong choice (unjustified seizure) is made repeatedly, it "frequently cause[s] the deprivation of a citizen's constitutional rights." *Jenkins*, 478 F.3d at 94. The pattern across shelter system and apartment incidents proves the training deficiency was the moving force. *City of Canton*, 489 U.S. at 390–91.

### iii.    So Consistent That Policymakers Must Have Been Aware

Plaintiff filed complaints with the Comptroller's Office, CCHR, Public Advocate, and CCRB — all of which put City policymakers on notice of the repeated violations. Dkt. 96 at 14. The City's failure to correct the custom despite actual or constructive notice establishes deliberate indifference. *Vann*, 72 F.3d at 1049 (failure to investigate citizen complaints supports *Monell*).

### b)  Qualified Immunity Does Not Protect Individual Officers or City at This Stage

Qualified immunity does not attach where probable cause is plausibly absent. Officers lacked arguable probable cause when they relied solely on hearsay after Plaintiff and witnesses denied any crisis, Plaintiff was not home, and she rationally explained the

16

situation. *Wright v. City of Philadelphia*, 409 F.3d 595 (3d Cir. 2005) (analogous); see also *Guan v. City of New York*, No. 20-4002 (2d Cir. 2022) (arguable probable cause required). The City's attempt to paint Plaintiff as delusional is directly contradicted by her video evidence (which the City has withheld via FOIL delays). These facts create triable issues that cannot be resolved on a motion to dismiss.

### c) City Actions Reinforce ADA Title II/V and RA Claims

The City's pattern of using NYPD/FDNY EMS to intimidate Plaintiff while she sought enforcement of her disability rights constitutes denial of "services" (law enforcement protection) and retaliation for asserting ADA rights. This violates ADA Title II (reasonable modifications in any public program) and Title V (retaliation/interference), as well as RA § 504 (in funded programs). (Dkt. 96), Point II. The weaponization of mental hygiene laws to punish disability-rights assertions is particularly egregious and supports the continuous-cause-of-action doctrine.

The R&R must be read in light of the full record in (Dkt. 96). The City's attempts to minimize the pattern as isolated or "conspiracy theory" are disgraceful and contradicted by Plaintiff's video evidence and medical records. On de novo review, the Court should allow all related *Monell*, ADA, and RA claims against the City to proceed alongside the unlawful-imprisonment claim.

## VIII. Request for Relief

17. For the foregoing reasons, and in light of the failure-to-accommodate and programmatic theories explained above, Plaintiff respectfully requests that the Court:

17

1) Reject the R&R's recommendation as to **all State Defendants** in full;

2) **Deny** State Defendants' Motion to Dismiss (Dkt. 75-78) **in its entirety** (except as to § 1981, which Plaintiff concedes should be dismissed with prejudice);

3) Adopt the recommendation allowing Plaintiff's unlawful-imprisonment § 1983 claim to proceed; and reject the R&R recommendation to Grant dismissal of all other claims against the City Defendants. **Deny** City Defendants' Motion to Dismiss (Dkt. 73-74) in its entirety.

4) Schedule an initial pretrial conference; and

5) Grant such other and further relief as the Court deems just and proper, including prospective injunctive relief vacating the DHR Determination and Order and remanding for proper FHAP-compliant processing.

Plaintiff requests oral argument.

Dated: New York, New York

    April 6, 2026

Respectfully submitted,

Kelly MacNeal
507 W 28th Street
New York, NY 10001
212-581-3223
Macnificent2016@gmail.com
*Pro se Plaintiff*

Cc:  **VIA ECF**
    Joseph Zangrilli
    New York City Law Department
    100 Church Street
    New York, NY 10007
    (212) 356-2657
    jzangril@law.nyc.gov
    *Attorney for Codefendant City of New York  -  Senior Counsel*

    Jack McLaughlin
    New York City Law Department
    100 Church Street

New York, NY 10007
(212) 356-2670
jmclaugh@law.nyc.gov
*Attorney for Codefendant City of New York - Assistant Corporation Counsel*

Bronwyn M. James
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8627
Email: Bronwyn.James@ag.ny.gov
*Attorney for Codefendant State of New York*

19